1  Jeffrey L. Fazio (146043) (jlf@fazmiclaw.com)
   Dina E. Micheletti (184141) (dem@fazmiclaw.com)
2  **FAZIO | MICHELETTI LLP**
   1111 Broadway, Suite 400
3  Oakland, CA  94607
   T: 925-543-2555
4  F: 925-369-0344

5  Keliang (Clay) Zhu (305509) (czhu@dehengsv.com)
   Andre Y. Bates (178170) (aybates@dehengsv.com)
6  Yi Yao (292563) (yyao@dehengsv.com)
   **DEHENG LAW OFFICES, P.C.**
7  Silicon Valley Office
   7901 Stoneridge Drive, Suite 208
8  Pleasanton, CA 94588
   T: 925-399-5856
9  F: 925-397-1976

10 *Attorneys for Plaintiff*
   *Robert M. Becker, on behalf of himself*
11 *and all others similarly situated*

12                  UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14

15 ROBERT M. BECKER, on behalf of himself     No. 3:25-cv-05331-SK
   and all others similarly situated,

16      Plaintiff,                            **SECOND AMENDED COMPLAINT FOR
                                              DAMAGES AND EQUITABLE RELIEF**
17           *v.*
                                              **CLASS ACTION**
18 VOLVO CARS OF NORTH AMERICA,
   LLC, a Delaware limited liability company;  **JURY TRIAL DEMANDED**
19 VOLVO CAR USA, LLC, a Delaware limited
   liability company; and VOLVO CARS AB
20 (publ.), a Swedish public limited company,

21      Defendants.



1      Plaintiff, Robert M. Becker, and all others similarly situated (collectively, "Plaintiff"),

2  alleges against Defendants Volvo Cars of North America, LLC, Volvo Car USA, LLC, and Volvo

3  Cars AB (collectively, "Volvo") as follows upon personal knowledge as to Plaintiff's own conduct

4  and experience, and on information and belief as to all other matters based on an investigation by

5  counsel, which forms the basis for the good-faith belief that the factual contentions herein have

6  evidentiary support or will likely have evidentiary support after a reasonable opportunity for

7  further investigation or discovery:

8  **INTRODUCTION**

9      1.    This case arises from a recurring safety defect in 2021–2024 Volvo XC40 Recharge

10  electric vehicles (the "**Class Vehicles**"): Uncommanded Vehicle Propulsion ("**UVP**")—forward

11  or rearward movement (including surging, lurching, or acceleration) initiated by the powertrain

12  control system without a corresponding driver throttle command and contrary to driver intent. UVP

13  occurs most often during low-speed maneuvers and gear transitions (including in One-Pedal Drive)

14  and can impair or delay the intended brake-throttle override function (the "**Powertrain Control**

15  **Defect"**), often without storing a persistent diagnostic trouble code observable at retail service.

16      2.    Within 24 hours of delivery, while using his vehicle in a reasonably foreseeable

17  and intended manner on his driveway, Plaintiff Becker experienced UVP: his XC40 Recharge

18  moved forward without throttle input and traveled a measurable distance—documented on video

19  with physical markers showing how far his Class Vehicle had moved on its own—before abruptly

20  braking to avoid a collision with another car. The UVP recurred and was independently replicated

21  by the Volvo-authorized dealership's service manager on (a) Plaintiff's vehicle and (b) a

22  brand-new, unsold XC40 Recharge on the lot. The vehicle had not been altered or misused, and

23  reasonable secondary causes (*e.g.,* pedal misapplication, foreign objects, aftermarket

24  modifications) were ruled out by inspection. Under the malfunction doctrine (and RESTATEMENT

25  (THIRD) OF TORTS § 3), these facts support a reasonable inference that the vehicle contained a

26  defect when it left Volvo's control.

27      3.    The Powertrain Control Defect can transform everyday locations into zones of high

28  risk. A family driveway, a crowded grocery store parking lot, a car wash, or a stoplight can

**-1-**         3:25-cv-05331-MMC
SECOND AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1    instantly become the scene of a terrifying UVP incident. As documented by numerous owners, the

2    defect causes the vehicle to suddenly jump forward or backward—sometimes by mere inches,

3    sometimes by several feet—in the very low-speed environments where drivers, pedestrians, and

4    children should feel safest. These are not mere glitches; they are heart-stopping moments where a

5    "near-miss" is separated from tragedy by only a driver's split-second reaction.

6        4.    Nonetheless, Volvo has characterized Plaintiff's and other UVP events as normal

7    vehicle behavior, even as it has (a) deployed specialized data recorders to capture anomalous

8    control signals reported in the field and (b) conducted a safety recall addressing a subset of

9    conditions capable of producing similar behavior (*e.g.*, accelerator-pedal harness water intrusion).

10   The recall covered just over 5,000 Class Vehicles—a mere fraction of those that were produced

11   and sold in the 2021 and 2022 model years to which the safety recall applied. UVP persisted before

12   and after that campaign and continues to be reported to NHTSA and elsewhere to this day.

13       5.    Volvo's own actions and records confirm the root cause lies within systems and

14   data under Volvo's control—including pre-release testing artifacts, dealer reports, internal

15   engineering reviews, and consumer complaints (including from vehicles sharing the XC40

16   Recharge platform).

17       6.    The Powertrain Control Defect is a systemic fragility that is intermittent and

18   electronic in nature: it is triggered by fleeting control/communications anomalies that are difficult

19   for standard diagnostics to capture and can impair safety-override logic. Whether denominated

20   "manufacturing" or "design," Volvo's downplaying and concealment of the defect violate

21   common-law fraudulent concealment, statutory consumer-protection laws, and warranty

22   obligations.

23       7.    Indeed, on March 21, 2025, a Volvo Critical Incident Coordinator—the corporate

24   function that triages and coordinates critical-incident reviews with engineering and executive

25   leadership, collaborates with technical staff on root-cause analysis and corrective actions, and

26   documents outcomes for regulatory/legal compliance—informed a customer whose 2023 XC40

27   Recharge was severely damaged in a UVP incident that, after a thorough internal review, "***there***

28   ***was a manufacturing defect at the time of the incident***." (Emphasis added.) As alleged below,

FAZIO | MICHELETTI LLP
Attorneys

1  those responsibilities place the statement squarely within the scope of agency, making it an

2  admission by a party-opponent.

3      8.    Volvo markets its vehicles on safety and commands a premium price as a result of

4  that marketing. Yet Volvo continued to sell and lease Class Vehicles despite its awareness that the

5  Powertrain Control Defect jeopardizes drivers, occupants, and bystanders—repeatedly dismissing

6  owner reports as normal while profiting from its safety reputation.

7      9.    Plaintiff and members of the proposed Class paid for safe, defect-free vehicles and

8  did not receive them. Plaintiff seeks damages, restitution, and injunctive relief requiring Volvo to

9  remedy or repurchase Class Vehicles.[1]

10 ## **PARTIES**

11     10.    Plaintiff Robert Becker is an individual citizen of California, residing in the

12 Northern District of California. On or about September 13, 2024, Plaintiff leased a new 2024

13 Volvo XC40 Recharge. Plaintiff has personally experienced the Defect in his vehicle, including

14 multiple instances of unexpected surging and lurching while operating the vehicle. At the time he

15 leased his vehicle, Plaintiff was aware of and relied upon Volvo's pervasive representations of

16 safety, reliability, and quality—representations made in its advertising, its corporate messaging,

17 and its written warranties. Plaintiff understood these representations to promise that his vehicle

18 would be safe and free from dangerous defects in materials and workmanship. He also understood

19 that Volvo's warranty meant that his vehicle would be repaired in the event of a problem. Within

20 the first month of his lease, and well within the warranty period, Plaintiff presented his vehicle to

21 an authorized Volvo dealership to diagnose and repair the Defect, but Volvo claimed that the UVP

22 event was a normal function of the vehicle.

23     11.    Defendant Volvo Cars of North America, LLC ("**VCNA**"), is a Delaware limited

24 liability company with its principal place of business in Mahwah, New Jersey. Among other things,

25

26

---

27 [1] As discussed below, Plaintiff has served CLRA notice under Cal. Civ. Code §§ 1782(a) and
   1794(d)(3). In the CLRA notice, Plaintiff requested that Volvo preserve evidence, including
28 information and tangible things relevant to the claims and defenses herein.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**



FAZIO | MICHELETTI LLP
Attorneys

1  VCNA serves as Volvo AB's regional operational hub for marketing, brand communications, and
2  warranty program administration in the United States and Canada.

3       12.    Defendant Volvo Car USA, LLC ("**VCUSA**"), is a Delaware limited liability
4  company with its principal place of business in Mahwah, New Jersey. VCUSA is a wholly owned
5  subsidiary of Volvo AB and serves as the exclusive importer and distributor of Volvo passenger
6  vehicles in the United States. Among other things, VCUSA is responsible for U.S. sales,
7  marketing, warranty administration, and dealer communications.

8       13.    Defendant Volvo Cars AB ("**Volvo AB**") is a Swedish public limited company
9  headquartered in Gothenburg, Sweden. Volvo AB is the ultimate parent of numerous operating
10  subsidiaries worldwide, including VCUSA. Volvo AB is majority-owned and controlled by
11  Zhejiang Geely Holding Group Co., Ltd., but exercises independent operational control over the
12  design, engineering, and production of all Volvo passenger vehicles, including the Class Vehicles
13  at issue in this action. Volvo AB's engineering divisions and wholly-owned subsidiaries—such as
14  Zenseact AB (vehicle control software) and HaleyTek AB (infotainment software)—develop, test,
15  and approve the powertrain control software and calibration parameters used in the Class Vehicles.
16  Volvo AB also issues engineering-level technical guidance to its global subsidiaries, including
17  VCUSA, concerning service policies and responses to customer complaints.

18       14.    As the manufacturer of the Class Vehicles, Volvo AB holds the California Air
19  Resources Board ("**CARB**") Executive Orders demonstrating compliance with California's Zero
20  Emission Vehicle ("**ZEV**") requirements and all related standards and accrues the ZEV credits
21  necessary for its vehicles to be sold and leased in California.

22                    **JURISDICTION AND VENUE**

23       15.    This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005,
24  28 U.S.C. § 1332(d)(2), because this is a class action involving more than 100 class members, the
25  aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there is
26  diversity of citizenship between many members of the proposed class and Defendants.

27       16.    This Court has personal jurisdiction over Defendants. VCNA and VCUSA conduct
28  substantial business in California, and the wrongful conduct alleged herein, including decisions

SECOND AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

FAZIO | MICHELETTI LLP
Attorneys

1 related to the design, manufacture, marketing, and sale of the Class Vehicles, and the concealment of

2 the Defect, occurred in and/or had substantial effects in California.

3    17.    Volvo AB is the manufacturer of the Class Vehicles and is subject to specific personal

4 jurisdiction in this District because it purposefully directed—***and continues to direct***—the design,

5 certification, marketing, advertising, and distribution of the XC40 Recharge toward California

6 consumers, and this action arises directly from those contacts. Among other forum-directed activities,

7 Volvo AB

8        a.    obtained CARB Executive Order A-18-0224-1 (and successor amendments)

9 certifying the XC40 Recharge for sale in California, thereby intentionally placing the vehicle into the

10 California stream of commerce;

11        b.    authored, owns, and enforces the global "Volvo Experience & Identity

12 Guideline" (the "Brand Book"), which states that ***"[p]romotion of all Volvo product and service***

13 ***offerings must always be Volvo-branded and follow the guidelines outlined in this document***."

14 Brand Book at 5 (2022 ed.) (emphasis added). The Brand Book's mandatory rules—drafted and

15 updated by Volvo AB's Global Brand & Communications team in Gothenburg—govern U.S. dealer

16 signage, advertising layouts, and the use or placement of safety tag-lines;

17        c.    pre-approves or requires approval of safety messaging disseminated in the

18 United States, including the corporate safety tagline "Safety first, always." That phrase (and slight

19 variants) appears in Volvo Cars' global newsroom materials (*e.g.*, June 15, 2023, EX30 press release)

20 bearing the notice "© Volvo Car Corporation," confirming headquarters authorship and copyright

21 ownership;[2]

22        d.    controls the authorized-dealer network in California through technical

23 journals, warranty directives, and marketing-compliance audits, requiring dealers to submit proposed

24

25

---

26 [2] *See* VolvoCars.com, "Cutting carbon, not corners: What makes the EX30 Volvo's most
sustainable car yet?" (June 16, 2023) ("Safety first, always" slogan appears verbatim and attributes
27 copyright ownership to "Volvo Car Corporation," a common reference to Volvo AB), available
online at https://www.volvocars.com/au/news/sustainability/2023-june-cutting-carbon-not-
28 corners/ (accessed July 24, 2025).



1    advertisements to Volvo AB's Brand Portal for approval and to remedy any deviation from the Brand

2    Book; and

3         e.    derives hundreds of millions of dollars in annual revenue from California

4    sales of Volvo vehicles—revenue that flows upstream to Volvo AB through its wholly-owned U.S.

5    subsidiaries.

6    18.    The Powertrain Control Defect that manifested in Plaintiff's Class Vehicle is the direct

7    result of Volvo AB's design, engineering, and manufacturing decisions—decisions made with the

8    express intent to leverage California's regulatory and marketing environment—and the resulting

9    vehicles were promoted to Plaintiff under Volvo AB-approved safety advertising. But for Volvo AB's

10   strategic choice to design, certify, and advertise the XC40 Recharge in California under the "Safety

11   first, always" promise, Plaintiff and Class Members would not have purchased or leased the defective

12   vehicles and would not have suffered the attendant economic or safety harms.

13   19.    Exercising jurisdiction over Volvo AB therefore comports with fair play and

14   substantial justice: California has a paramount interest in adjudicating safety-defect disputes

15   involving vehicles operated on its roads, and Volvo AB—a global automaker that purposefully avails

16   itself of the California market and exercises cradle-to-grave control over design, certification,

17   distribution, and advertising—faces no undue burden litigating here.

18   20.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Plaintiff resides in

19   this District, and a substantial part of the events, omissions, and harms giving rise to these claims

20   occurred in this District.

21   **FACTUAL ALLEGATIONS**

22   **VOLVO'S CORPORATE STRUCTURE**

23   21.    Volvo AB exercises centralized control over the design, engineering, and

24   production of all Volvo passenger vehicles worldwide, including the Class Vehicles alleged

25   herein. Volvo AB's wholly owned subsidiaries, such as Zenseact AB and HaleyTek AB, develop,

26   test, and approve the powertrain control software and related calibration parameters used in the

27   Class Vehicles. Volvo AB also issues engineering-level technical guidance and service policies

28   to its global distribution subsidiaries.

FAZIO | MICHELETTI LLP
Attorneys

22.     Volvo AB approved and deployed the powertrain control software that governs throttle and regenerative braking behavior, including "one-pedal drive" mode; implemented internal engineering measures to investigate unintended acceleration complaints, including flight recorder installations in certain vehicles to capture anomalous control signals; issued engineering-level service guidance to subsidiaries, including VCUSA, labeling certain customer complaints about unintended surging as "normal function" and instructing dealers to refrain from making repairs unless corporate engineering authorized them; maintained direct oversight of Zenseact (software engineering) and HaleyTek (infotainment), both wholly owned subsidiaries supporting Class Vehicle control systems; and developed, approved, and disseminated global advertising content and brand messaging, including safety campaigns ("Safety first, always"), which VCUSA used in U.S. marketing without disclosing known low-speed surging risks.

23.     VCNA acts as Volvo AB's North American operational arm for marketing and warranty programs. VCNA develops and executes Volvo's regional advertising campaigns and brand communications in the United States and Canada, shaping consumer perceptions of Volvo vehicle safety and reliability. VCNA also administers new vehicle warranties, Certified Pre-Owned programs, and extended service plans (including Protection Plus+ and VIP coverage). Acting under corporate directives from Volvo AB, VCNA implemented policies that perpetuated Volvo AB's concealment of the Defect by promoting Class Vehicles using Volvo's global "Safety first, always" messaging while following instructions to treat surging complaints as "normal function" and limit warranty remedies.

24.     VCNA designed and executed North American advertising campaigns, while VCUSA disseminated those campaigns through U.S. dealer channels. VCNA's marketing role focused on regional brand strategy and consumer-facing campaigns, whereas VCUSA implemented those campaigns at the retail level, coordinating with authorized dealers for local dissemination and compliance.

25.     VCUSA is Volvo AB's U.S. distribution and customer-facing arm. Acting as Volvo AB's agent, VCUSA imports, markets, and sells Volvo passenger vehicles in the United States, administers warranty coverage, and communicates with U.S. dealers and customers.

FAZIO | MICHELETTI LLP
Attorneys

Pursuant to corporate policies and technical guidance from Volvo AB, VCUSA disseminated marketing materials touting the Class Vehicles' safety and performance and implemented service policies that downplayed or dismissed customer complaints about the Defect as "normal function." These actions were performed in furtherance of Volvo AB's concealment of the defect.

26.    VCUSA marketed Class Vehicles to U.S. consumers using Volvo's global safety messaging ("Safety first, always") without disclosing known low-speed surging risks; disseminated Technical Journals (Volvo's term for Technical Service Bulletins (TSBs)) and service procedures that incorporated Volvo AB's instructions not to attempt repairs absent corporate authorization; and denied warranty coverage for surging complaints by citing "normal function," even when local dealership personnel replicated the issue, thereby concealing the defect at the point of service.

27.    As the U.S. distributor and warrantor, VCUSA issued the New Vehicle Limited Warranty and controlled the administration of warranty claims in the United States. Following direction from Volvo AB, VCUSA denied or limited repairs for surging complaints.

28.    Volvo AB knew, before and at the time of sale, that the powertrain control software had calibration parameters that could cause UVP during low-speed drive and reverse maneuvers. Volvo AB nonetheless approved production releases and exported affected vehicles worldwide, including to the United States and California.

**THE POWERTRAIN CONTROL DEFECT MANIFESTED THE DAY AFTER PLAINTIFF TOOK DELIVERY OF HIS CLASS VEHICLE, WHICH VOLVO DISMISSED AS A "NORMAL FUNCTION"**

29.    Plaintiff Becker leased his 2024 model-year Volvo XC40 Recharge on September 13, 2024. When he attempted to move the vehicle rearward out of his downward-sloping driveway the following day—September 14, 2024—Plaintiff's Class Vehicle surged forward approximately 20 inches after putting the transmission into Reverse, requiring him to immediately apply the brakes and put the transmission into Park before re-engaging the desired gear. Plaintiff soon discovered that his Class Vehicle would also suddenly surge rearward if parked on an incline when the transmission was moved from Park to Drive, which likewise required the immediate application of brakes to avoid collision.

FAZIO | MICHELETTI LLP
Attorneys

30.    This erratic behavior presents a clear and substantial safety hazard, particularly in low-speed maneuvering scenarios such as parking lots and driveways, where the risk to vehicle occupants, pedestrians, and surrounding property is most acute. The UVP behavior Plaintiff's Class Vehicle exhibited is fundamentally inconsistent with reasonable consumer expectations regarding predictable vehicle control and safe operation.

31.    Plaintiff promptly reported this severe and persistent safety concern to Volvo through its authorized dealership, Volvo Cars Burlingame, from which Plaintiff leased his Class Vehicle. Specifically, Plaintiff advised the dealership about his Class Vehicle's propensity to "surge forward in reverse or roll backward in drive—sometimes by as much as 20 inches on a decline/incline." Plaintiff also provided the dealership with video documentation of his Class Vehicle manifesting the Powertrain Control Defect by including a link to the URL where the recording could be accessed.[3]

32.    The dealership's initial response demonstrated the seriousness of the reported safety concern. Service Manager Aldo Luna diagnosed the UVP issue and verified that the Defect became manifest in Plaintiff's Class Vehicle as well as another new Class Vehicle that had yet to be sold. Mr. Luna acknowledged that UVP affects other XC40 Recharges as well; specifically stating on the repair order that "CUSTOMER STATES THE VEHICLE SURGES FORWARD ABOUT 20 INCHES IN REVERSE ON A DECLINE ON FIRST STARTUP OR WHEN COLD. *We were able to verify the concern on this car as well as a new in stock unit on our ramp*." Ex. 1 at 1 (emphasis added). The repair order also documented that the dealership had "attached the customer supplied link to the YouTube video the customer posted of the concern to the case." *Id*.

33.    Despite verifying a safety defect affecting multiple vehicles, Mr. Luna ultimately advised Plaintiff that "[a]s far as Volvo is concerned at this time the vehicle is working as designed and this is a normal characteristic of the vehicle." Consequently, the dealership made no attempt to repair Plaintiff's Class Vehicle.

---

[3] A true and correct copy of the Volvo Cars of Burlingame repair order that pertains to Plaintiff's Class Vehicle is attached hereto as **Exhibit 1**. The URL of the YouTube video discussed in the repair order is https://www.youtube.com/watch?v=Zl4Zs_NaQKk. Personal information has been redacted from each of the three documents appended to this Complaint as Exhibits 4 through 6.



SECOND AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

34.     The dealership's failure to repair (or even attempt to repair) Plaintiff's Class Vehicle even after confirming that the defect affected other Class Vehicles heightened Plaintiff's safety concerns. Plaintiff therefore reported the matter to NHTSA shortly after his Class Vehicle was returned to him from the dealership.[4] The content of that report demonstrates both the severity of the safety hazard and the inadequacy of Volvo's response:

> I am a new leasee [*sic*] a Volvo XC40 Recharge (leased September 13, 2024). When starting my car from a decline on my driveway, or in a parking spot on a decline, ***after putting the car in reverse, the car immediately surges forward 20 inches before I have to hit the brakes again to make it stop from hitting a car in front of me. The same behavior occurs if I am parked on an incline and put the car in drive — it immediately surges backwards and I have to hit the brakes to make the car stop.*** This issue puts my and other cars parked in front or behind me at risk of being hit when trying to leave a parking spot. This issue was confirmed by the dealer (see attachment) and replicated on another XC40 Recharge that the dealer tested it on. The service rep stated that "As far as Volvo is concerned at this time the vehicle is working as designed and this is a normal characteristic of the vehicle." ***I am not sure why they would say this as a car should not surge forward when it reverse or backward when in drive. No other car in the history of my driving cars has ever done this.***

Ex. 2 at 1 (emphasis added).

35.     After receiving this federal safety report documenting the existence of the Powertrain Control Defect in multiple vehicles, Volvo Customer Care, through its representative "Matthew," formally responded to Plaintiff by asserting that the "***concern is a normal function of the vehicle and that no repair is currently needed.***" (Emphasis added.)[5]

36.     Volvo's characterization of a Class Vehicle's UVP as constituting "normal function" defies fundamental principles of predictable vehicle control and contradicts reasonable consumer expectations regarding vehicle safety. Volvo's assertion becomes even more troubling when viewed against Volvo's contemporaneous deployment of sophisticated diagnostic equipment to investigate substantially identical symptoms in other Class Vehicles.

---

[4] A true and correct copy of the report Plaintiff submitted to NHTSA on or about October 15, 2024, is attached hereto as **Exhibit 2**.

[5] A true and correct copy of Plaintiff's email correspondence with Volvo Customer Care on November 1, 2024, is attached hereto as **Exhibit 3**.


FAZIO | MICHELETTI LLP
Attorneys

**CLASS VEHICLES SUFFER FROM A COMMON POWERTRAIN CONTROL DEFECT**

37.     The Volvo XC40 Recharge is an all-electric compact SUV that Volvo markets as a safe, reliable, and technologically advanced vehicle. It is built on the Compact Modular Architecture (CMA) platform, co-developed by Volvo, and shares critical powertrain components and control systems with other vehicles, including the Polestar 2.

38.     Contrary to Volvo's representations of safety and reliability, Class Vehicles suffer from a latent Powertrain Control Defect that can cause the vehicle to behave erratically and dangerously. Yet, when tested on common diagnostic tools, the Powertrain Control Defect often does not produce a DTC, resulting in the drivers of Class Vehicles being told that there is nothing that can be done about the problem.

39.     Plaintiff submits that this systemic fragility is the product of a constellation of challenges within the Compact Modular Architecture (CMA) platform—an integration failure that creates a specific vulnerability where transient, sub-threshold electrical anomalies or digital signal corruption that are too fleeting to trigger a fault code are misinterpreted by Class Vehicles' complex predictive software, particularly the "One-Pedal Drive" logic. It appears that this misinterpretation can cause a Class Vehicle's control unit to issue an erroneous, and momentarily persistent, command for positive torque, resulting in dangerous UVP events experienced by Plaintiff and members of the proposed Class.

40.     UVP events often occur when shifting gears (*e.g.*, from Park to Drive or Reverse), particularly on an incline or decline, at low speeds (*e.g.*, while parking), and when the OPD system is active.[6] They also occur during low-speed maneuvers and at a standstill, causing Class Vehicles suddenly and abruptly lurch and jump.

---

[6] Industry literature explains, for example, that EV controllers may command a small positive torque at very low speeds to simulate "creep," and in some implementations that positive torque can persist even when the creep setting is disabled. *See* Ronald A. Belt, "A Cause of Sudden Acceleration in Battery-Powered Electric Vehicles—Rev 3" at 8 & n. 2 (Jan. 27, 2023), available online at https://www.autosafety.org/wp-content/uploads/2023/02/A-Cause-of-Sudden-Acceleration-in-Battery-Powered-Electric-Vehicles-Rev-3.pdf (accessed July 28, 2025).


FAZIO | MICHELETTI LLP
Attorneys

41. The Powertrain Control Defect appears to betray a fundamental flaw in Class Vehicles' safety architecture by causing an erroneous, but internally consistent "driver intent" signal for acceleration, bypassing or significantly delaying the activation of Class Vehicles' Brake-Throttle Override ("**BTO**") system. The BTO is designed to counter clear component failures rather than an algorithmic misinterpretation in which a Class Vehicle's control unit erroneously reacts as though it is executing a valid driver command to accelerate. This appears to render the ultimate fail-safe mechanism ineffective during these dangerous events: when One-Pedal Drive (OPD) is engaged and the defect misinterprets inputs as acceleration, the resulting "driver-intent" signal can delay or bypass the BTO fail-safe. These dangerous behaviors can occur even when the driver's foot is on the brake pedal and not on the accelerator pedal.

42. At bottom, the Powertrain Control Defect is not a "normal operating characteristic" as Volvo has claimed to customers, including Plaintiff. It is a dangerous flaw in Class Vehicles' design and manufacture of a complex assemblage of hardware and software.

### VOLVO WAS ACUTELY AWARE OF THE DEFECT AND CONCEALED IT

43. Volvo possessed exclusive and superior knowledge of the Powertrain Control Defect long before Plaintiff and Class Members leased or purchased their vehicles. Volvo alone had access to pre-release testing data, internal engineering assessments, dealership warranty submissions, and customer complaint logs that documented surging, lurching, and unintended acceleration.

44. Because Volvo's knowledge was not reasonably accessible to consumers, and because the Powertrain Control Defect poses an unreasonable safety risk (sudden unintended acceleration and loss of predictable braking/propulsion control), Volvo had a duty to disclose the Powertrain Control Defect at the point of sale or lease.

45. Volvo also made partial representations—touting "Safety first, always" and promising smooth, predictable control with One Pedal Drive—while concealing the Powertrain Control Defect's existence, nature, and scope. These partial disclosures triggered a further duty to speak fully and truthfully.

46. Volvo's knowledge of this specific failure pathway is further evidenced by its own remedial actions and internal investigations. As discussed below, the recall for the accelerator pedal

1  sensor harness (NHTSA Safety Recall 22V-288) put Volvo on express notice that the system was

2  vulnerable to corrupted input signals causing unintended acceleration.

3      47.    Furthermore, Volvo's deployment of sophisticated "flight data recorders" in

4  customers' Class Vehicles demonstrates its awareness of, and investigation into, complex,

5  intermittent events that were not being captured by standard on-board diagnostics. These actions are

6  inconsistent with a "normal characteristic"; rather, they are consistent with an investigation into a

7  transient, software-and-hardware-based anomaly, as alleged herein.

8      48.    Fundamental engineering principles informed Volvo that the Powertrain Control

9  Defect existed throughout the Class Period, well before Plaintiff and proposed Class Members

10  purchased or leased their Class Vehicles. Volvo's early and ongoing knowledge stems from

11  numerous sources, demonstrating a clear pattern of awareness and subsequent concealment as

12  enumerated below:

13      a.    **CMA Platform and Shared Component Development**: As a co-developer

14  of the CMA platform and its core electrical architecture, Volvo's extensive internal design, testing,

15  and validation processes should have revealed the propensities for the unintended and dangerous

16  behaviors associated with the Defect.

17      b.    **Early Evidence of System Instability (BECM)**: The Polestar 2, which

18  shares the CMA platform and critical components like the BECM with the XC40 Recharge, began

19  production in December 2019. Early Polestar 2 vehicles experienced critical powertrain failures,

20  including loss of propulsion, due to a software defect in the shared BECM. This knowledge of a

21  critical defect in an identical, shared component in a sister vehicle put Volvo on direct notice of the

22  powertrain control system's inherent instability.

23      c.    **Insufficient Safety Recalls**: Volvo's eventual, limited recalls serve as

24  admissions of its knowledge of the powertrain control system's inherent instability. These piecemeal

25  and unduly narrow recalls failed to address the full scope or all root causes of the Defect across all

26  Class Vehicles, further evidencing knowledge and an attempt to minimize the problem:

27      i.    **NHTSA Recall 21V-109 (Volvo Recall R10078)**: Issued for certain

28  2021-2022 XC40 Recharge vehicles for a BECM software fault causing loss of propulsion. This

1    recall addressed only one symptom of the system's instability in a limited subset of vehicles, failing

2    to cure the underlying control logic flaws that cause the dangerous surging and lurching that define

3    the Defect.

4            ii.    **NHTSA Recall 22V-288 (Volvo Recall R10170)**: Issued for certain

5    2021-2022 XC40 BEV vehicles for potential water ingress in the accelerator pedal sensor (APS)

6    harness. While addressing one hardware-specific trigger for unintended acceleration in a limited

7    production range, it did not address the Defect in vehicles outside this range or those experiencing

8    similar symptoms from other root causes, such as the CMA platform's flawed OPD control logic.

9    Although the recall involved two model years of Class Vehicles, only 2,278 were actually recalled

10   and, as discussed below, UVP incidents continue to this day.

11           d.    **Internal Data and Testing**: Volvo's pre-production testing, software

12   development logs, and early engineering assessments would have further highlighted the Powertrain

13   Control Defect's manifestations.

14           e.    **Early Consumer Complaints and Dealership Data**: Volvo received direct

15   complaints from consumers and data from its dealership network—including warranty claims, repair

16   orders, and technical assistance requests—detailing the Defect's manifestations shortly after launch.

17   Indeed, Volvo's knowledge is further evidenced by statements from its own agents, such as the

18   dealership service manager who, after diagnosing the issue in Plaintiff's Class Vehicle, stated that

19   the surging problem affects other XC40 Recharges as well.

20           f.    "**Electric Vehicle Technician designations**." On March 11, 2021, Volvo

21   issued a Service Manager Bulletin announcing a restrictive technician policy that choked off the

22   primary channel for defect diagnosis at the dealership level just as the first 2021 XC40 Recharge

23   vehicles were beginning to exhibit the early signs of the Powertrain Control Defect. The policy

24   established a strict multi-tiered hierarchy for technicians, with progressively more stringent training

25   required to perform more complex work, thereby ensuring that any investigation into a complex,

26   intermittent issue could not be performed by a typical dealership technician, but would require one

27   of the few, highly-trained AEVT-BEV technicians, creating a significant bottleneck that slows down

28   or prevents the diagnosis of systemic issues at the local level:

FAZIO | MICHELETTI LLP
Attorneys

1          i.     **Electric Vehicle Awareness (EVA):** Can perform no work on high-

2 voltage components.

3          ii.     **Electric Vehicle Technician (EVT):** Can de-energize the vehicle

4 and replace major HV components, but is explicitly forbidden from working on ***internal battery***

5 ***components***.

6          iii.     **Advanced Electric Vehicle Technician - BEV (AEVT-BEV):** Only

7 this highest-level technician is permitted to perform "live voltage work" and "internal battery

8 repairs," which would include diagnostics and repairs on the Battery Energy Control Module

9 (BECM) and related internal systems where the Defect resides. Although the policy was ostensibly

10 a proactive, safety-first initiative, its structure, timing, and practical effect went far beyond simple

11 safety and function as an information control mechanism. For example, although an EVT-certified

12 technician is fully trained and authorized to perform the most critical safety procedure: the de-

13 energization and re-energization of the high-voltage system, the policy explicitly prohibits those

14 technicians from performing "internal battery repairs," a vague term that would include investigating

15 the Battery Energy Control Module—notwithstanding that, once  the vehicle is safely de-energized

16 by a qualified EVT, the immediate electrical danger is neutralized. The restriction on ***who*** is allowed

17 to diagnose the already inert components is not a safety measure, but an administrative one. It limits

18 the pool of investigators to a small, elite group of AEVT-BEV technicians, centralizing the flow of

19 sensitive diagnostic information directly to Volvo. Consequently, if a customer reports an

20 intermittent surge to a local Volvo dealer who finds no error codes, the dealer is contractually

21 forbidden by this policy from investigating further if it lacks an immediately available AEVT-BEV

22 technician, and reports "cannot replicate" or "operating as designed" on the repair report. And, in a

23 Service Manager Bulletin (00-029) that it issued on September 17, 2021, Volvo imposed additional

24 requirements that made it even more difficult for local dealers to diagnose such problems and enabled

25 Volvo to enforce the entire system with financial penalties to ensure compliance. Thus, if no AEVT-

26 BEV-certified technicians are available at a given dealership, then under Volvo's policies no

27 diagnostic work on internal battery components—including the Battery Energy Control Module

28 implicated in the Defect—could proceed locally at all. This policy, when combined with Volvo's

FAZIO | MICHELETTI LLP
Attorneys

1    practice of dismissing complaints as a "normal function" and denying warranty coverage absent error

2    codes, functioned to suppress the discovery of systemic defects.

3           g.     **The "Volvo Complimentary Factory Scheduled Maintenance**

4    **'FSM220'" program**. On July 28, 2021, Volvo issued a TSB announcing that ***only*** 2021 model-

5    year "Recharge Pure Electric vehicles" were eligible for cost-free maintenance, which was a

6    strategic, preemptive measure by Volvo to mitigate and suppress early owner complaints about the

7    2021 XC40 Recharge—the very first model year to exhibit the powertrain defects at issue in this

8    litigation. By implementing this program in mid-2021, Volvo created a mechanism to placate the

9    earliest adopters of this new EV technology and established a targeted response to early data and

10   feedback Volvo was receiving about the vehicle's performance while making it less likely for

11   purchasers and lessees to escalate their complaint if they are simultaneously receiving free services

12   that create a sense of being valued by the manufacturer. A claim submitted under this program was

13   coded as "FSM220" with a generic symptom and cause code, thereby sanitizing the nature of the

14   service performed by eliminating the paper trail that would have been created by preventing the

15   proliferation of more alarming warranty claims that would otherwise be documented—claims for

16   "unintended acceleration," "powertrain malfunction," or "lurching." Indeed, by funneling early

17   service visits into a complimentary program that coded visits as routine maintenance rather than

18   warranty repairs, Volvo reduced the visibility and statistical reporting of potential safety-related

19   complaints within its internal warranty data systems. The FSM220 claims were processed through

20   Volvo's warranty system, but coded in a manner that prevented categorization as warranty defect

21   claims.

22          h.     **The "Goodwill Program" Strategy for Containment**: In July 2021, Volvo

23   implemented the "MY2021 XC40 BEV Recharge Premium Customer Experience Program," which

24   empowered dealers to offer up to $1,000 in "goodwill" payments for non-warranty customer

25   concerns on the earliest XC40 EVs. This program was not merely a customer service initiative, but

26   was part of a deliberate strategy to contain and manage early reports of the Defect without generating

27   a visible record of warranty claims that could have triggered a more comprehensive recall

28   investigation or regulatory scrutiny.

FAZIO | MICHELETTI LLP
Attorneys

1

2

VOLVO PROMOTED "SAFETY FIRST" WHILE PRIVATELY INVESTIGATING
THE VERY SURGING AND SUDDEN ACCELERATION IT CALLED "NORMAL"

3

4

5

6

7

8

49.    Volvo's reputation for safety is arguably its most significant brand asset, and it has formed the bedrock of Volvo's promotion of its XC40 Recharge EVs. Volvo advertising and other corporate communications implicitly and explicitly draw on Volvo's decades-long focus on safety, emphasizing that "Volvo is known for producing safe, long-lasting vehicles."[7] Volvo's marketing materials promote the XC40 Recharge with taglines such as "Safety first. Always" and "Every mile should be safe," creating consumer expectations of predictable, reliable vehicle control.

9

10

11

12

13

14

50.    Volvo positions the XC40 Recharge not merely as an EV, but as a symbol of its broader commitment to safety and sustainability, integrating this message deeply into its brand narrative. When it introduced the XC40 Recharge in 2019, Volvo connected the company's historical emphasis on human safety with a new imperative for planetary safety, stating explicitly that "we have been a safety company since 1927 . . . yet our products have contributed to climate change making our planet less safe. . . . It's time to change . . . every new Volvo model will be electrified."[8]

15

16

17

18

19

20

21

22

51.    This safety-focused marketing stands in stark contrast to the manner in which Volvo has reacted to the Defect, as demonstrated by Plaintiff's experience and that of many other drivers of Class Vehicles. Prior to leasing, Plaintiff was repeatedly exposed to Volvo's sustained, uniform safety-first campaign through dealership materials, online ads, and Volvo's website. He cannot identify each specific ad, but he relied on Volvo's repeated and consistent safety messaging and reputation when deciding to lease his Class Vehicle. Had Volvo disclosed the Powertrain Control Defect and its attendant safety risks, Plaintiff would not have leased the vehicle (or would have paid materially less). The omission was material to a reasonable consumer.

23

24

25

26

27

28

---

[7] Andrew Koopman, "2024 Volvo XC40 Recharge: A Comprehensive Guide On Features, Specs, And Pricing," *TopSpeed* (April 29, 2024), available at https://www.topspeed.com/2024-volvo-xc40-recharge-overview/ (accessed June 27, 2025).

[8] Volvo Cars, "Volvo Moment, Sustainability #VolvoCars," YouTube (Oct. 16, 2019), available at https://www.youtube.com/watch?v=KxSQNiLlS5A (accessed June 27, 2025).


FAZIO | MICHELETTI LLP
Attorneys

**VOLVO'S CONTRADICTORY, DECEPTIVE CONDUCT**

52.      Early consumer reviews for the 2021 model year XC40 Recharge documented significant issues, including electrical problems and system failures, indicating Volvo's awareness of quality control problems from the vehicle's launch period. Despite possessing detailed knowledge of the Defect, Volvo engaged in a systematic course of contradictory conduct that reveals the deceptive nature of its corporate response.

53.      Although Volvo's corporate customer care told Plaintiff that the surging behavior of his Class Vehicle was a "normal function," its engineering department had managed NHTSA Recall 22V-288 for unintended acceleration caused by a faulty accelerator pedal harness. These contradictory corporate positions—public denial, internal acknowledgment, and regulatory action—cannot be reconciled. Rather, they demonstrate Volvo's deliberate strategy to avoid liability while maintaining profits from continued sales of defective vehicles. It is simply not plausible that a Class Vehicle surging unexpectedly is a "normal function" notwithstanding that the manufacturer conducted recalls for unintended acceleration caused by faulty electronic signals and deployed—and continues to deploy—forensic data recorders to capture other elusive, anomalous powertrain events.

54.      This contradictory conduct extended to Volvo's deployment of sophisticated diagnostic equipment while publicly dismissing identical symptoms. As detailed below, Volvo's installation of "flight data recorders" (*i.e.,* Event Data Recorders or "**EDRs**") to investigate acceleration anomalies directly contradicts its public characterization of such behavior as "normal function," creating compelling evidence of corporate knowledge and deliberate concealment.

### *Volvo's Deployment of "Flight Recorders" as Tacit Acknowledgment of Defect*

55.      Volvo's dismissal of the surging phenomenon as "normal function" stands in direct contradiction to its documented practice of deploying highly specialized diagnostic tools, colloquially termed "flight data recorders," in other customer vehicles exhibiting similar unintended acceleration or One Pedal Drive (OPD) anomalies. In May 2024, the driver of a Class Vehicle reported on the Volvo XC40 Forum that Volvo installed such a monitoring device in their Class Vehicle to capture data on "OPD failure events" after repeated reports of lurching and unexpected

FAZIO | MICHELETTI LLP
Attorneys

1    acceleration.[9] This deployment occurred following the driver's direct engagement with Volvo USA,

2    involving consultation with a regional engineer and the transmission of vehicle logs to Sweden.

3         56.    The installation of a forensic data recorder—a device typically associated with deep

4    technical investigation into anomalous system behaviors in critical applications such as aviation—

5    constitutes an implicit yet compelling acknowledgment by Volvo that the reported issues are not

6    "normal functions." Rather, such deployment indicates recognition of complex phenomena requiring

7    granular, continuous data capture for root cause analysis. If the surging or lurching behavior were

8    truly within the intended operational parameters of Class Vehicles, the engineering imperative for

9    deploying such costly and intrusive diagnostic measures would be entirely absent.

10        57.    The installation of these recorders in 2024, concurrent with Volvo's assertion to

11   drivers, including Plaintiff, that identical symptoms constitute "normal" behavior, reveals a

12   fundamental inconsistency in Volvo's corporate response to recurring powertrain control issues in

13   its electric vehicle line. This dual approach constitutes compelling evidence that Volvo has been

14   acutely aware of the Defect while simultaneously pursuing a deliberate strategy of public denial and

15   deflection.

16        58.    The deployment of flight recorders represents substantial corporate investment in

17   terms of engineering resources, technical personnel, and international coordination between United

18   States and Swedish operations. Such sophisticated investigative measures are not undertaken for

19   genuinely normal vehicle characteristics. The existence and deployment of this diagnostic program

20   directly contradict Volvo's public position and demonstrates the company's knowledge that the

21   reported acceleration anomalies represent serious defects requiring extensive technical investigation.

22

23   ───────────────────────

24   [9]  XC40Forum.com, "Car suddenly lurched forward at a red light while in OPD mode" (May 3,
     2024) (post # 65), available online at https://www.xc40forum.com/threads/car-suddenly-lurched-
25   forward-at-a-red-light-while-in-opd-mode.6112/page-4 ("A month after the engineer drove w/ me
     and inspected the car in Dec, Volvo said they wanted to install a flight-data-recorder (my words
26   not theirs) (accessed July 8, 2025). **We had to wait about 4mos for one to become available. Just
     had it installed 02MAY24** (pics). The thing that looks like a bomb trigger is for me to add a flag
27   to the logs that are supposed to be recording all the time. Supposed to press it when a OPD failure
     event occurs. [¶] **And yes, in the last 4-5mos I've had 2-3 crawl incidents which are repeatable
28   in given locations usually with up or down slopes often where driveways or parking lots join to
     roads . . .**") (emphasis added). Others posted similar experiences. *See generally id.*

FAZIO | MICHELETTI LLP
Attorneys

*The Sandvika Storsenter Incident and Subsequent Investigation*

59.     As reported in various media, on September 23, 2024, a man in his 60s was killed when his 2021 model-year XC40 Recharge crashed through a brick wall at 62 km per hour (38 mph) on an upper floor of the Sandvika Storsenter parking garage in Bærum, Norway, and fell to the ground below.[10]

60.     Data collected by an EDR (Event Data Recorder) showed that the vehicle was traveling at 62 km/h (approximately 38 mph) at the moment of impact with the wall. The EDR recorded a signal corresponding to 100% full accelerator pedal activation for approximately three seconds before the crash, and that the brake pedal was not used in the final five seconds before impact.

61.     Based on this evidence, the official position was that the vehicle did not accelerate due to technical failure, but, rather, responded to an input commanding full acceleration. The technical phase of the investigation was considered closed, with the final determination of cause (driver error versus medical episode) pending autopsy results.

62.     The family of the deceased driver and independent experts raised significant challenges to this conclusion. Simen Huse, the managing director of Simco, a firm specializing in vehicle electronics, explained that the EDR records the electronic command for 100% throttle, but cannot definitively distinguish whether that command originated from the driver physically pressing the pedal or from an electronic anomaly within the vehicle's control systems that transmitted an erroneous signal.

63.     After Mr. Huse and his company spent four months examining the victim's XC40, they concluded that the victim was not in the driver's seat when it crashed and that he was "100

---

[10] *See, e.g.,* "The fatal accident in Sandvika: Report shows no faults or defects in the accident vehicle," *Motor* (Dec. 9, 2024), available online at https://www.motor.no/aktuelt/rapport-ikke-feil-pa-ulykkes-volvoen-i-sandvika/295686 (translated electronically to English) (accessed July 28, 2025); Jon Terje Hellgren Hansen, "The Sandvika accident: Cannot see if the accelerator pedal has been pressed," *Motor* (Nov. 19, 2024) (translated electronically to English) (accessed July 28, 2024).


FAZIO | MICHELETTI LLP
Attorneys

percent certain that that pedal was not pressed by a foot in the seconds before the crash."[11]

64.     More recently, Mr. Huse found that moisture had seeped into an unsealed electronic component in the XC40 Recharge that controls certain functions, such as heating, cooling, lighting, windows, and door locks, and that the moisture may have caused the Sandvika incident.[12]

65.     The cause of the Sandvika crash remains disputed, but the investigation's methodology illustrates the inherent evidentiary challenges in proving intermittent electronic faults and Volvo's willingness to trade on the uncertainty. The possibility that electronic control system failures could generate commands for UVP while leaving no trace in EDR data creates reasonable doubt regarding the official conclusion and supports the inference that similar electronic anomalies may be responsible for the widespread UVP events that Volvo dismisses so cavalierly as "normal function."

66.     This is particularly troubling in light of Volvo's public-facing support documents, which stated that the EDR is not a comprehensive diagnostic tool designed to monitor all vehicle behavior. As Volvo admits, an EDR is a crash-focused tool that ***does not register data during normal driving conditions*** and only records information ***during a non-trivial collision situation***.[13]

67.     In other words, the Powertrain Control Defect can manifest as dangerous events that fall below the EDR's recording threshold, such as near-misses or terrifying UVP events that a driver

---

[11] *See, e.g.,* Jon Terje Hellgren Hansen, "The driver was never in the driver's seat of the accident car," *Motor* (June 24, 2025), available online at https://www.motor.no/aktuelt/sandvika-mysteriet-sjaforen-satt-aldri-i-forersetet-pa-ulykkesbilen/319426 (translated electronically to English) (accessed July 28, 2025); Kjetil Olsen Vethe and Jørgen Dahl Kristensen, "Physically impossible that the driver could have stepped on the accelerator pedal," *Budstikka* (July 1, 2025), available online at https://www.budstikka.no/fysisk-umulig-at-sjaforen-kan-ha-trakket-pa-gasspedalen/s/5-55-2024665 (translated electronically to English) (accessed July 28, 2025).

[12] *See* Jon Terje Hellgren Hansen, "Found moisture in one of Volvo's main computers," *Motor* (July 3, 2025), available online at https://www.motor.no/aktuelt/sandvika-ulykken-fant-fukt-i-en-av-volvoens-hovedcomputere/320486 (translated electronically to English) (accessed July 28, 2025).

[13] Volvocars.com, "Recording Data" (Mar. 16, 2023), available online at https://www.volvocars.com/en-bh/support/car/xc40/article/c0439cbb7ef49076c0a80151144705b5/ (accessed July 8, 2025).

1  successfully brakes to avoid. Even in instances where UVP **does** result in an impact, the EDR is

2  designed as a crash-reconstruction tool, not a diagnostic one; its limited data-capture window of only

3  a few seconds is insufficient to identify the root cause of an intermittent electronic fault that may

4  precede the collision.

5      68.    Therefore, by Volvo's own design, the EDR is incapable of capturing the vast

6  majority of events that would demonstrate the Defect's prevalence and patterns. This creates a self-

7  serving evidentiary framework: Volvo treats the limited EDR data as definitive proof of driver error

8  when a collision **does** occur, but systematically ignores the non-recorded, near-miss incidents that

9  confirm the Powertrain Control Defect's existence—while enforcing a policy that severely limits

10 dealers' ability to conduct diagnostic testing, thereby allowing the company to dismiss credible

11 reports of UVP incidents as unproven or as "normal function."

12 **WIDESPREAD CONSUMER REPORTS DOCUMENTING IDENTICAL DEFECTS**

13     69.    The UVP incidents experienced by Plaintiff are not isolated incidents. Rather, they

14 are part of a documented pattern of widespread consumer complaints spanning multiple model years

15 and reported through both official government channels and public forums. These reports, which

16 predate and postdate Plaintiff's experience, demonstrate that Volvo has been on notice of dangerous

17 acceleration anomalies affecting Class Vehicles for years.

18     70.    For example, on December 9, 2024, the driver of an XC40 Recharge, Shannon Werre,

19 experienced a UVP event while at a car wash. While Ms. Werre was braking to park, the vehicle

20 accelerated uncontrollably. Diagnostic reports revealed multiple DTCs (Diagnostic Trouble Codes),

21 indicating communication failures across critical vehicle modules such as the Brake Control Module

22 (BCM2) and the Central Electronic Module (CEM), potentially impacting the vehicle's safety and

23 performance before the UVP incident.

24     71.    Volvo claimed that the incident was caused by a "full accelerator pedal request," but

25 when Ms. Werre sought the data on which Volvo's assertion was ostensibly based, Volvo declined

26 to provide it. Moreover, in an email dated March 21, 2025, a Volvo Critical Incident Coordinator

27 stated that a thorough review by their engineering and customer care executive teams confirmed

28

"*there was a manufacturing defect at the time of the incident*."[14]

72.     Multiple consumers have also filed formal complaints with NHTSA documenting substantially identical UVP events in XC40 Recharge vehicles. In August 2021, for example, the driver submitted the following report:

> On 8/3/21 I had an accident in my brand new 2021 xc40. *I lightly tapped on the accelerator to close in a gap as I came to a stop at a red light. The vehicle jumped forward as though I floored the accelerator, though again, it was a slight tap. I rear-ended the car in front of me. There was no forward collision warning, no mitigation by the vehicle applying the brakes, nothing.* The vehicle is supposed to assist in this situation, but the aeb system did not work at all. The jump in power and failure of the aeb is very troubling. Especially since it's a large part of the Volvo selling point.[15]

73.     Similarly, NHTSA reported that the driver of a 2022 model-year XC40 encountered the following on December 19, 2022:

> The contact owns a 2022 Volvo XC40. The contact stated while dropping off her niece at school, *the vehicle was at a complete stop with the brake pedal depressed; however, the vehicle accelerated unintendedly and drove over the pavement. The brake pedal was depressed but failed to respond. The vehicle crashed into the wall of the school and crashed into the school fence.* The curtain air bags were deployed; however, the front driver's side air bag failed to deploy. The contact sustained pain in the right shoulder. The contact received medical assistance the following day. A police report was filed. The vehicle was towed to a tow lot. The manufacturer was notified of the failure and referred the contact to a Volvo Collision Center. The Volvo Collision Center took the vehicle to their location and informed the contact that they were awaiting a Volvo engineer to diagnose the vehicle. *The vehicle was not diagnosed nor repaired*. The failure mileage was approximately 7,000.[16]

---

[14] A Volvo Critical Incident Coordinator is responsible for overseeing and maintaining Volvo's policies and goals in the management of critical incidents, such as alleged product failures, subrogation demands, and urgent customer or regulatory inquiries. *See, e.g.,* Advertisement by Volvo for Critical Incident Coordinator, available online at https://www.career.com/job/volvo-cars/critical-incident-coordinator/j202312052334125040113 (accessed August 11, 2025). A true and correct copy of the email messages Ms. Werre provided to Plaintiff's counsel are attached as **Exhibit 4** at 1 (emphasis added).

[15] NHTSA ID Number: 11427734 (Aug. 4, 2021), available online at https://www.nhtsa.gov/vehicle/2021/VOLVO/XC40%252520RECHARGE/SUV/FWD at page 8 (accessed July 8, 2025) (emphasis added).

[16] NHTSA ID Number: 11508568 (Feb. 22, 2023), available online at https://www.nhtsa.gov/vehicle/2022/VOLVO/XC40%252520P8%252520RECHARGE%252520AWD/SUV/AWD at page 5 (accessed July 8, 2025) (emphasis added).

74.     On August 7, 2024, the driver of a 2024 Volvo XC40 submitted this complaint to NHTSA about the experience he and his wife had with the vehicle:

> My wife pulled into a neighbor's driveway and put the car in Park. The car stopped. She reached over to the passenger's seat to pick up an item and *the car lurched forward, crashing into the closed garage door before she could stop it. There were no warning lights alerting her that this would happen. She later told me, though, there had been previous instances of the car "bucking" after she had put it into park*. The incident clearly posed a safety risk to my wife and others. Had someone been standing in front of the car when this happened, they could have been seriously injured or killed. Had the car not stopped after hitting the garage door, my wife, too, could have been seriously injured or killed. Had this happened in an area such as a parking lot, others also might have been injured. *Volvo advised me not to file a police report at this time.* The vehicle was inspected at Wallace Volvo in Stuart, Florida, and would be available for additional inspection. *Volvo claims to have found liquid on internal parts. The larger, and more important question, though, is how the vehicle's design could have allowed that to happen. Facts clearly point to a design flaw. The vehicle design clearly allows liquid to reach the parts in question and create the problem we experienced.* If Volvo had designed the vehicle with a "tight" interior – a design that would have protected internal parts and not left them vulnerable – no amount of liquid in any amount from any source under any circumstance would have ended up in the vehicle's internal parts. In my claim to Volvo, *I asked that they make repairs to assure that this never happens again. They conceded that they did perform "repairs" to the vehicle but called it a "one-time good will gesture." I also asked Volvo to pay for the body damage to my vehicle and the damage ($2,364) caused to my neighbor's garage door by the malfunctioning vehicle. Volvo has refused to compensate me for the damage caused by their malfunctioning vehicle.*[17]

75.     Another driver of a Class Vehicle experienced a similarly horrifying incident while attempting to park:

> On Wednesday morning [XXX] at [XXX] I was parking my 2023 Volvo XC Recharge in the parking lot on Stearns Wharf in Santa Barbara where I was meeting my walking group for our regular morning walk on the pier and along the waterfront. *While I was slowly finishing pulling into a parking spot, with my foot solidly on the brake, the car suddenly lurched and accelerated. It jumped the parking spot wooden stop and then jumped the orange iron barrier that divides the parking lot from the pier road. It felt as if I were suddenly on a runaway horse.* My instincts kicked in as *the car bounced fully onto the pier road, and I immediately turned the car so that I would not crash through the other barrier on the ocean side of the pier road and dive into the ocean.* I immediately drove the car back into the lot and parked it. The pier is not a standard asphalt/concrete road or lot. It is wooden beams placed one after the other. It is very bumpy and the speed limit is 10 miles per hour, but usually you cannot even drive that fast because it is so rough and bumpy. *I was going the slowest you can go just before coming to a full stop in my parking spot, with my foot fully on the brake, when the sudden*

---

[17]    NHTSA ID Number: 11614571 (Sept. 14, 2024), available online at https://www.nhtsa.gov/vehicle/2024/VOLVO/XC40%252520RECHARGE/SUV/RWD at page 1 (accessed July 8, 2025) (emphasis added).


FAZIO | MICHELETTI LLP
Attorneys

*acceleration occurred.* It is a very bumpy and uneven surface and maybe that contributed to a failure in the vehicle monitoring system or automatic braking system. I feel incredibly fortunate that this malfunction did not cause more damage than a blown tire. *I am grateful there were no pedestrians or cars in the path of the car and that I was not parked on the ocean side of the parking lot. This could easily have been a fatal and catastrophic incident.* My trust in the car to function properly is severely compromised. *Volvo kept the car for 2 months while investigating. They said there was no malfunction, but refused to release any report substantiating their conclusion.*[18]

76.     On April 17, 2025, NHTSA received a report that a 2024 XC40 Recharge "*suddenly accelerated/stuck accelerator in the parking lot hitting several vehicles.*" The driver went on to note that, in addition to "sudden acceleration . . . the car did not apply the emergency braking system."[19]

77.     The drivers of many other Class Vehicles have had similar experiences, which they have posted in online forums. Indeed, a Reddit user posted in 2024 about an experience with two separate XC40 Recharge vehicles—one a 2022 model, the other a 2023. The user explained, "We realized while using *they both moved suddenly at times outside of our control.* One out of three resulted in a small crash too which never happened before."[20] In response to this post, another Reddit user described a similar experience:

Yes, this is a real thing and Volvo definitely knows about it. I had something similar happen once. *I was in OPD mode. I lifted my foot completely off the pedal, but the car continued creeping forward at a slow pace and then lurched forward.* I hit the brake immediately, as there was a closed garage door directly in front of me. I have a dashcam, so I have a POV video of it, too. It was very odd, but I have not been able to replicate it since. Some others have reported similar events in the XC40 forums. It seems to mostly happen in OPD mode.

*Id.* (emphasis added).

78.     The same Reddit user explained that the XC40, "even when on brake or just lightly on move just suddenly moves very fast." *Id.* The post goes on to report that after taking the cars in,

---

[18]     NHTSA   ID   Number:   11637199   (Jan.   20,   2025),   available   online   at https://www.nhtsa.gov/vehicle/2023/VOLVO/XC40%252520RECHARGE%252520TWIN/SUV /AWD at page 3 (accessed July 8, 2025) (emphasis added).

[19]     NHTSA   ID   Number:   11655323   (April   17,   2025),   available   online   at https://www.nhtsa.gov/vehicle/2024/VOLVO/XC40%252520RECHARGE/SUV/AWD at page 1 (accessed July 28, 2025) (emphasis added).

[20]     Reddit,     "Volvo     XC40     sudden     jump     issue,"     available     online     at https://www.reddit.com/r/electricvehicles/comments/1d8vl0z/volvo_xc40_sudden_jump_issue/ (accessed July 8, 2025).

FAZIO | MICHELETTI LLP
Attorneys

1   "they told us they tried to simulate same situation in their base but they didnt have that 'sudden jump.'

2   They even changed computer system of the car... Volvo refuses to accept such thing is happening."

3   This response—denial and an inability to replicate an intermittent fault—is a recurring theme in

4   owner accounts. And, as another driver reported in March 2023,

5       I have a 2023 Ultimate which I've had for about 2 months. Yesterday I was driving
        home from the grocery store with my wife. About halfway home, we were sitting at a
6       red light on a narrow street. I was the first car in line, and I was sitting with my foot
        off the pedals and talking to my wife. **Suddenly, the car lurched forward, and I**
7       **instinctively moved my foot to the brake to stop. There was no warning message or**
        **beeping, or anything to suggest it was trying to avoid a collision or anything like**
8       **that. No idea what happened, but it's not confidence inspiring to have a car do**
        **something unexpected. As anyone experienced anything similar?**[21]

9

10      79.    Yet another XC40 driver replied with this comment: "Yes. Twice. Both happened in

11  Q4 of last year. In both cases I also was first in line. One was a traffic light, and one was a busy 4-

12  way stop. I've been moving my foot to the brake pedal at stops ever since, and it hasn't recurred.

13  What software version are you running?"[22]

14      80.    More recently, an XC40 driver asked, "Does anyone have any experience with the

15  problem of sudden unintended *acceleration after braking*? It has already happened to me twice, the

16  last time I had a serious accident, fortunately only with damage to the metal." (Emphasis in

17  original.)[23]

18      81.    Volvo promotes its one-pedal driving system as providing intuitive, predictable

19  control, asserting that "One Pedal Drive is ideal for city driving. Using One Pedal Drive the car can

20  be driven in a smooth way by simply depressing and releasing the accelerator pedal without the need

21

22

---

23  [21] XC40Forum.com, available online at https://www.xc40forum.com/threads/car-suddenly-lurched-
    forward-at-a-red-light-while-in-opd-mode.6112/ (Mar. 8, 2023) (accessed July 8, 2025) (emphasis
24  added).

25  [22] *Id.* (Mar. 9, 2023). *See also id.* (Mar. 12, 2023) ("Just happened to me just 30 mins ago and I
    remembered reading this post. **Was at a crossroad junction and car decided to go forward. Not a**
26  **nice sensation**. Haven't used the brake pedal in ages apart from today") (accessed July 8, 2025)
    (emphasis added).

27  [23] XC40Forum.com, "Unintended Acceleration after braking" (Apr. 22, 2024) available online at
    https://www.xc40forum.com/threads/unintended-accelaration-after-braking.7635/ - replies (accessed
28  July 8, 2025) (emphasis in original).

FAZIO | MICHELETTI LLP
Attorneys

to use the brake pedal."[24]

82.    Volvo's marketing materials also assert that, "Regardless of what drives a car forward, be it an electric machine or combustion engine, a Volvo must be safe," says Malin Ekholm, head of safety at Volvo Cars. "The fully electric XC40 will be one of the safest cars we have ever built."[25]

**THE PATTERN OF CORPORATE KNOWLEDGE AND DELIBERATE CONCEALMENT**

83.    The totality of these consumer reports, spanning multiple model years and reported through various channels, establishes several critical facts. First, the Powertrain Control Defect is widespread and affects vehicles across the entire Class Vehicle population. Second, the Powertrain Control Defect manifests in multiple scenarios—from parking lots to highway on-ramps to traffic intersections—creating diverse categories of safety risk. Third, the Powertrain Control Defect has been consistently reported to Volvo through dealership networks, federal agencies, and public forums, providing the company with extensive notice of the safety hazard.

84.    Most significantly, these reports demonstrate that Volvo's characterization of the UVP behavior as "normal function" is demonstrably false. The consistent nature of these reports across multiple vehicles, owners, and timeframes establishes that Volvo has been aware of serious safety defects while deliberately misrepresenting their nature to consumers and regulatory authorities.

85.    The juxtaposition of Volvo's public statements and private conduct reveals a calculated corporate strategy designed to minimize liability exposure while avoiding acknowledgment of known safety defects. This pattern includes: (a) dismissal of documented safety hazards as normal function despite dealership confirmation and replication of the Powertrain Control

---

[24] VolvoCars.com, "One Pedal Drive" (Mar. 2, 2025) available online at https://www.volvocars.com/mt/support/car/c40-recharge/article/8ada7895815de52fc0a801512e68fae2/ (accessed July 8, 2025)..

[25] VolvoCars.com, "Why Volvo is the Safest Brand in the World," available online at https://www.media.volvocars.com/us/en-us/media/pressreleases/257570/the-fully-electric-xc40-suv-volvos-first-electric-car-and-one-of-the-safest-on-the-road (Sept. 25, 2019) (accessed July 8, 2025).



Defect; (b) simultaneous deployment of sophisticated diagnostic equipment to investigate substantially identical symptoms in other vehicles; (c) establishment of policies that effectively prohibited Volvo dealers from using more stringent diagnostic procedures that might have enabled them to detect the true nature and scope of the Powertrain Control Defect; and (d) the refusal to provide the data on which Volvo has ostensibly based its determinations that Class Vehicles involved in UVP events were non-defective—notwithstanding that one of Volvo's own Critical Incident Coordinators admitted that a manufacturing defect existed at the time of a UVP incident Volvo investigated, but refused to share its data on the ground of "trade secrecy."

86.    The deployment of EDR technology concurrent with public denial of defects constitutes particularly compelling evidence of Volvo's knowledge and intent. No reasonable automotive manufacturer deploys costly, sophisticated diagnostic equipment to monitor normal vehicle behavior. The existence of this investigative program, combined with Volvo's refusal to acknowledge or repair identical symptoms in other vehicles, supports a strong inference of deliberate concealment of known safety defects.

87.    Moreover, the expert analysis of the Sandvika incident demonstrates the potential inadequacy of current investigation methodologies to detect the precise electronic control failures responsible for UVP events. This limitation creates additional urgency regarding Volvo's pattern of denial, as affected consumers may be unable to definitively prove the technical cause of acceleration anomalies even in cases resulting in serious injury or death.

88.    The totality of this evidence establishes that Volvo has knowledge of serious safety defects affecting the acceleration control systems of Class Vehicles, yet has pursued a systematic strategy of public denial while privately conducting extensive technical investigations of substantially identical symptoms. This conduct violates Volvo's duties to consumers and regulatory authorities and creates an ongoing threat to public safety.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

FAZIO | MICHELETTI LLP
Attorneys

**THE POWERTRAIN CONTROL DEFECT POSES**

**AN UNREASONABLE RISK OF MOTOR VEHICLE SAFETY**

89.    The Powertrain Control Defect creates a significant and unreasonable risk of collisions and injuries to drivers, passengers, pedestrians, and other motorists. The unpredictable nature of Class Vehicles' acceleration can lead to collisions, particularly in common driving situations like parking, merging into traffic, or navigating intersections. As discussed above, numerous owners have reported near-misses and actual collisions resulting from the Powertrain Control Defect's manifestations and Volvo's decision to conduct a safety recall limited to just over 5,000 Class Vehicles produced for the 2021 and 2022 model years was woefully deficient to correct the problem—as demonstrated by the fact that UVP events in Class Vehicles have continued to this day.

**IMPACT ON PLAINTIFF AND PROPOSED CLASS MEMBERS**

90.    As a direct and proximate result of Volvo's concealment and misrepresentations, Plaintiff and proposed Class Members have suffered ascertainable losses and damages, including, but not limited to, the following:

a.    **Overpayment for Their Class Vehicles**: They paid a premium for vehicles they believed to be safe and reliable, but received vehicles with a dangerous latent defect.

b.    **Diminished Value**: The Class Vehicles are worth significantly less than they would be without the Defect.

c.    **Out-of-Pocket Expenses**: Costs incurred for attempted diagnosis, repairs, and alternative transportation.

d.    **Loss of Use**: Inability to use their vehicles as intended due to safety concerns or while undergoing attempted repairs.

e.    **Future Costs**: Anticipated costs to properly repair or replace components affected by the Defect, to the extent not covered by an adequate recall.

91.    The Powertrain Control Defect was and is a material fact. A reasonable consumer would consider the existence of a defect that causes unintended acceleration, surging, or lurching important information to consider when deciding whether to purchase or lease a vehicle and in

1    determining the price they would be willing to pay. Plaintiff and members of the proposed Class

2    were unaware of the Defect. Had Volvo disclosed the Defect, they would not have purchased or

3    leased the Class Vehicles or would have paid substantially less for them.

4                        **CLASS-ACTION ALLEGATIONS**

5          92.    Plaintiff brings this action on behalf of himself and as a class action pursuant to

6    Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(5), on behalf of the following proposed

7    Nationwide Class and Subclasses:

8     •   **Nationwide Class**: All persons or entities in the United States who purchased or leased any

9         2021 through 2024 model-year Volvo XC40 Recharge electric vehicle.

10    •   **California Subclass**: All persons or entities in California who purchased or leased any 2021

11        through 2024 model-year Volvo XC40 Recharge electric vehicle.[26]

12         93.    Excluded from the proposed Classes are Defendants, their officers, directors,

13    employees, affiliates, and their immediate families; any entity in which Defendants have a

14    controlling interest; the Judge to whom this case is assigned and their staff and immediate families;

15    and any persons who timely and validly request exclusion.

16         94.    **Numerosity (Fed. R. Civ. P. 23(a)(1))**: The proposed Class Members are so

17    numerous that joinder of all members is impracticable. There are tens of thousands of Class Vehicles

18    in the United States. The precise number and identities of proposed Class Members are ascertainable

19    from Volvo's records.

20         95.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and 23(b)(3))**:

21    Questions of law and fact common to the Class predominate over any questions affecting only

22    individual proposed Class Members. These common questions include, but are not limited to, the

23    following:

24              a.    Whether the Class Vehicles suffer from the common Powertrain Control

25    Defect as alleged herein;

26

27    _____

28    [26] Plaintiff reserves the right to propose a redefined class or subclasses at class certification in
      accordance with information obtained through investigation and discovery.


FAZIO | MICHELETTI LLP
Attorneys

b.      Whether the Powertrain Control Defect is material and poses an unreasonable safety risk;

c.      What Volvo knew or should have known about the Powertrain Control Defect, and the timing of such knowledge;

d.      Whether Volvo concealed the existence and nature of the Powertrain Control Defect from Plaintiff and the Class;

e.      Whether Volvo had a duty to disclose the Powertrain Control Defect;

f.      Whether Volvo's conduct constitutes fraudulent concealment;

g.      Whether Volvo violated the California Consumers Legal Remedies Act, the Unfair Competition Law, and/or the False Advertising Law with respect to the California Subclass;

h.      Whether Volvo was unjustly enriched as a result of its unfair, unlawful, and fraudulent conduct;

i.      Whether Plaintiff and members of the proposed Class are entitled to damages, including actual and punitive damages, and the proper measure of such damages; and

j.      Whether Plaintiff and members of the proposed Class are entitled to equitable relief, including restitution and injunctive relief.

96.      **Typicality (Fed. R. Civ. P. 23(a)(3))**: Plaintiff's claims are typical of the claims of proposed Class Members. Plaintiff purchased a Class Vehicle suffering from the Defect and has been damaged by the same wrongful conduct by Volvo that harmed other proposed Class Members.

97.      **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to those of other proposed Class Members. Plaintiff has retained counsel competent and experienced in complex class action litigation, particularly in automotive-defect cases.

98.      **Superiority (Fed. R. Civ. P. 23(b)(3))**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by individual proposed Class Members, while significant to them, may not be large enough to justify the expense and burden of individual litigation. A class action will concentrate litigation in a single forum, promoting judicial economy and avoiding the risk of inconsistent or contradictory judgments.

FAZIO | MICHELETTI LLP
Attorneys

99. **Injunctive and Declaratory Relief (Fed. R. Civ. P. 23(b)(2))**: Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the proposed Class as a whole. This includes compelling Volvo to adequately address the Defect through an effective recall, repair, replacement, or buyback program, and to cease its deceptive practices.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Common Law Fraudulent Concealment)

100. Plaintiff incorporates by reference all preceding paragraphs.

101. Plaintiff brings this claim against all Defendants on behalf of himself and all proposed Class Members or, alternatively, on behalf of the California Subclass.

102. As alleged above, VCNA designed and executed North American advertising campaigns, while VCUSA disseminated those campaigns through U.S. dealer channels, both using Volvo AB's global safety messaging and brand directives. These distinct roles were coordinated under Volvo AB's overarching corporate policies, ensuring that the same safety representations and omissions regarding the Defect were conveyed at every level of consumer contact.

103. Volvo communicated with consumers through the same channels it used to conceal the Defect—including NHTSA Part 573 reports, CARB Executive Order submissions, technical journals and service manager bulletins, and national advertising—all of which omitted the Defect while affirmatively promoting safety. Thus, Volvo had a duty to disclose the Powertrain Control Defect to Plaintiff and proposed Class Members because Volvo possessed superior and exclusive knowledge of the Defect, knew the Defect was material to reasonable consumers, and knew that Plaintiff and proposed Class Members were unaware of the Defect and could not reasonably discover it prior to purchase or lease. This duty also arose from Volvo's exclusive knowledge of the ongoing safety risks associated with surging and lurching, its affirmative representations of vehicle safety and reliability, and its partial disclosures through limited recalls which failed to reveal the full extent and nature of the un-remedied Defect.

FAZIO | MICHELETTI LLP
Attorneys

104.    As detailed above, Volvo knowingly and intentionally concealed the ongoing risks of the Powertrain Control Defect from Plaintiff and proposed Class Members. Volvo knew of the Defect from internal testing, early consumer complaints from XC40 and Polestar 2 owners, dealership repair orders, and its own internal reviews long before and during the period Class Vehicles were sold and leased.

105.    Volvo intentionally concealed the un-remedied aspects of the Defect with the intent to induce Plaintiff and proposed Class Members to purchase or lease the Class Vehicles and to pay a higher price for them than they otherwise would have.

106.    The existence of the Defect was a material fact that a reasonable consumer would have considered important in the decision to purchase or lease a Class Vehicle or in determining the price to pay.

107.    Plaintiff and proposed Class Members were unaware of the Defect at the time of purchase or lease and justifiably relied on Volvo's silence as an implicit representation of the vehicles' safety and integrity. Had Volvo disclosed the ongoing risks of the Defect, Plaintiff and proposed Class Members would not have purchased their Class Vehicles or would have paid substantially less for them.

108.    As a direct and proximate result of Volvo's fraudulent concealment, Plaintiff and proposed Class Members have suffered damages, including diminution in value, overpayment, and other pecuniary losses in an amount to be proven at trial. Plaintiff also seeks punitive damages due to Volvo's willful, wanton, and reckless disregard for safety and consumer rights.

**SECOND CLAIM FOR RELIEF**

**(Violation of the Consumers Legal Remedies Act (CLRA), Cal. Civ. Code §§ 1750-1784)**

109.    Plaintiff incorporates by reference all preceding paragraphs.

110.    Plaintiff brings this claim against all Defendants on behalf of himself and all proposed Class Members or, alternatively, on behalf of the California Subclass.

111.    As alleged above, VCNA designed and executed North American advertising campaigns, while VCUSA disseminated those campaigns through U.S. dealer channels, both using Volvo AB's global safety messaging and brand directives. These distinct roles were

**SECOND AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

1   coordinated under Volvo AB's overarching corporate policies, ensuring that the same safety

2   representations and omissions regarding the Defect were conveyed at every level of consumer

3   contact.

4          112.    Class Vehicles are "goods" under Cal. Civ. Code § 1761(a), Plaintiff and

5   California Subclass Members are "consumers" under Cal. Civ. Code § 1761(d), and Defendants

6   are "persons" under Cal. Civ. Code § 1761(c). Volvo violated the CLRA by engaging in the

7   following unfair or deceptive acts or practices in transactions intended to result or which resulted

8   in the sale or lease of goods to consumers:

9              a.    Representing that the Class Vehicles had characteristics, uses, or benefits

10  which they do not have (Cal. Civ. Code § 1770(a)(5))—specifically, representing them as safe

11  and reliable when they possess the dangerous, un-remedied Powertrain Control Defect that causes

12  surging, lurching, and unintended acceleration;

13             b.    Representing that the Class Vehicles were of a particular standard, quality,

14  or grade when they were of another (Cal. Civ. Code § 1770(a)(7))—specifically, of a lower

15  standard, quality, and grade due to the undisclosed Defect;

16             c.    Advertising goods with intent not to sell them as advertised (Cal. Civ. Code

17  § 1770(a)(9))—specifically, by advertising safe and reliable vehicles while concealing the

18  ongoing risks of the Defect; and

19             d.    Representing that a transaction confers or involves rights, remedies, or

20  obligations which it does not have or involve (Cal. Civ. Code § 1770(a)(14))—by failing to

21  disclose the Defect, Volvo misrepresented the true nature of the vehicles and the consumers' rights

22  to a defect-free product.

23         113.    Plaintiff and proposed Class Members suffered damages as a direct and proximate

24  result of Volvo's CLRA violations because they would not have purchased or leased their Class

25  Vehicles, or would have paid substantially less for them, had they known the true facts concealed

26  by Volvo.

27         114.    On or about May 14, 2025, Plaintiff, on behalf of himself and all proposed Class

28  Members, provided VCNA and VCUSA with written notice of its violations of the CLRA

SECOND AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

FAZIO | MICHELETTI LLP
Attorneys

1    pursuant to the provisions of California Civil Code section 1782(a) ( "CLRA notice"), detailing

2    the specific violations and demanding that Volvo correct, repair, replace, or otherwise rectify the

3    goods and practices alleged to be in violation of § 1770.

4         115.    On June 10, 2025, Volvo's counsel responded to the CLRA notice by contending

5    that the notice was deficient—professing confusion regarding Plaintiff's description of the Defect

6    even while claiming to be conducting an investigation into "public chatroom postings" and the

7    video Plaintiff provided to (the same recording he shared with the Volvo dealership when seeking

8    inspection and repair). Rather than proposing to repair, remedy, or otherwise rectify the Defect,

9    Volvo's counsel made premature demands that Plaintiff submit to informal discovery and submit

10    his Class Vehicle to another inspection.

11         116.    On or about July 7, 2025, Plaintiff served Volvo AB with a CLRA notice at the

12    place where Plaintiff leased his Class Vehicle (Volvo Cars of Burlingame), which was delivered

13    on July 9, 2025. A copy of the CLRA notice was also delivered by United Parcel Service to Volvo

14    AB's world headquarters in Sweden and by email to Volvo's counsel.[27]

15         117.    Volvo AB failed to provide an adequate and appropriate remedy within 30 days

16    from the delivery of the CLRA notice. Accordingly, Plaintiff now seeks compensatory and

17    punitive damages, due to Volvo's willful, wanton, and reckless disregard for safety and consumer

18    rights, pursuant to Cal. Civ. Code § 1780(a).

19         118.    Plaintiff, on behalf of himself and members of the proposed Class, also seeks

20    restitution, injunctive relief, attorneys' fees, and costs, and any other relief the Court deems proper

21    under Cal. Civ. Code § 1780.

22         119.    Plaintiff would purchase or lease a Class Vehicle again if the defect were corrected,

23    but cannot rely on Volvo's representations absent court oversight, and over-the-air updates and

24    evolving calibrations create an ongoing risk of recurrence, supporting forward-looking relief

25

26

27    [27] Because Volvo AB does not maintain a principal place of business in California, Plaintiff
directed the CLRA notice to "the place where the transaction occurred" (*i.e.,* Volvo Cars

28    Burlingame) in accordance with Civil Code section 1782(a)(2). A true and correct copy of the
CLRA notice to Volvo AB is attached hereto as **Exhibit 5**.

FAZIO | MICHELETTI LLP
Attorneys

1    notwithstanding model-year differences. Thus, legal remedies are inadequate due to the ongoing

2    safety risk, forward-looking repairs and potential need for monitoring, and restitution for members

3    of the proposed Class members who cannot be compensated individually with damages.

4                                    **THIRD CLAIM FOR RELIEF**

5    **(Violation of the Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200-17209)**

6            120.    Plaintiff incorporates by reference all preceding paragraphs.

7            121.    Plaintiff brings this claim against all Defendants on behalf of himself and all

8    proposed Class Members or, alternatively, on behalf of the California Subclass.

9            122.    Volvo's conduct, as alleged herein, constitutes unfair, unlawful, and fraudulent

10   business acts and practices under Cal. Bus. & Prof. Code § 17200.

11           123.    **Unlawful Prong**: Volvo's conduct was "unlawful" because it violated the CLRA

12   (as alleged above) and constituted statutory and common law fraudulent concealment, and

13   because it failed to comply with its obligations under the Transportation Recall Enhancement,

14   Accountability and Documentation (TREAD) Act, as codified at 49 U.S.C. §§ 30101, 30112,

15   30115-30120.

16           124.    **Unfair Prong**: Volvo's conduct was "unfair" because its practice of concealing

17   the known Powertrain Control Defect offends established legislative policy promoting vehicle

18   safety and consumer protection, such as the CLRA and the Transportation Recall Enhancement,

19   Accountability and Documentation (TREAD) Act, as codified at 49 U.S.C. §§ 30101, 30112,

20   30115-30120. The harm to consumers from this safety defect and the economic losses

21   significantly outweighs any purported utility of Volvo's conduct. The conduct is immoral,

22   unethical, oppressive, unscrupulous, and substantially injurious to consumers.

23           125.    **Fraudulent Prong**: Volvo's conduct was "fraudulent" because it was likely to

24   deceive, and did deceive, reasonable consumers, including Plaintiff and proposed Class Members.

25   Volvo's concealment of the Defect, while continuing to market the Class Vehicles as safe and

26   reliable, would likely mislead a reasonable consumer.

27           126.    As a direct and proximate result of Volvo's violations of the UCL, Plaintiff and

28   proposed Class Members have suffered injury in fact and lost money or property, including the

FAZIO | MICHELETTI LLP
Attorneys

1    purchase or lease price paid for defective vehicles or the overpayment for such vehicles due to the
2    undisclosed Defect.

3        127.    Plaintiff, on behalf of himself and proposed Class Members, seeks restitution of
4    all money or property wrongfully obtained by Volvo through such unfair competition and an
5    injunction prohibiting Volvo from continuing these unlawful, unfair, and fraudulent practices to
6    protect the public at large from physical harm as well as from ongoing and future violations of
7    the law. Plaintiff would purchase or lease a Class Vehicle again if the defect were corrected, but
8    cannot rely on Volvo's representations absent court oversight, and over-the-air updates and
9    evolving calibrations create an ongoing risk of recurrence, supporting forward-looking relief
10    notwithstanding model-year differences.

11    **FOURTH CLAIM FOR RELIEF**

12    **(Violation of the False Advertising Law (FAL), Cal. Bus. & Prof. Code §§ 17500-17509)**

13        128.    Plaintiff incorporates by reference all preceding paragraphs.

14        129.    Plaintiff brings this claim against all Defendants on behalf of himself and all
15    proposed Class Members or, alternatively, on behalf of the California Subclass.

16        130.    Volvo, in connection with the sale and lease of Class Vehicles, disseminated untrue
17    and misleading statements to Plaintiff and proposed Class Members.

18        131.    Specifically, Volvo advertised, represented, and marketed the Class Vehicles as
19    safe, reliable, of high quality, and possessing certain performance characteristics, through various
20    channels including national advertising campaigns, owner's manuals, website content, and
21    dealership materials. These representations were false and misleading because Volvo failed to
22    disclose, and actively concealed, the existence of the Powertrain Control Defect which renders
23    the vehicles unsafe, unreliable, and not of the quality represented, particularly in light of the
24    ongoing and un-remedied risks of surging, lurching, and unintended acceleration.

25        132.    Volvo knew, or in the exercise of reasonable care should have known, that its
26    representations were untrue or misleading at the time they were made, given its internal
27    knowledge of the Defect.

28

-37-

**SECOND AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

FAZIO | MICHELETTI LLP
Attorneys

133.    As a direct and proximate result of Volvo's false advertising, Plaintiff and proposed Class Members have suffered injury in fact and lost money or property, including the purchase or lease price paid or the overpayment for vehicles that did not conform to the advertised representations.

134.    Plaintiff, on behalf of himself and proposed Class Members, seeks restitution of all money or property obtained by Volvo through such false advertising.

135.    Plaintiff, on behalf of himself and proposed Class Members, seeks an injunction prohibiting Volvo from continuing these unlawful practices and to protect the public at large from physical harm as well as from ongoing and future violations of the law. Plaintiff would purchase or lease a Class Vehicle again if the defect were corrected, but cannot rely on Volvo's representations absent court oversight, and over-the-air updates and evolving calibrations create an ongoing risk of recurrence, supporting forward-looking relief notwithstanding model-year differences. Thus, legal remedies are inadequate due to the ongoing safety risk, forward-looking repairs and potential need for monitoring, and restitution for members of the proposed Class members who cannot be compensated individually with damages.

### FIFTH CLAIM FOR RELIEF

### (Violation of Song-Beverly Consumer Warranty Act)

136.    Plaintiff incorporates by reference all preceding paragraphs.

137.    This claim is brought by Plaintiff on behalf of himself and the California Subclass against all Defendants.

138.    Plaintiff and the California Subclass are "buyers" within the meaning of Cal. Civ. Code § 1791(b), and the Class Vehicles are "consumer goods" within the meaning of § 1791(a).

139.    Defendants are "manufacturers," "distributors," and "retail sellers" of consumer goods within the meaning of Cal. Civ. Code § 1791(j).

140.    At the time of sale or lease, and during the warranty period, the Class Vehicles contained or developed the Powertrain Control Defect that rendered them unfit for their ordinary purpose of providing safe and reliable transportation, thereby breaching the implied warranty of merchantability imposed by Cal. Civ. Code § 1792.

FAZIO | MICHELETTI LLP
Attorneys

141. The Powertrain Control Defect substantially impairs the use, value, and safety of the Class Vehicles.

142. As a direct and proximate result of Defendants' violation of the Song–Beverly Consumer Warranty Act, Plaintiff and California Subclass Members have suffered damages, including diminution in value, overpayment, and out-of-pocket repair expenses.

143. Plaintiff, through his counsel of record, provided Defendants with written notice pursuant to Cal. Civ. Code § 1794(d)(3) on August 12, 2025.

144. Plaintiff and California Subclass Members are entitled to all remedies provided by the Song–Beverly Act, including actual damages, restitution, and reasonable attorneys' fees and costs. Plaintiff will also seek civil penalties of up to two times actual damages under Cal. Civ. Code § 1794(c) for willful failure to comply with its warranty obligations.

**SIXTH CLAIM FOR RELIEF**

**(Unjust Enrichment)**

145. Plaintiff incorporates by reference all preceding paragraphs.

146. Plaintiff brings this claim against all Defendants on behalf of himself and all proposed Class Members.

147. By its wrongful acts and omissions, including its knowing concealment of the Powertrain Control Defect and its misrepresentations regarding the quality and safety of the Class Vehicles, Volvo knowingly received and retained benefits from Plaintiff and proposed Class Members. These benefits include the full purchase or lease payments for vehicles that were defective and worth less than the amount paid.

148. Volvo knew of and appreciated the benefits it wrongfully received from Plaintiff and proposed Class Members, as it profited from sales that would not have occurred, or would have occurred at lower prices, had the Defect been disclosed.

149. It is inequitable and unjust for Volvo to retain these benefits under the circumstances where Plaintiff and proposed Class Members paid for safe and reliable vehicles but received defective vehicles with undisclosed safety risks and diminished value.

150. Plaintiff and proposed Class Members are entitled to restitution from Volvo of all

1  amounts by which Volvo has been unjustly enriched, in an amount to be proven at trial. This claim

2  is pleaded in the alternative to the extent other legal remedies are deemed inadequate.

3  **PRAYER FOR RELIEF**

4  WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully

5  requests that the Court enter judgment in their favor and against Defendants, awarding the following

6  relief:

7  A.    An order certifying this action as a class action under Fed. R. Civ. P. 23, appointing

8  Plaintiff as Class Representative, and his undersigned counsel as Class Counsel;

9  B.    An award of actual, compensatory, consequential, and punitive damages in amounts

10  to be proven at trial;

11  C.    An order for restitution and disgorgement of all profits and unjust enrichment

12  obtained by Defendants as a result of their wrongful conduct;

13  D.    Injunctive relief to protect the public at large from physical harm as well as from

14  ongoing and future violations of the law, including but not limited to an order requiring Defendants

15  to do the following: (i) adequately disclose the Powertrain Control Defect to all proposed Class

16  Members; (ii) conduct a court-supervised notice, inspection, repair/retrofit, repurchase or

17  replacement program consistent with 49 U.S.C. § 30120 and applicable law; and (iii) cease the

18  deceptive advertising and marketing practices alleged herein;

19  E.    Pre-judgment and post-judgment interest at the maximum rate allowable by law;

20  F.    An award of reasonable attorneys' fees and litigation costs; and

21  G.    Such other and further relief as the Court may deem just and proper.

22

23

24

25

26

27

28



SECOND AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

1

## JURY DEMAND

2    Plaintiff demands a trial by jury on all issues so triable.

3                          Respectfully submitted,

4    DATED: August 12, 2025        FAZIO | MICHELETTI LLP

5                          by      /s/ *Jeffrey L. Fazio*

6                          Jeffrey L. Fazio (146043)
                           Dina E. Micheletti (184141)
7                          FAZIO | MICHELETTI LLP
                           1111 Broadway, Suite 400
8                          Oakland, CA 94607
                           T: 925-543-2555
9                          F: 925-369-0344

10                         Keliang (Clay) Zhu (305509)
                           Andre Y. Bates (178170)
11                         Yi Yao (292563)
                           DEHENG LAW OFFICES, P.C.
12                         Silicon Valley Office
                           7901 Stoneridge Drive, Suite 208
13                         Pleasanton, CA 94588
                           T: 925-399-5856
14                         F: 925-397-1976

15                         *Attorneys for Plaintiff*
                           *Robert M. Becker, on behalf of himself*
16                         *and all others similarly situated*

17

18

19

20

21

22

23

24

25

26

27

28



SECOND AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF