Jeffrey L. Fazio (146043) (jlf@fazmiclaw.com)
Dina E. Micheletti (184141) (dem@fazmiclaw.com)
**FAZIO | MICHELETTI LLP**
1111 Broadway, Suite 400
Oakland, CA  94607
T: 925-543-2555
F: 925-369-0344

Keliang (Clay) Zhu (305509) (czhu@dehengsv.com)
Andre Y. Bates (178170) (aybates@dehengsv.com)
Yi Yao (292563) (yyao@dehengsv.com)
**DEHENG LAW OFFICES, P.C.**
Silicon Valley Office
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
T: 925-399-5856
F: 925-397-1976

Attorneys for Plaintiff
Robert M. Becker, on behalf of himself
and all others similarly situated

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT M. BECKER, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>VOLVO CARS OF NORTH AMERICA, LLC, a Delaware limited liability company; VOLVO CAR USA, LLC, a Delaware limited liability company; and VOLVO CARS AB (publ.), a Swedish public limited company,<br><br>        Defendants. | No. 3:25-cv-05331-MMC<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS VOLVO CARS NORTH AMERICA, LLC AND VOLVO CAR USA, LLC'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>DATE: December 5, 2025<br>TIME: 9:00 a.m.<br>COURTROOM: 7 (19th Floor)<br><br>**Hon. Maxine M. Chesney** |

1

## TABLE OF CONTENTS

PAGE

I.   INTRODUCTION ...................................................................................................1

II.  ARGUMENT ........................................................................................................3

     A.   Plaintiff's Fraud-Based Claims Are Properly Pleaded ...............................3

          1.   Volvo Misapplies California Law; *Dhital*, Not *Rattagan,* Controls
               This Fraudulent Inducement Case ..................................................3

          2.   The SAC Pleads Three Independent Bases for a Duty to Disclose.......4

               a.   Exclusive Knowledge of a Material Safety Defect....................5

               b.   Volvo Actively Concealed the Defect ......................................8

               c.   Volvo's Partial Representations About Safety Triggered a Duty
                    to Disclose ..........................................................................9

          3.   Volvo's Safety Representations Are Actionable Misrepresentations,
               Not Puffery.........................................................................10

          4.   The SAC Satisfies the "Direct Dealings" Requirement Under Any
               Formulation ......................................................................12

               a.   "Direct Dealings" Does Not Require Contractual Privity....................12

               b.   Each Defendant is Liable for the Same Fraudulent Conduct ................14

          5.   The SAC Alleges Scienter with Particularity........................................15

          6.   Plaintiff's Statutory Claims Do Not Require Privity and Are
               Independently Viable ...........................................................17

               a.   The CLRA Does Not Require Privity ......................................17

               b.   The UCL Does Not Require a Transactional Relationship ...................19

               c.   The FAL Does Not Require Privity .........................................20

     B.   The Independent Tort Doctrine Does Not Bar the Fraudulent Concealment Claim........21

     C.   The Song-Beverly Act Claim Is Properly Pleaded ...........................................23

     D.   Plaintiff Has Properly Pleaded Claims for Equitable Relief.................................24

V.   CONCLUSION .....................................................................................................25

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS SECOND AMENDED COMPLAINT

1

## **TABLE OF AUTHORITIES**

2

### *Cases*

PAGE

3

*Alfaro v. Community Housing Imp. System & Planning Ass'n, Inc.,*
4       171 Cal. App. 4th 1356 (2009) ................................................................................16

*Anderson v. Apple Inc.,*
5       500 F. Supp. 3d 993 (N.D. Cal. 2020) ..............................................................13, 16

6   *Barnhouse v. City of Pinole,*
        133 Cal. App. 3d 171 (1982) ..................................................................................14
7

*Bigler-Engler v. Breg, Inc.,*
8       7 Cal. App. 5th 276 (2017) ...............................................................................12, 13

9   *Bledsoe v. FCA US LLC,*
        663 F. Supp. 3d 753 (E.D. Mich. 2023) .................................................................17
10

*Chamberlan v. Ford Motor Co.,* No. C 03-2628 CW,
11      2003 U.S. Dist. LEXIS 27912 (N.D. Cal. Aug. 6, 2003) .......................................17

12  *Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.,*
        819 F.2d 1519 (9th Cir. 1987) ..................................................................................9
13

*Crawford v. Nastos,*
14      182 Cal. App. 2d 659 (1960) ...................................................................................15

15  *Czuchaj v. Conair Corp.,* No. 13-CV-1901-BEN (RBB),
        2014 U.S. Dist. LEXIS 54410 (S.D. Cal. Apr. 16, 2014) .........................................5
16
    *Dei Rossi v. Whirlpool Corp.,* No. 2:12-cv-00125,
17      2013 U.S. Dist. LEXIS 153682 (E.D. Cal. Oct. 24, 2013) .....................................17

18  *Dhital v. Nissan N. Am., Inc.,*
        327 Cal. Rptr. 3d 898, 559 P.3d 1083 (2024) ..........................................................3
19
    *Falco v. Nissan N. Am. Inc.,*
20      96 F. Supp. 3d 1053 (C.D. Cal. 2015). ................................................................2, 17

21  *Falk v. Gen. Motors Corp.,*
        496 F. Supp. 2d 1088 (N.D. Cal. 2007) ................................................................4, 5
22
    *Fitzpatrick v. Ford Motor Co.,* No. 2:22-cv-01924-FWS-JPR,
23      2024 U.S. Dist. LEXIS 93870 (C.D. Cal. Jan. 5, 2024) .........................................23

24  *Gavaldon v. DaimlerChrysler Corp.,*
        32 Cal. 4th 1246 (2004) ...........................................................................................23
25
    *Geernaert v. Mitchell,*
26      31 Cal. App. 4th 601 (1995) ....................................................................................13

27                                                              -ii-

28          **PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS SECOND AMENDED COMPLAINT**

FAZIO | MICHELETTI LLP
Attorneys

*Gofnung v. BMW of N. Am., LLC*, No. 2:21-cv-06328-MEMF-(JCx),
    2023 U.S. Dist. LEXIS 78498 (C.D. Cal. May 4, 2023) ......................................23

*Gray v. BMW of N. Am., LLC*, No. 13-cv-3417-WJM-MF,
    2014 U.S. Dist. LEXIS 133337 (D.N.J. Sep. 23, 2014) ......................................16

*Hernandez v. Radio Sys. Corp.*, No. EDCV 22-1861 JGB (KKx),
    2023 U.S. Dist. LEXIS 40038 (C.D. Cal. Mar. 9, 2023)...............................11, 25

*Hervey v. BMW of N. Am., LLC*, No. B321367,
    2025 Cal. App. Unpub. LEXIS 939 (Cal. App. Feb. 18, 2025) ..........................14

*In re Craftmatic Sec. Litig.*,
    890 F.2d 628 (3d Cir. 1989) .................................................................................16

*In re Future Motion, Inc., Onewheel Prods. Liab. Litig.*, No. 23-md-03087-BLF,
    2024 U.S. Dist. LEXIS 99867 (N.D. Cal. July 12, 2024) ...................................10

*In re S1 Corp. Sec. Litig.*,
    173 F. Supp. 2d 1334 (N.D. Ga. 2001)................................................................15

*In re Takata Airbag Prods. Liab. Litig.*,
    193 F. Supp. 3d 1324 (S.D. Fla. 2016).......................................................2, 10, 11

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009).....................................................................................20, 21

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*,
    754 F. Supp. 2d 1145 (C.D. Cal. 2010) .................................................................9

*In re Toyota Motor Corp.*, No. 8:10ML 02151 JVS (FMOx),
    2012 U.S. Dist. LEXIS 189744  (C.D. Cal. May 4, 2012)...............................11, 20

*J.J. v. Ashlynn Mktg. Grp., Inc.*, No. 24-cv-00311-GPC-MSB,
    2025 LX 246296 (S.D. Cal. July 1, 2025)...........................................................24

*Johnson v. Glock, Inc.*,
    2021 U.S. Dist. LEXIS 253042 (N.D. Cal. Sept. 22, 2021) ................................10

*Kasky v. Nike, Inc.*,
    27 Cal. 4th 939 (2002).........................................................................................19

*Keilholtz v. Superior Fireplace Co.*, No. CV 07-6072 CAS (JTLx),
    2008 U.S. Dist. LEXIS 113583(C.D. Cal. June 23, 2008) ..................................18

*Khan v. Shiley*,
    217 Cal. App. 3d 848 (1990) .................................................................................5

*Kohanof v. Porsche Cars N.A., Inc.*,
    2025 U.S. Dist. LEXIS 94513 (C.D. Cal. Mar. 31, 2025)...................................11

-iii-

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS SECOND AMENDED COMPLAINT**

FAZIO | MICHELETTI LLP
*Attorneys*

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ...........................................................................20

*Krotin v. Porsche Cars N. Am., Inc.*,
   38 Cal. App. 4th 294 (1995) .....................................................................23

*Lilly v. Jamba Juice Co.*,
   2015 U.S. Dist. LEXIS 34498 (N.D. Cal. Mar. 18, 2015) ......................25

*Lovejoy v. AT&T Corp.*,
   92 Cal. App. 4th 85 (2001) .........................................................................9

*Lozano v. AT&T Wireless Servs., Inc.*,
   504 F.3d 718 (9th Cir. 2007) ...................................................................20

*Makaeff v. Trump Univ., Ltd. Liab. Co.*,
   145 F. Supp. 3d 962 (S.D. Cal. 2015) ......................................................17

*Margolis v. Apple Inc.*,
   777 F. Supp. 3d 1060 (N.D. Cal. 2025) ......................................................5

*McGill v. Citibank, N.A.*,
   2 Cal. 5th 945 (2017) ................................................................................17

*Mexia v. Rinker Boat Co., Inc.*,
   174 Cal. App. 4th 1297 (2009) ........................................................2, 22, 23

*Nationwide Biweekly Admin., Inc. v. Superior Court*,
   9 Cal. 5th 279 (2020) .................................................................2, 19, 20, 21

*OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*,
   157 Cal. App. 4th 835 (2007) ...................................................................14

*Reniger v. Hyundai Motor Am.*,
   122 F. Supp. 3d 888 (N.D. Cal. 2015) ......................................................17

*Seifi v. Mercedes-Benz USA*, LLC, No. C12-5493 TEH,
   2013 U.S. Dist. LEXIS 73415 (N.D. Cal. May 23, 2013) .......................18

*Shapiro v. Sutherland*,
   64 Cal. App. 4th 1534 (1998) ...................................................................14

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) ...................................................................24

*Stevens v. Superior Court*,
   180 Cal. App. 3d 605 (1986) ...............................................................9, 16

*Varwig v. Anderson-Tully Co.*,
   147 Cal. App. 3d 324 (1983) ....................................................................14

-iv-

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS SECOND AMENDED COMPLAINT

FAZIO | MICHELETTI LLP
*Attorneys*

*Wilson v. Hewlett-Packard Co.*,
  668 F.3d 1136 (9th Cir. 2012) ................................................................................................5

*Wool v. Tandem Computers, Inc.*,
  818 F.2d 1433 (9th Cir. 1987) ..............................................................................................16

**<u>Statutes</u>**

49 U.S.C. § 30118(c) ..................................................................................................................20

Cal. Bus. & Prof. Code § 17500 ................................................................................................20

Cal. Civ. Code § 1760 ................................................................................................................17

Cal. Civ. Code § 1761(e) ..............................................................................................2, 17, 18

Cal. Civ. Code § 1770 ................................................................................................................19

Cal. Civ. Code § 1770(a)(29)(A) ..............................................................................................19

Cal. Comm. Code § 2608 ..........................................................................................................22

Civ. Code § 1793.2(d) ................................................................................................................23

Civ. Code § 1794(b) ..................................................................................................................23

**<u>Other Authorities</u>**

BAJI 12.50 (9th ed. 2003) ..........................................................................................................14

James S. Reed, *Legislating for the Consumer: An Insider's Analysis of the Consumers Legal Remedies Act*, 2 McGeorge L.Rev. 1 (1971) ..............................................................................18

**<u>Regulations</u>**

49 C.F.R. § 573.2(a) ..................................................................................................................20

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS SECOND AMENDED COMPLAINT**

FAZIO | MICHELETTI LLP
*Attorneys*

I.       INTRODUCTION AND SUMMARY OF ARGUMENT

Volvo built its brand on a single promise: "Safety first, always." But when Robert Becker leased a 2024 XC40 Recharge that began surging forward unpredictably the day after delivery, Volvo called the dangerous behavior "normal"—even as it deployed sophisticated flight data recorders to investigate identical complaints, conducted a safety recall for related acceleration issues, and implemented programs designed to prevent reporting to regulators and alienating prospective buyers and lessees. ECF 19 ¶¶ 28-29, 33, 47, 55-58. This case does not concern warranty performance; it concerns Volvo's concealment of a known safety defect to induce consumers to lease and purchase vehicles they would not have chosen had they known the truth.

The facts are straightforward. Becker's dealer confirmed the defect in his vehicle **and** in another new XC40 on the lot, but, rather than repair the vehicles, the dealer advised him to drive with both feet—one on the brake, one on the accelerator—rather than repair the vehicles. *Id.* ¶¶ 30-32 & Ex. 1 (ECF 19-1). Volvo Customer Care dismissed the defect as a "normal characteristic of the vehicle." *Id.* ¶ 33. Yet Volvo simultaneously used devices "typically associated with deep technical investigation into anomalous system behaviors in critical applications such as aviation" to capture granular data in response to complaints about the same defect in the other XC40 electric vehicles. *Id.* ¶¶ 47, 55-58. It conducted a safety recall of 5,351 XC40 EVs when they exhibited the same behavior as Becker's vehicle. *Id.* ¶¶ 4, 46. And it restricted dealers from working on XC40 EVs, masked warranty claims through a "complimentary" maintenance program, and offered $1,000 payments to silence dissatisfied customers—all to suppress the spread of information about the defect. *Id.* ¶ 48(f)-(h). This pattern of public denial and private acknowledgment reveals the fraud.

Volvo now moves to dismiss this action, but its motion rests on a misreading of California Supreme Court precedent. *Rattagan v. Uber Technologies, Inc.*, 17 Cal. 5th 1 (2024), addressed fraud *during* an existing employment relationship. The controlling authority for pre-transaction fraudulent *inducement* is *Dhital v. Nissan North America, Inc.*, 84 Cal. App. 5th 828, 842 (2022), which held that manufacturers with superior knowledge of latent defects have a duty to disclose them before consumers enter transactions. After deciding *Rattagan*, the California Supreme Court dismissed review of *Dhital* on December 18, 2024, leaving its holding intact.

FAZIO | MICHELETTI LLP
*Attorneys*

Federal courts have recognized the distinction, which has led them to reject arguments like those Volvo makes here. *See, e.g., Ramos v. Ford Motor Co.*, 2025 U.S. Dist. LEXIS 73678, at *13-14 (C.D. Cal. Apr. 16, 2025) (rejecting economic loss/independent tort doctrine arguments); *Moore v. Am. Honda Motor Co.*, 2025 U.S. Dist. LEXIS 59461, at *25 (N.D. Cal. Mar. 28, 2025) (same). Moreover, the standards that apply to claims under the CLRA, the UCL, and the FAL differ from the standard that applies to common law fraudulent concealment claims, rendering Volvo's "direct transaction" argument inapplicable to those claims. *E.g.*, *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009); *Chamberlan v. Ford Motor Co*., 369 F. Supp. 2d 1138, 1144 (N.D. Cal. 2005).

Volvo's remaining arguments also fail. The SAC alleges three independent bases for duty to disclose: exclusive knowledge of a latent defect, active concealment through, *inter alia*, Technical Service Bulletins and warranty-masking programs, and partial safety representations that were misleading without disclosure. ECF 19 ¶¶ 43-58, 85-86. Volvo's "Safety first, always" marketing is not puffery when juxtaposed with concealed knowledge of the serious safety risk posed by uncommanded acceleration. *Hauter v. Zogarts*, 14 Cal. 3d 104, 112 (1975); *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324, 1340 (S.D. Fla. 2016).

Even if it did apply (and it does not), the "direct dealings" requirement Volvo urges the Court to adopt does not demand contractual privity—it merely distinguishes claims based on specific relationships from generalized public statements. *Rattagan*, 17 Cal. 5th at 41. Here, Volvo marketed to Plaintiff, controlled the dealer network, benefited from his payments, and knew of his vehicle use. *Ladanowsky v. FCA US LLC*, 2024 U.S. Dist. LEXIS 234447, at *9 (N.D. Cal. Dec. 30, 2024). The SAC alleges scienter with particularity through Volvo's contradictory conduct—public dismissal paired with private investigation and concealment. The CLRA, UCL, and FAL do not require privity. Cal. Civ. Code § 1761(e); *Nationwide Biweekly Admin., Inc. v. Superior Court*, 9 Cal. 5th 279, 309 (2020); *Falco v. Nissan N. Am. Inc.*, 96 F. Supp. 3d 1053, 1062-63 (C.D. Cal. 2015). The economic loss rule does not bar fraudulent inducement claims. *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 989-90 (2004); *Dhital*, 84 Cal. App. 5th at 848. The Song-Beverly Act contains no "reasonable time" requirement. *Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297, 1307 (2009). And Plaintiff has

FAZIO | MICHELETTI LLP
Attorneys

1    standing for injunctive relief under *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969-70 (9th Cir.

2    2018), and other controlling authority.

3    At bottom, manufacturers with superior knowledge of latent safety defects have a duty to

4    disclose those defects before inducing consumers to enter transactions. Volvo breached that duty. This

5    motion should be denied.

6    **II.    ARGUMENT**

7    **A.    PLAINTIFF'S FRAUD-BASED CLAIMS ARE PROPERLY PLEADED**

8    Volvo challenges Plaintiff's fraud claims on four grounds: no duty to disclose, safety marketing was

9    puffery, no "direct dealings," and insufficient scienter. Each challenge fails.

10            **1.    Volvo Misapplies California Law: *Dhital*, Not *Rattagan*, Controls This**

11                    **Fraudulent Inducement Case**

12    Volvo's lead argument rests on a fundamental misreading of California Supreme Court

13    precedent. It contends that *Rattagan v. Uber Technologies, Inc.*, 17 Cal. 5th 1 (2024), eliminated the

14    long-established duty manufacturers owe to disclose latent defects before consumers enter transactions.

15    Volvo's reliance on *Rattagan* is misplaced.

16    *Rattagan* concerned a former in-house lawyer for an Uber subsidiary who alleged that Uber

17    concealed misconduct from him during his employment, inducing him to continue performing under

18    his existing employment agreement. 17 Cal. 5th at 18. The Court held that when parties have an

19    ongoing contractual relationship, "a tort claim must be independent of that contract" to survive. *Id*.

20    Nothing in *Rattagan* addressed—much less overruled—the separate and well-settled body of law

21    governing a manufacturer's duty to disclose latent defects before a consumer ever enters a transaction.

22    The controlling authority is *Dhital v. Nissan North America, Inc.*, 84 Cal. App. 5th 828 (2022).

23    *Dhital* squarely held that a manufacturer with exclusive knowledge of a material defect that is not

24    known to the plaintiff has a duty to disclose it. *Id*. at 844. *Dhital* is dispositive. After issuing *Rattagan*

25    in August 2024, the Supreme Court had *Dhital*'s petition for review before it. On December 18, 2024,

26    the Court dismissed review—effectively republishing *Dhital* without modification or instructions. *See*

27    327 Cal. Rptr. 3d 898, 559 P.3d 1083 (2024). This dismissal sent an unmistakable signal: *Dhital*'s rule

28

-3-

FAZIO | MICHELETTI LLP
*Attorneys*

1    for pre-transaction fraudulent inducement by concealment remains good law alongside *Rattagan's* rule

2    for fraud during contractual performance.

3    　　　Federal courts in California have recognized this distinction. In *Moore v. American Honda*

4    *Motor Co., Inc.* (where Volvo's counsel, Mr. Mallow represented Honda), Judge Freeman confronted

5    the identical argument Volvo advances here and rejected it, holding that "*Dhital* rather than *Rattagan*

6    applies to the fact pattern in this case." 2025 U.S. Dist. LEXIS 59461, at *25 (N.D. Cal. Mar. 28, 2025).

7    *Moore* noted that the California Supreme Court's dismissal of *Dhital*'s appeal after deciding *Rattagan*

8    "indicated that the reasoning in *Dhital* should guide claims . . . of fraudulent inducement by omission."

9    *Id.* at *26. The Central District reached the same conclusion in *Ramos v. Ford Motor Co.*, holding that

10    "*Dhital* controls fraudulent concealment inducing the formation of a contractual relationship," whereas

11    "*Rattagan* controls fraud within an existing one." 2025 U.S. Dist. LEXIS 73678, at *13-14 (C.D. Cal.

12    Apr. 16, 2025) (emphasis in original).

13    　　　The distinction is both legally sound and practically essential. *Rattagan* addresses fraud in the

14    performance of an existing contract—situations where contractual remedies and duties ***already*** govern

15    the parties' relationship. *Dhital* addresses fraud that ***induces*** the contract's formation—situations

16    where the fraudulent concealment precedes and causes the transaction itself. To conflate these

17    scenarios, as Volvo urges, would eviscerate consumer protection for pre-contractual fraud and reward

18    manufacturers who conceal dangerous defects until after the sale closes. The Second Amended

19    Complaint alleges that Plaintiff would not have leased his vehicle had he known of the Powertrain

20    Control Defect that Volvo concealed. ECF 19 ¶¶ 85, 104-07. This is quintessential *Dhital* fraudulent

21    inducement, and *Rattagan* is inapposite.

22    　　　　　　**2.    The SAC Pleads Three Independent Bases for a Duty to Disclose**

23    　　　Not even Volvo disputes that a duty to disclose arises under the four circumstances described

24    in *LiMandri v. Judkins*: (1) when defendant has exclusive knowledge of material facts not known to

25    plaintiff; (2) when defendant actively conceals a material fact; (3) when defendant makes partial

26    representations that are misleading without additional facts; or (4) when parties are in a fiduciary

27    relationship. 52 Cal. App. 4th 326, 336 (1997). *See also Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d

28

1088, 1095 (N.D. Cal. 2007) (discussing same). The claims at issue here are predicated on the first

three, each of which is satisfied for the reasons described below.

### a. *Exclusive Knowledge of a Material Safety Defect*

A manufacturer that possesses exclusive or superior knowledge of a latent defect unknown to consumers has a duty to disclose it. *Dhital*, 84 Cal. App. 5th at 844; *Wilson v. Hewlett-Packard Co*., 668 F.3d 1136, 1147 (9th Cir. 2012). Plaintiff alleges Volvo knew of the Powertrain Control Defect from sources uniquely available to it: pre-release testing data, internal validation studies, aggregate warranty claim records, early consumer complaints to Volvo and its dealers, Volvo's own investigations using flight data recorders, knowledge of critical defects in the shared Battery Energy Control Module ("BECM") from the sister Polestar 2 vehicle, and safety recalls for related unintended acceleration issues. ECF 19 ¶¶ 43, 47-48, 55-58, 59. Consumers like Plaintiff could not discover this latent, intermittent electronic defect through reasonable inspection. *See, e.g., id*. ¶ 47 (discussing Volvo's use of sophisticated electronic data recorders when it chose to respond to complaints of uncommanded vehicle propulsion).

Volvo contends that the existence of some NHTSA complaints defeats "exclusive knowledge." ECF 38 at 9:9-10. This argument fails. California law does not require literally exclusive knowledge; superior knowledge suffices. *See Falk*., 496 F. Supp. 2d at 1097-98 ("The fact that some information may be publicly available does not defeat a claim of superior knowledge" where the manufacturer possesses "superior knowledge from sources like pre-release testing data"). A manufacturer is deemed "to have known a lot more about the defect, including information unavailable to the public." *Margolis v. Apple Inc.*, 777 F. Supp. 3d 1060, 1069-70 (N.D. Cal. 2025) (cleaned up). This superior knowledge of a dangerous safety defect triggers a duty to disclose it. *See, e.g., Khan v. Shiley*, 217 Cal. App. 3d 848, 858 (1990) ("our decision neither establishes a new cause of action nor drastically extends existing law. It merely confirms that ***a manufacturer of a product may be liable for fraud when it conceals material product information from potential users. This is true whether the product is a mechanical heart valve or frozen yogurt***") (emphasis added; footnote omitted); *see also Czuchaj v. Conair Corp.*, No. 13-CV-1901-BEN (RBB), 2014 U.S. Dist. LEXIS 54410, at *10-12 (S.D. Cal. Apr. 16, 2014) ("Exclusivity is not applied with rigidity, and is analyzed in part by determining whether the defendant

**-5-**

FAZIO | MICHELETTI LLP
*Attorneys*

1  has 'superior' knowledge of the defect" (citing *Johnson v. Harley-Davidson Motor Co. Grp., LLC,* 285

2  F.R.D. 573, 583 (E.D. Cal. 2012), and discussing *Falk,* 496 F. Supp. 2d at 1096-97).

3       The SAC's detailed allegations demonstrate Volvo's superior knowledge. Volvo deployed

4  "flight data recorders"—sophisticated Event Data Recorders typically "associated with deep technical

5  investigation into anomalous system behaviors in critical applications such as aviation"—to investigate

6  uncommanded acceleration events, an "engineering imperative" that "would be entirely absent" if the

7  behavior were normal. ECF 19 ¶¶ 55-56. After one such investigation, Volvo's own Critical Incident

8  Coordinator admitted in writing "there was a manufacturing defect at the time of the incident." *Id.* ¶

9  71 & Ex. 4 (ECF 19-4). Regardless of Volvo's decision to ignore it in this motion, the admission is

10  evidence of knowledge obtained from sources unavailable to the public—plain and simple.

11       Volvo's contention that Plaintiff has made only "vague allegations" about its knowledge of the

12  defect before Plaintiff or proposed class members purchased or leased a Class Vehicle, *see* ECF 38 at

13  8:13-9:12, fails for two basic reasons. ***First,*** Volvo misapplies the case law it cites. The cases Volvo

14  relies upon—*Mandani, Blissard, Burdt,* and *Grodzitzky*—dismissed complaints alleging nothing more

15  than generic, unspecified "testing" with no factual context. *See id.* at 8:18-9:2. ***Second***, the allegations

16  in the SAC are not "vague"; they provide extensive detail and context. Plaintiff alleges that

17  "[f]undamental engineering principles informed Volvo that the Powertrain Control Defect existed

18  throughout the Class Period, well before Plaintiff and proposed Class Members purchased or leased

19  their Class Vehicles." ECF 19 ¶ 48. Specifically, "the ***Polestar 2, which shares the CMA platform***

20  ***and critical components like the BECM [Battery Energy Control Module] with the XC40 Recharge,***

21  ***began production in December 2019. Early Polestar 2 vehicles experienced critical powertrain***

22  ***failures, including loss of propulsion, due to a software defect in the shared BECM***. This knowledge

23  of a critical defect in an identical, shared component in a sister vehicle put Volvo on direct notice of

24  the powertrain control system's inherent instability." *Id.* ¶ 48b (emphasis added).[1]

---

[1] "Volvo's eventual, limited recalls serve as admissions of its knowledge of the powertrain control system's inherent instability. These piecemeal and unduly narrow recalls failed to address the full scope or all root causes of the Defect across all Class Vehicles, further evidencing knowledge and an attempt to minimize the problem[.]" *Id.* ¶ 48c.



Thus, on **February 24, 2021** Volvo announced two safety recalls that involved only 2,278 XC40 Recharge and 3,134 Polestar 2 vehicles (of which Volvo had to aware of well **before** it announced the recall), *id.* ¶ 48c.i., to address a fault in the "Battery Energy Control Module (BECM) micro-processor operating system causing a BECM micro-processor reset[,]" Fazio Decl., Exs. B-C, that could result in a loss of propulsion while driving.[2] , thereby addressing "only one symptom of the system's instability in a limited subset of vehicles, failing to cure the underlying control logic flaws that cause the dangerous surging and lurching that define the Defect." ECF 19 ¶ 48c.ii.[3]

A mere **seven days** later, on March 3, 2021, Volvo issued a bulletin to its dealerships explicitly forbidding its dealerships from performing "battery repairs" on Volvo EVs (which includes diagnostics and repairs on the BECM, "just as the first 2021 XC40 Recharge vehicles were beginning to exhibit the early signs of the Powertrain Control Defect[,]" *id.* ¶¶ 48f, f.iii, unless designated to do so by "one of the few, highly-trained AEVT-BEV technicians, creating a significant bottleneck that slows down or prevents the diagnosis of systemic issues at the local level[,]" *id.* ¶ 48f.iii. Four months later, on "July 28, 2021, Volvo issued a TSB announcing that only 2021 model-year 'Recharge Pure Electric vehicles' were eligible for cost-free maintenance, which was a strategic, preemptive measure by Volvo

---

[2] The failure mode was the same in both sets of vehicles, and although the Polestar 2 EVs may differ from XC40 Recharge EVs in other respects, those differences have no bearing on the fact that Volvo conduct safety recalls of both groups of vehicles for precisely the same reason: malfunctioning BECMs, a part of the CMA platform and its powertrain control software. *Id.* ¶¶ 39-40 & n. 6. To the extent Volvo claims otherwise, it is raising a factual dispute that cannot be resolved by a motion to dismiss. *See, e.g. Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 n. 7 (9th Cir. 2013); *Reniger v. Hyundai Motor Am.*, 122 F. Supp. 3d 888, 900 (N.D. Cal. 2015); *Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 99798 (N.D. Cal. 2013).

[3] On February 19, 2021, just **five days** before it announced the XC40 and Polestar 2 recalls, Volvo issued a bulletin to its dealerships announcing that, "**to proactively address non-warranty customer concerns in an expeditious manner**[,]" they were being given the "latitude" to provide up to $1,000 in cash, gift cards to Tiffany's, Ruth's Chris Steakhouse, etc., to the owners of "all MY2021 XC40 BEV Recharge models with customer retail dates between December 15, 2020 and June 1, 2021." Declaration of Jeffrey L. Fazio in Opposition to Motion to Dismiss ("Fazio Decl."), Ex. A (emphasis added); *see also* ECF 19 ¶ 48h (discussing same). *See Scott v. Cty. of Kern*, No. 1:24-cv-00423-CDB, 2025 LX 400336, at *7 (E.D. Cal. Oct. 30, 2025) ("a 'court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion'" quoting *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)). As Plaintiff has alleged, this "goodwill" effort was actually "part of a deliberate strategy to contain and manage early reports of the Defect without generating a visible record of warranty claims that could have triggered a more comprehensive recall investigation or regulatory scrutiny." ECF ¶ 19 ¶ 4h.

1   to mitigate and suppress early owner complaints about the 2021 XC40 Recharge—the very first model

2   year to exhibit the powertrain defects at issue in this litigation." *Id.* ¶ 48g.

3          And on April 28, 2022, Volvo announced another safety recall—this time involving only 5,351

4   XC40 Recharge EVs—due to "unintended acceleration or no acceleration, loss of drive or no start,

5   increasing the risk of a crash," which Volvo attributed to a cable harness from a supplier that allowed

6   water into the accelerator pedal. *Id.* ¶ 48f.ii.; Fazio Decl., Ex. D. Yet, in the wake of an incident in

7   Sandvika, Norway, involving a 2021 model-year XC40 Recharge crashing through the wall of a four-

8   story parking structure and killing the driver when it crashed into the street below, the expert retained

9   by the victim's family concluded "that moisture had seeped into an unsealed electronic component in

10  the XC40 Recharge . . . and that the moisture may have caused the Sandvika incident." *Id.* ¶ 64.

11         Despite its ostensible efforts to correct the problem by way of the April 2022 safety recall,

12  Volvo told Plaintiff Becker that the same behavior that led to the recall—"unintended acceleration"—

13  was "normal." *Id.* ¶ 53. And, notwithstanding those efforts, Plaintiff Becker was just one of many

14  XC40 Recharge drivers who continued to complain about the problem for years thereafter. *See, e.g.,*

15  *id.* ¶¶ 69-80.[4]

16              **b.    *Volvo Actively Concealed the Defect***

17         A duty to disclose also arises when a party "actively conceals a material fact from the other."

18  *LiMandri*, 52 Cal. App. 4th at 336. The SAC alleges Volvo did not just remain silent; it took affirmative

19  steps to conceal the defect's existence. These acts include issuing restrictive Technical Service

20  Bulletins to dealers on how to address the defect without triggering warranty claims, ECF 19 ¶ 48(f),

21

22  _____

23  [4] Volvo attempts to downplay the significance of these complaints by contending that the SAC points
    to only "three NHTSA complaints pre-dating his lease, along with several NHTSA complaints
    thereafter." ECF 38 at 9:6-7. Actually, the SAC includes four (not three) complaints that were

24  submitted to NHTSA before September 2024 (one for 2021, 2022, 2023, and 2024). *See* ECF 19 ¶¶
    72-74. But the ***number*** of NHTSA complaints cited in the SAC is irrelevant. The defect's intermittent,

25  latent nature (which "often does not produce a [diagnostic trouble code]" ECF 19 ¶ 38, and was
    dismissed as a "normal characteristic" *id.* ¶ 33) served the purpose of Volvo's documented suppression

26  efforts beginning in early 2021, which was to ***prevent*** prospective buyers and lessees from learning
    about the nature and extent of the defect. *See generally id.* ¶ 48. The relevance of the NHTSA and

27  other complaints described in the SAC is that they demonstrate not only Volvo's early knowledge, but
    the ***ongoing and expanding nature of the defect*** long after Volvo purportedly corrected it 2021 and

28  2022 model-year XC40s with a safety recall in early 2022, which affects later model-years as well.

implementing the "FSM220" program designed to mask warranty claims related to the defect, *id.* ¶ 48(g), and offering $1,000 "goodwill" payments to dissatisfied customers to "sanitize the warranty record" and prevent NHTSA reporting, *id.* ¶ 48(h). These allegations of affirmative conduct, designed to prevent consumers and regulators from discovering the truth, are more than sufficient to establish a duty to disclose. *See Lovejoy v. AT&T Corp.*, 92 Cal. App. 4th 85, 94 (2001) (duty arises when defendant "performs an act designed to prevent the plaintiff from discovering the truth"); *Stevens v. Superior Court*, 180 Cal. App. 3d 605, 609-10 (1986) (active concealment includes conduct "undertaken for the purpose of preventing, or which has the effect of preventing, discovery of the concealed facts").

### c.    *Volvo's Partial Representations About Safety Triggered a Duty to Disclose*

Finally, a duty arises when a party makes "partial representations" that are misleading because they "suppress[] a fact which makes them misleading." *LiMandri*, 52 Cal. App. 4th at 336. Volvo has built its global brand on the singular promise of "Safety first, always." ECF 19 ¶¶ 17c & n. 2, 18, 22-23, 26, 45, 48f.iii., 49-51. As explained in the SAC, "Volvo's marketing materials promote the XC40 Recharge with taglines such as 'Safety first. Always' and 'Every mile should be safe,' creating consumer expectations of predictable, reliable vehicle control." *Id.* ¶ 49. Moreover, "Volvo positions the XC40 Recharge not merely as an EV, but as a symbol of its broader commitment to safety and sustainability, integrating this message deeply into its brand narrative." *Id.* ¶ 50.

These representations are, at minimum, partial representations. By touting its commitment to safety while simultaneously concealing knowledge of a dangerous defect that causes uncommanded acceleration, Volvo created a profoundly misleading impression. Its failure to disclose the truth about the defect—that its vehicles were not safe—renders its affirmative representations actionable. *See Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir. 1987) (applying California law) (defendant who represents that it is the "industry leader in safety" has duty to disclose facts inconsistent with that representation); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1179 (C.D. Cal.

2010) (marketing vehicles as safe while knowing of unintended acceleration defect creates duty to disclose).

### 3. Volvo's Safety Representations Are Actionable Misrepresentations, Not "Puffery"

Safety is not subjective opinion; it is a measurable design attribute that consumers rely upon and manufacturers quantify through testing, certification, and recalls. Volvo's fallback argument—that its core "safety" promise is mere "puffery"—is, therefore, both legally incorrect and deeply cynical. *See* ECF 38 at 11:10-21. While generalized statements of opinion are not actionable, "a statement 'crosses the line' from puffery to an actionable misrepresentation" when it is "juxtaposed with a manufacturer's contemporaneous knowledge of a concealed defect." *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324, 1340 (S.D. Fla. 2016) (applying California law). This principle—that context transforms puffery into fraud—is well-established and fatal to Volvo's argument.

The California Supreme Court's decision in *Hauter v. Zogarts* is instructive. 14 Cal. 3d 104 (1975). There, the manufacturer marketed a golf training device as safe despite knowing it could cause serious injury. *Id*. at 112-113 ("the assertion 'Completely Safe Ball Will Not Hit Player' constitutes a factual representation. Defendants' statement parallels that of an automobile dealer who asserts that the windshield of a car is "shatterproof'"). The Court held this was not "mere puffing" but rather "a specific representation of fact" because safety "is not a matter of opinion." *Id*. The representation was actionable because it addressed "a matter of legitimate concern to the consumer" that the consumer "could not be expected to discover" through inspection. *Id*.[5]

*Hauter*'s reasoning applies with full force here. Safety is not subjective. When Volvo represents that safety is its "first" priority and "core value," while simultaneously concealing a defect causing uncommanded acceleration, those representations are factual statements about the vehicle's design and engineering—not opinions about abstract brand values. *See Johnson v. Glock, Inc*., 2021

---

[5] Here, "Volvo's marketing materials . . . assert that, 'Regardless of what drives a car forward, be it an electric machine or combustion engine, *a Volvo must be safe*,' says Malin Ekholm, head of safety at Volvo Cars. '*The fully electric XC40 will be one of the safest cars we have ever built*.'" ECF 19 ¶ 82 (emphasis added).

-10-

1   U.S. Dist. LEXIS 253042, at *25-26 (N.D. Cal. Sept. 22, 2021) ("Last are the statements about safety:

2   describing the guns as 'Safe Action©,' 'Safe. Simple. Fast. = Confidence,' and that it 'delivers on our

3   promise of safety, reliability, and simplicity.' I cannot find that this group of representations is mere

4   puffery; a factfinder will have to make that assessment").[6]

5       Recent precedent confirms this analysis. In *Kohanof v. Porsche Cars N.A., Inc.*, the Central

6   District addressed virtually identical safety representations in a vehicle defect case. 2025 U.S. Dist.

7   LEXIS 94513, at *19-20 (C.D. Cal. Mar. 31, 2025). The court held that while some statements

8   constitute puffery—such as calling a vehicle the "best SUV"—representations that vehicles are "safe"

9   are "objectively true or false" and therefore not puffery as a matter of law. *Id.* The court explained that

10  whether a statement constitutes puffery "is a question of fact, not law," and cited with approval the

11  *Takata* airbag litigation, which held that "[a]dvertising a car as safe and reliable when it actually has a

12  safety-related defect that may render it unable to stop is not 'within the tolerable range of commercial

13  puffery,' especially because [the defendant] allegedly had exclusive knowledge of the [] defect." *Id.*

14  (quoting *In re Takata Airbag Prods. Liab. Litig.*, 2020 U.S. Dist. LEXIS 95692, 2020 WL 3286821, at

15  *7 (S.D. Fla. May 29, 2020)).

16      The same principle applies here. Volvo's "Safety first, always" messaging, juxtaposed with its

17  knowledge of the Powertrain Control Defect—confirmed by not only by the circumstances described

18  in detail in the SAC, but by its own admission of a "manufacturing defect," ECF 19 ¶ 71 & Ex. 4 (ECF

19  19-4), is actionable misrepresentation, not puffery. In short, Volvo cannot have it both ways. If safety

20  representations are mere puffery as Volvo claims, then the company built its reputation and

21

22

---

23  [6] *See also In re Future Motion, Inc., Onewheel Prods. Liab. Litig.*, No. 23-md-03087-BLF, 2024 U.S.
    Dist. LEXIS 99867, at *45-48 (N.D. Cal. July 12, 2024) (defendant's statements that product "keep[s]
24  you perfect" and is safe for riders of "all ages" were not puffery when allegations suggested product
    was dangerous); *Hernandez v. Radio Sys. Corp.*, No. EDCV 22-1861 JGB (KKx), 2023 U.S. Dist.
25  LEXIS 40038, at *11-16 (C.D. Cal. Mar. 9, 2023) (representations that electric shock collars were
    "safe" and "harmless" were not puffery because they addressed "product attributes of importance to
26  customers" and "reasonable consumer could be misled"); *In re Toyota Motor Corp.*, No. 8:10ML
    02151 JVS (FMOx), 2012 U.S. Dist. LEXIS 189744, at *280 (C.D. Cal. May 4, 2012) ("Advertising
27  a car as safe and reliable when it actually has a safety-related defect that may render it unable to stop
    is not within the tolerable range of commercial puffery, especially because Toyota allegedly had
28  exclusive knowledge of the SUA defect") (cleaned up).

FAZIO | MICHELETTI LLP
Attorneys

1  commanded premium prices based on meaningless statements. But Volvo knows—and consumers

2  reasonably believe—that these safety representations are substantive commitments about the quality

3  and safety engineering of Volvo vehicles. When those representations are false because Volvo

4  concealed a known safety defect, they are actionable.

5          **4.      The SAC Satisfies the "Direct Dealings" Requirement Under Any**

6                  **Formulation**

7          Volvo's most audacious argument is that manufacturers owe no duty to consumers unless they

8  sell vehicles directly to the public, rather than through dealer networks. If accepted, this theory would

9  immunize every automotive manufacturer from liability for concealing safety defects—a result that

10  would eviscerate consumer protection law and contradict how modern commerce actually functions.

11         The argument fails for two independent reasons: (1) the "direct dealings" requirement does not

12  mean what Volvo claims it means, and (2) even under Volvo's cramped reading, the SAC adequately

13  alleges the requisite relationship.

14             **a.      *"Direct Dealings" Does Not Require Contractual Privity***

15         In *Rattagan*, the California Supreme Court stated that a fraud claim requires "a transaction

16  [that] must necessarily arise from direct dealings between the plaintiff and the defendant; it cannot

17  arise between the defendant and the public at large." 17 Cal. 5th at 41 (quoting *Bigler-Engler v. Breg,

18  Inc.*, 7 Cal. App. 5th 276, 312 (2017)) (emphasis added). Volvo seizes on this language to argue that

19  consumers who purchase vehicles through dealerships have no fraud claim against manufacturers. The

20  argument fails because it misreads the quoted language and ignores both precedent and practical reality.

21         Start with the text. The *Rattagan* Court required "direct dealings between the plaintiff and the

22  defendant"—not a "direct transaction," as Volvo repeatedly mislabels it. (See ECF 38 at 7:24-25.) The

23  contrast was between dealings "between the plaintiff and the defendant" versus dealings "between the

24  defendant and the public at large." *Rattagan*, 17 Cal. 5th at 41. This language distinguishes fraud claims

25  based on specific relationships from claims based on generalized public statements, not claims

26  involving dealer intermediaries from claims involving direct sales.

27         Judge Tigar explained this distinction persuasively in *Ladanowsky v. FCA US LLC*. Rejecting

28  the identical argument Volvo makes here, Judge Tigar held: "[A]s a car manufacturer, FCA cannot

-12-

FAZIO | MICHELETTI LLP
Attorneys

1   shirk its duty to disclose material facts to subsequent purchasers of its vehicles just because consumers

2   purchase those vehicles from FCA's dealerships rather than from FCA directly." 2024 U.S. Dist.

3   LEXIS 234447, at *9 (N.D. Cal. Dec. 30, 2024) (emphasis added). The court recognized that

4   interpreting "direct dealings" to require contractual privity would create an irrational windfall for

5   manufacturers, allowing them to "shirk" disclosure duties merely by using the dealer distribution

6   model that has dominated the automotive industry for over a century.

7       Judge Vera's recent decision in *Meneses v. FCA US LLC* provides even more detailed analysis.

8   The court explained that *Bigler-Engler*'s "direct dealings" language must be read in context:

9       FCA construes this language to bar fraudulent concealment claims against
        manufacturers where products are sold indirectly through third-party intermediaries,
10      such as dealerships. FCA overreads these cases. Bigler-Engler for example, discusses
        whether the parties directly transact as just one part of the analysis of the aspects of a
11      relationship giving rise to a duty to disclose. Also relevant to this same analysis is
        whether the defendant knew of plaintiff's use of its product, whether the defendant
12      advertised their product to consumers, and whether the defendant derived benefit from
        plaintiff's use of the product . . . . Bigler-Engler's requirement of "direct dealings
13      between the plaintiff and the defendant" is best understood in the context of the rest of
        the sentence—as opposed to "between the defendant and the public at large"—not as
14      requiring immediate privity.

15  2025 U.S. Dist. LEXIS 211418, at *13-14 (N.D. Cal. Oct. 3, 2025) (citations omitted; emphasis added).

16      In other words, the relevant inquiry is whether the manufacturer had a relationship with the

17  specific consumer (or class of consumers) sufficient to trigger a disclosure duty, ***not*** whether the

18  manufacturer signed the purchase contract. The SAC easily satisfies this standard. Volvo knew of

19  Plaintiff's use of its product (he leased a Volvo vehicle from an authorized Volvo dealership), ECF 19

20  ¶ 10; Volvo advertised its products directly to Plaintiff and other consumers through nationwide

21  marketing campaigns touting "Safety first, always," *id.* ¶¶ 17-20, 49-50; Volvo derived direct benefit

22  from Plaintiff's lease payments, *id.* ¶ 147; and Volvo controlled every aspect of the transaction through

23  its comprehensive dealer network, *id.* ¶¶ 17-28. These facts establish a relationship between Volvo and

24  Plaintiff that is anything but "between the defendant and the public at large."

25      The distinction between "direct dealings" and dealings with "the public at large" is meaningful

26  and finds support in decades of California precedent. Courts have long recognized that manufacturers

27  who market directly to consumers, derive revenue from their purchases, and control the distribution

28  channel have a relationship with those consumers sufficient to trigger disclosure duties—regardless of

-13-

1    whether an intermediary signs the final contract. *See Geernaert v. Mitchell*, 31 Cal. App. 4th 601, 608

2    (1995) ("The essence of the tort [of fraudulent nondisclosure] is preventing another from acquiring

3    relevant information, not a breach of a confidential relationship."); *Varwig v. Anderson-Tully Co.*, 147

4    Cal. App. 3d 324, 334 (1983) ("there may arise a situation where nondisclosure constitutes actionable

5    fraud even where the parties to the transaction are not in a confidential or fiduciary relationship").

6        Volvo attempts to support its position by citing *Hervey v. BMW of N. Am., LLC*, No. B321367,

7    2025 Cal. App. Unpub. LEXIS 939 (Cal. App. Feb. 18, 2025), and *Gonzalez v. FCA US LLC*, No. 23-

8    cv-05835-TSH, 2024 U.S. Dist. LEXIS 42395 (N.D. Cal. Mar. 11, 2024). These cases do not help

9    Volvo. *Hervey* is an unpublished decision involving a used car buyer—a materially different scenario

10   from the original lessee of a new vehicle alleged here.[7]

11       Moreover, *Hervey* preceded the California Supreme Court's dismissal of its review of *Dhital*,

12   and thus did not have the benefit of that critical signal. *Gonzalez* likewise predated the Supreme Court's

13   December 2024 dismissal of *Dhital* review and, more important, predated the detailed analysis in

14   *Moore*, *Ladanowsky*, and *Meneses*—all of which were decided after the *Dhital* dismissal and thus

15   correctly analyzed the issues in light of the full picture. These more recent decisions from this District

16   are far more persuasive. And, at the very least, whether a relationship constitutes "direct dealings" is a

17   factual issue inappropriate for resolution on a motion to dismiss.

18

19

20

---

21   [7] As the *Meneses* court went on to observe, however, "California courts have held that '[u]nder

22   California law, a vendor has a duty to disclose material facts not only to immediate purchasers, but
     also to subsequent purchasers when the vendor has reason to expect that the item will be resold.'" 2025

23   U.S. Dist. LEXIS 211418, at *14 (quoting *OCM Principal Opportunities Fund, L.P. v. CIBC World
     Mkts. Corp.*, 157 Cal. App. 4th 835, 839 (2007), and citing *Barnhouse v. City of Pinole*, 133 Cal. App.

24   3d 171, 192 (1982)). The court also explained that in *Barnhouse*, "at least one of the plaintiff-appellants
     purchased their home from the original purchaser and did not deal directly with the developer," hence

25   "[t]he relationship between plaintiff and defendant in *Barnhouse* is thus exactly as direct as the one
     between Plaintiffs and FCA here." *Id.* at *14 n. 3. *See also* BAJI 12.50 (9th ed. 2003) ("A person has

26   reason to expect that a nondisclosure of material fact will be passed on to other persons and that such
     persons will act upon it, if the nondisclosure is made in connection with the sale of goods, the

27   furnishing of services, or a business transaction that will directly affect other persons"); *Shapiro v.
     Sutherland*, 64 Cal. App. 4th 1534, 1548 (1998) ("***it is clear that in California an action for deceit***

28   ***does not require privity***") (citing cases) (emphasis added).

-14-

FAZIO | MICHELETTI LLP
*Attorneys*

1        **b.        *Each Defendant is Liable for the Same Fraudulent Conduct***

2        Although Volvo AB manufactured the Class Vehicles, Defendants VCNA and VCUSA are

3   independently liable because they were not passive intermediaries—they actively perpetrated the same

4   fraudulent scheme through their coordinated roles in marketing, distribution, and warranty

5   administration.[8] Critically, these Defendants' roles "were coordinated under Volvo AB's overarching

6   corporate policies, ensuring that the same safety representations and omissions regarding the Defect

7   were conveyed at every level of consumer contact." *Id.* ¶¶ 102, 112. VCNA and VCUSA were not

8   merely conduits for Volvo AB's fraud—they were active participants who executed the marketing

9   campaigns that made the affirmative safety misrepresentations, administered the warranty denials that

10  perpetuated the concealment, and disseminated the service directives that instructed dealers to dismiss

11  consumer complaints as "normal function."

12        Under California law, it is "the settled rule that every person connected with a fraud is liable

13  for the full amount of damages." *Crawford v. Nastos*, 182 Cal. App. 2d 659, 665 (1960). VCNA and

14  VCUSA acted in concert as to the fraudulent concealment by affirmatively promoting the vehicles'

15  safety credentials while simultaneously concealing the known defect and denying warranty repairs.

16  They are therefore independently liable for the entire fraudulent scheme, regardless of which corporate

17  entity manufactured the vehicles. *See Continental Airlines, Inc. v. McDonnell Douglas Corp.*, 216 Cal.

18  App. 3d 388, 407 (1989) (distributor liable for fraud where it "played an active and substantial role in

19  promoting" the product and concealing known defects).

20        **5.        The SAC Alleges Scienter with Particularity**

21        Volvo's scienter argument is unavailing. The SAC contains one of the clearest possible

22  allegations of fraudulent intent: Volvo's own admission. After one vehicle owner experienced

23  uncommanded acceleration, Volvo investigated using a sophisticated "flight data recorder" and

24

25

26  _____

27  [8] Defendants' respective roles in the marketing, brand communications, advertising campaigns, sale,
    customer communications, and warranty program administration for the XC40 Recharge in the United
28  States and Canada are described in detail in the SAC. *See* ECF 19 ¶¶ 11-14, 17-28.


FAZIO | MICHELETTI LLP
Attorneys

1    concluded unequivocally that "there was a manufacturing defect at the time of the incident." ECF 19

2    ¶¶ 47, 71 & Ex. 4 (ECF 19-4). This is a direct admission of knowledge.

3        This admission is wholly consistent with detailed allegations of contradictory conduct that

4    "strongly impl[y]" fraudulent intent. *In re S1 Corp. Sec. Litig.*, 173 F. Supp. 2d 1334, 1351 (N.D. Ga.

5    2001). The SAC alleges that while Volvo publicly dismissed the defect as "normal," ECF 19 ¶ 33,

6    Volvo simultaneously deployed sophisticated flight data recorders—typically "associated with deep

7    technical investigation into anomalous system behaviors in critical applications such as aviation"—to

8    investigate identical symptoms in other customer vehicles, *id.* ¶¶ 47, 55-58; issued restrictive Technical

9    Service Bulletins to dealers on how to address the defect, *id.* ¶ 48(f); implemented the "FSM220"

10   program designed to mask warranty claims related to the defect, *id.* ¶ 48(g); and offered $1,000

11   "goodwill" payments to dissatisfied customers to "sanitize the warranty record" and prevent NHTSA

12   reporting, *id.* ¶ 48(h).

13       This pattern—public denial coupled with private acknowledgment and systematic

14   concealment—is the hallmark of fraudulent intent. *See Stevens*, 180 Cal. App. 3d at 609-10. Moreover,

15   the SAC alleges that Volvo had knowledge of defects in the Battery Energy Control Module

16   ("BECM")—a critical component shared with the Polestar 2 vehicle—including "critical powertrain

17   failures" and "loss of propulsion" due to software defects. ECF 19 ¶ 48(b). Volvo also conducted

18   multiple safety recalls for related unintended acceleration issues, including NHTSA Recall 22V-288

19   for a faulty accelerator pedal harness. *Id.* ¶¶ 46, 48(c). These allegations demonstrate that Volvo was

20   on notice of "the system's vulnerability to corrupted input signals causing unintended acceleration."

21   *Id.* ¶ 46.

22       To the extent Volvo argues the SAC fails to identify by name the specific Volvo employees

23   who possessed knowledge of the defect, Volvo is asking for more than Rule 9(b) requires. *See, e.g.,*

24   *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1018 (N.D. Cal. 2020) ("while, typically, averments of

25   fraud must be accompanied by 'the who what when where, and how of the misconduct charged,' pure

26

27

28

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS SECOND AMENDED COMPLAINT**

FAZIO | MICHELETTI LLP
Attorneys

1   omissions claims can succeed without the same level of specificity required by a normal fraud claim")

2   (cleaned up).[9]

3          **6.      Plaintiff's Statutory Claims Do Not Require Privity and Are**

4                  **Independently Viable**

5          Volvo's attempt to dismiss the CLRA, UCL, and FAL claims on privity grounds fails. These

6   consumer protection statutes have broader standards than common law fraud and do not require privity

7   with the defendant.

8                  a.      *The CLRA Does Not Require Privity*

9          The Consumers Legal Remedies Act defines "transaction" broadly as "an agreement between

10  a consumer and another person, whether or not the agreement is a contract enforceable by action, and

11  includes the making of, and the performance pursuant to, that agreement." Cal. Civ. Code § 1761(e)

12  (emphasis added). Moreover, the statute must be "liberally construed" to protect consumers. Cal. Civ.

13  Code § 1760; *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 954 (2017); *see also Chamberlan v. Ford Motor*

14  *Co.*, No. C 03-2628 CW, 2003 U.S. Dist. LEXIS 27912, at *17 (N.D. Cal. Aug. 6, 2003) ("Liberally

15  construed, the CLRA's proscription against unfair and deceptive business practices encompasses

16  Defendant's alleged concealment of product defects").

17         "[W]hile tort standards at times may be relevant to a court's evaluation of CLRA actions, that

18  does not mean that CLRA actions must fulfill the same elements as common law fraud claims."

19  *Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1144 (N.D. Cal. 2005).[10] Courts have

20  consistently held that "a manufacturer that is not the direct seller may be held liable for failure to

21

_____

22  [9] "Because this is a fraudulent concealment case involving the internal doings of a sophisticated

23  corporation, those facts are within the Defendants' knowledge and are properly to be determined
    through discovery, not on a motion to dismiss." *Gray v. BMW of N. Am., LLC*, No. 13-cv-3417-WJM-

24  MF, 2014 U.S. Dist. LEXIS 133337, at *8 (D.N.J. Sep. 23, 2014)) (citing *Alfaro v. Community Housing*
    *Imp. System & Planning Ass'n, Inc.*, 171 Cal. App. 4th 1356, 1384-85 (2009)); *see also In re Craftmatic*

25  *Sec. Litig.*, 890 F.2d 628, 645 (3d Cir. 1989) (corporate fraud claims should be judged with sensitivity
    to "unique problems" caused by "defendants' concealing conduct and 'inside' information") (citing

26  *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987)).

27  [10] Many other courts have cited *Chamberlan* for this fundamental understanding that most modern
    commercial transactions occur through a retailer intermediary. *See, e.g., Bledsoe v. FCA US LLC*, 663

28  F. Supp. 3d 753, 795 (E.D. Mich. 2023)*; Makaeff v. Trump Univ., Ltd. Liab. Co.*, 145 F. Supp. 3d 962,
    980 (S.D. Cal. 2015); *Reniger v. Hyundai Motor Am.*, 122 F. Supp. 3d 888, 899 (N.D. Cal. 2015).

FAZIO | MICHELETTI LLP
Attorneys

disclose material defects under the CLRA . . . although not for common law fraud." *Falco v. Nissan N. Am. Inc.*, 96 F. Supp. 3d 1053, 1062–63 (C.D. Cal. 2015). There are "numerous cases supporting [the] contention that ***a direct sale is not required to allege a CLRA claim***." *Dei Rossi v. Whirlpool Corp.*, No. 2:12-cv-00125, 2013 U.S. Dist. LEXIS 153682, at *28 (E.D. Cal. Oct. 24, 2013) (citing cases) (emphasis added). The CLRA's "protection extends to the manufacturer as well, ***regardless of whether the consumer dealt directly with the manufacturer***." *Id*. (emphasis added).

In *Chamberlan*, the District Court held that used-car purchasers—who had no transaction of any kind with the manufacturer—could pursue CLRA claims based on the manufacturer's exclusive knowledge of a defect. 369 F. Supp. 2d at 1144. The court specifically rejected Ford's argument that lack of privity barred CLRA standing. *Id.*[11]

Here, Plaintiff entered into a transaction for a Volvo vehicle based on Volvo's representations about safety and concealment of the defect. ECF 19 ¶¶ 2, 10, 104-07, 110-13. This satisfies the CLRA's broad "transaction" requirement. The statute's consumer protection purpose would be "undercut" if Volvo could escape liability simply because it used dealers as intermediaries. *Seifi*, 2013 U.S. Dist. LEXIS 73415, at *23. The legislative history confirms this interpretation. As the then-Chief Counsel for the California Assembly Judiciary Committee explained shortly after it became law, the CLRA provides

> remedies for those consumers damaged by specifically proscribed deceptive practices on the part of a merchant. It applies to transactions for the sale or lease of goods or services "primarily for personal, family or household purposes," or for "services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods. A contract is not a necessary condition precedent to an action." ***The only transaction necessary is some "agreement between a consumer" and the defendant "whether or not the agreement is enforceable by action, and includes the making of, and the performance pursuant to that agreement." The agreement need not be express. An advertisement which invokes action by a consumer certainly "includes the making of" an agreement and is therefore a "transaction" within the meaning of the statute***. A construction any less broad would

---

[11] *See also Seifi v. Mercedes-Benz USA*, LLC, No. C12-5493 TEH, 2013 U.S. Dist. LEXIS 73415, at *23 (N.D. Cal. May 23, 2013) ("The consumer protection goal behind the CLRA would be undercut if consumers were barred from bringing claims for failure to disclose material facts simply because of lack of privity"); *Keilholtz v. Superior Fireplace Co*., No. CV 07-6072 CAS (JTLx), 2008 U.S. Dist. LEXIS 113583, at *18-19 (C.D. Cal. June 23, 2008) (transaction requirement satisfied where plaintiff purchased product and defendant's misrepresentations "concern the characteristics and performance of the product at issue").

render several subparagraphs of Civil Code section 1770 worthless as a practical matter.

James S. Reed, *Legislating for the Consumer: An Insider's Analysis of the Consumers Legal Remedies Act*, 2 MCGEORGE L.REV. 1, 10 (1971) (citing, *inter alia,* Cal. Civ. Code § 1761(e)) (footnotes omitted; emphasis added). The CLRA was designed to reach precisely the type of manufacturer misconduct alleged here.

But Volvo's "direct relationship" argument is not merely foreclosed by the *Chamberlan* line of cases; it is now squarely contradicted by the Legislature's most recent amendments to the CLRA itself. In July 2024, Senate Bill 478 (the "Honest Pricing Law") took effect. *See* SB 478 (2023-2024 Reg. Sess.), Stats. 2023, ch. 400. The new law amends the very statute at issue, Cal. Civ. Code § 1770, to make it unlawful to engage in "drip pricing" by, among other things, "***[a]dvertising, displaying, or offering*** a price for a good or service that does not include all mandatory fees or charges." Cal. Civ. Code § 1770(a)(29)(A) (emphasis added).

This action affirms the *Chamberlan* court's broad interpretation of the statute. It confirms the CLRA is designed to regulate the *entire* consumer journey, starting with the manufacturer-controlled representations that are "intended to result in" a sale. Cal. Civ. Code § 1770(a). Volvo's argument, if accepted, would create an absurd result: the CLRA would apply to a ***dealer's*** misleading price advertisement (under Stats. 2023, ch. 400) but would shield a ***manufacturer's*** far more pervasive and influential misleading safety advertisements. The Legislature's recent action provides further confirmation that the statute is aimed at the party responsible for the deceptive conduct, regardless of contractual privity.

### b.    *The UCL Does Not Require a Transactional Relationship*

The UCL, like the CLRA, is a consumer protection statute that must be "liberally construed" to protect consumers. *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950 (2002). As the California Supreme Court has explained,

> [a]t common law, deceived consumers had no claim for unfair competition. This made little sense, since ultimately it is the consumer who is harmed by a business that passes off goods or services as genuine, or as those of another. . . . No matter; consumers were left without a claim or remedy. This was the era of *caveat emptor* [that is, let the buyer beware].

1

2

3

> The UCL and the FAL were enacted for the specific purpose of creating new rights and remedies that were not available at common law. The statutes deliberately broaden the types of business practices that can properly be found to constitute unfair competition and eliminate a number of elements that were required in common law actions for fraud.

4    *Nationwide Biweekly Admin., Inc. v. Superior Court*, 9 Cal. 5th 279, 322 (2020) (cleaned up; brackets

5    in original).

6          The statute prohibits "unlawful," "unfair," and "fraudulent" business practices. Cal. Bus. &

7    Prof. Code § 17200. Each prong is independently viable and does not require proof of the elements of

8    common law fraud. *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007).

9          The "unlawful" prong borrows violations from other laws. *Korea Supply Co. v. Lockheed*

10   *Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003). Here, Plaintiff alleges Volvo's concealment violates the

11   CLRA, the FAL, and federal law—specifically the Transportation Recall Enhancement,

12   Accountability, and Documentation ("TREAD") Act, which requires manufacturers to report safety

13   defects. *See* 49 U.S.C. § 30118(c) (requiring manufacturer to notify consumers when it "learns the

14   vehicle or equipment contains a defect and decides in good faith that the defect is related to motor

15   vehicle safety"); 49 C.F.R. § 573.2(a) (discussing same). Volvo's failure to report the Powertrain

16   Control Defect to NHTSA, combined with its affirmative efforts to "sanitize the warranty record" to

17   prevent reporting, ECF 19 ¶ 48(h), violates the TREAD Act and thus provides a predicate for the

18   UCL's unlawful prong. *See Korea Supply*, 29 Cal. 4th at 1143 (UCL can borrow violations of federal

19   statutes).

20         The "fraudulent" prong does not have a "direct dealings" requirement; it requires only that

21   members of the public are likely to be deceived. *See Nationwide Biweekly*, 9 Cal. 5th at 309 ("to state

22   a claim under either the UCL or the false advertising law, based on false advertising or promotional

23   practices, it is necessary only to show that members of the public are likely to be deceived") (cleaned

24   up); *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009) (same). Unlike common law fraud, it does

25   not require proof of actual reliance, justifiable reliance, or privity. *Lozano*, 504 F.3d at 731. Plaintiff's

26   allegations that Volvo marketed its vehicles as safe while concealing a dangerous defect easily satisfy

27   this standard.

28

FAZIO | MICHELETTI LLP
Attorneys

1

### c.    *The FAL Does Not Require Privity*

2        The same is true of the False Advertising Law, which prohibits "unfair, deceptive, untrue or

3   misleading advertising." Cal. Bus. & Prof. Code § 17500. Like the UCL, the FAL is a public protection

4   statute that does not require privity. *See In re Toyota Motor Corp*., No. 8:10ML 02151 JVS (FMOx),

5   2012 U.S. Dist. LEXIS 189744, at *277-81 (C.D. Cal. May 4, 2012) (plaintiffs need not point to

6   specific advertisement to maintain FAL claim based on material omissions regarding safety defect;

7   causation satisfied where plaintiffs alleged manufacturer's nondisclosure caused economic loss).

8        Volvo's safety representations, made in nationwide marketing campaigns, satisfy the FAL's

9   requirements. The question is whether those representations, in context, were likely to deceive

10  consumers, not whether Volvo or its dealers signed the lease agreement. *Nationwide Biweekly*, 9 Cal.

11  5th at 309. Moreover, a plaintiff "is not required to necessarily plead and prove individualized reliance

12  on specific misrepresentations or false statements where, as here, those misrepresentations and false

13  statements were part of an extensive and long-term advertising campaign." *In re Tobacco II Cases*, 46

14  Cal. 4th at 312. Here, Volvo has used nearly 100 years of advertising to make "safety" synonymous

15  with "Volvo." *See, e.g.,* ECF 19 ¶¶ 49-50 ("Volvo's reputation for safety is arguably its most

16  significant brand asset, and it has formed the bedrock of Volvo's promotion of its XC40 Recharge

17  EVs. Volvo advertising and other corporate communications implicitly and explicitly draw on Volvo's

18  decades-long focus on safety").

19  **B.    THE INDEPENDENT TORT DOCTRINE DOES NOT BAR THE FRAUDULENT**

20  **CONCEALMENT CLAIM**

21        Volvo separately argues that the economic loss rule bars the common law fraud claim. *See* ECF

22  38 at 12:20-13:10. This is merely a repackaging of its flawed reliance on *Rattagan* and

23  mischaracterization of the SAC. Volvo's economic-loss argument fails because it collapses the

24  distinction between breach of warranty and fraudulent inducement, which arises before any contract

25  exists.

26        The economic loss rule provides that a plaintiff may not recover in tort for economic losses

27  that "arise from . . . a contract breach." *Robinson Helicopter*, 34 Cal. 4th at 988. The rule does not bar

28

FAZIO | MICHELETTI LLP
Attorneys

tort claims that are independent of the contract. Fraudulent inducement is the quintessential independent tort. *Id*. at 989-90.

*Dhital* squarely held that a claim that a manufacturer fraudulently induced the plaintiffs to buy by concealing a known defect is not a claim that sounds in breach of contract and is therefore not barred by the economic loss rule. 84 Cal. App. 5th at 842. Federal courts applying California law post-*Rattagan* have expressly adopted this holding. *See Moore*, 2025 U.S. Dist. LEXIS 59461, at *29 (explaining that fraudulent inducement claim survives economic loss rule because "Plaintiffs' point is that they were fraudulently induced into entering a contract that they might otherwise have rejected. Had they known . . . they might have . . . chosen a different car altogether."); *Ramos*, 2025 U.S. Dist. LEXIS 73678, at *13-14 (same).

Plaintiff's claim here is identical: Volvo's pre-contractual concealment of a dangerous safety hazard induced him to enter the lease in the first place. *See, e.g.,* ECF 19 ¶¶ 91, 104-07, 113, 126, 133. This is not a claim that Volvo breached its warranty; it is a claim that Volvo's fraud induced the contract's formation. The independent tort doctrine does not apply.

Moreover, *Robinson Helicopter* itself forecloses Volvo's argument. There, the California Supreme Court held that the economic loss rule did not bar recovery where "the breach is accompanied by a traditional common law tort, such as fraud," where "the means used to breach the contract are tortious, involving deceit," or where "one party intentionally breaches the contract intending or knowing that such a breach will cause severe . . . harm." 34 Cal. 4th at 990. The Court emphasized that "[f]ocusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated." *Id*.

Fraudulent concealment of a safety defect satisfies all three exceptions. It is "a traditional common law tort" (fraud); it involves "tortious means" (deceit); and it reflects "intentional conduct" designed to induce reliance. *Id*. As the Court explained, "a party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to that contract." *Id*. at 993. Nor could Mr. Becker have "rationally calculate[d]" that Volvo would conceal a defect causing uncommanded acceleration while proclaiming "Safety first, always."

FAZIO | MICHELETTI LLP
*Attorneys*

Neither the economic loss rule nor the independent tort doctrine insulates Volvo from tort liability for its fraudulent inducement.

## C.    THE SONG-BEVERLY ACT CLAIM IS PROPERLY PLEADED

Volvo argues that Plaintiff's implied warranty claim under the Song-Beverly Warranty Act fails because he did not "timely revoke acceptance" under Commercial Code Section 2608. ECF 38 at 14:11-15:7. Volvo is mistaken. "***In contrast to the California Uniform Commercial Code, the Song-Beverly Act 'contains no "reasonable time" requirement by which the consumer must invoke the [Song-Beverly] Act or lose rights granted by that statutory scheme.'***" *Mexia v. Rinker Boat Co., Inc*., 174 Cal. App. 4th 1297, 1307 (2009) (quoting *Krotin v. Porsche Cars N. Am., Inc*., 38 Cal. App. 4th 294, 301-302 (1995)) (emphasis added). Rather, Song-Beverly provides its own remedial scheme that does not incorporate the Commercial Code's timing requirements for revocation of acceptance. As the Central District recently held in rejecting this identical defense argument:

> Although this argument has some superficial appeal, it ignores the fact that the operative condition is set forth in Section 1794 of the Civil Code, namely "where the buyer has . . . justifiably revoked acceptance." There is nothing in Section 1794 or the Song-Beverly Act more generally to suggest that the meaning of "justifiably revoked" is to be determined with reference to the Commercial Code and specifically Section 2608 of the Commercial Code. ***The legislature could have, but did not explicitly define "justifiably revoked" to mean "timely revoked" under the requirements of Section 2608 of the Commercial Code. This Court therefore declines to read the statute in this manner***.

> In short, the Song-Beverly Act is clear on the requirements for damages and *timely* revocation under acceptance is not among them. *See* Civ. Code § 1793.2(d) and Civ. Code § 1794(b).

*Gofnung v. BMW of N. Am., LLC*, No. 2:21-cv-06328-MEMF-(JCx), 2023 U.S. Dist. LEXIS 78498, at *17-18 (C.D. Cal. May 4, 2023) (footnote omitted; bold italics added, normal italics in original).[12]

The court's reasoning applies with equal force here. Section 1794(b) sets forth the remedies available to a buyer when the manufacturer breaches the implied warranty of merchantability. Nothing in the statute conditions those remedies on compliance with Commercial Code Section 2608's timing requirements. Volvo's attempt to read Section 2608's "reasonable time" and "substantial change in

---

[12] *See also Fitzpatrick v. Ford Motor Co*., No. 2:22-cv-01924-FWS-JPR, 2024 U.S. Dist. LEXIS 93870, at *15 (C.D. Cal. Jan. 5, 2024) (same);


FAZIO | MICHELETTI LLP
Attorneys

1  condition" requirements into the Song-Beverly Act contradicts the statute's plain language and

2  consumer protection purpose.

3       Moreover, even if Commercial Code timing requirements applied (which they do not), Plaintiff

4  acted reasonably. He experienced the defect the day after leasing the vehicle, ECF 19 ¶ 29, reported it

5  to the dealer, *id*. ¶¶ 30-32, was told by Volvo that the behavior was "normal," *id*. ¶ 33, and filed this

6  action within nine months of taking possession. Given Volvo's repeated assurances that the vehicle's

7  behavior was "normal," Plaintiff's timeline was reasonable and caused no conceivable prejudice to

8  Volvo in any event. *See Gavaldon v. DaimlerChrysler Corp.*, 32 Cal. 4th 1246, 1264 (2004)

9  (revocation must occur "within a reasonable time after the buyer discovers or should have discovered

10  the ground for it").

11       The Song-Beverly Act claim is properly pleaded.

12       **D.  PLAINTIFF HAS PROPERLY PLEADED CLAIMS FOR EQUITABLE RELIEF**

13       Finally, Volvo argues that Plaintiff's claims for equitable relief under the CLRA, UCL, and

14  FAL must be dismissed. ECF 38 at 15:25-17:11. The argument fails on both law and facts.

15       *First*, Volvo argues that Plaintiff's legal remedies are adequate, citing *Sonner v. Premier*

16  *Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020). But *Sonner* requires only that a plaintiff plead

17  inadequacy. Plaintiff has done so. ECF 19 ¶¶ 120, 128, 136. More fundamentally, legal damages are

18  inherently inadequate to remedy the ongoing public safety risk and market-wide deception at issue

19  here. *See, e.g., J.J. v. Ashlynn Mktg. Grp., Inc.*, No. 24-cv-00311-GPC-MSB, 2025 LX 246296, at *46-

20  47 (S.D. Cal. July 1, 2025) ("Plaintiff C.B. thus seeks 'injunctive relief to prevent future harm—not

21  just to Plaintiffs, but to the broader public. . . . These allegations are sufficient at this stage to adequately

22  plead that Plaintiff C.B. lacks an adequate remedy at law to subdue the risk of future harm to the

23  public") (citing cases). Nor will money damages serve to compel Volvo to disclose the Powertrain

24  Control Defect to other current and prospective owners and lessees, or correct the false information

25  that continues to mislead the public about Volvo's safety. Only injunctive relief can accomplish these

26  objectives.

27       *Second*, Volvo argues Plaintiff lacks standing for an injunction because he now knows of the

28  defect and cannot be "fooled again." This argument was explicitly rejected by the Ninth Circuit in

1    *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018). Davidson held that a consumer has

2    standing to seek an injunction where she "would 'consider purchasing the product again if she could

3    be sure' it was not defective" but "is 'unable to rely on the product's advertising . . . in the future.'" *Id.*

4    at 969-70.

5        This is precisely what the SAC alleges. Plaintiff is a "safety-conscious" consumer who "would

6    be interested in leasing or purchasing a Class Vehicle from Volvo in the future" but "will be unable to

7    rely on Volvo's representations" absent an injunction requiring corrective disclosures and prohibiting

8    further deceptive conduct. ECF 19 ¶¶ 119, 127, 135. This is the exact "inability to rely" harm that

9    *Davidson* recognizes as sufficient for Article III standing. *See also Hernandez v. Radio Sys. Corp.*, No.

10   EDCV 22-1861 JGB (KKx), 2023 U.S. Dist. LEXIS 40038, at *16-18 (C.D. Cal. Mar. 9, 2023)

11   (plaintiff who "continues to have use" for defendant's products and "would want to purchase [them]

12   in the future" but "does not and cannot know if [defendant's] advertising is accurate and truthful" has

13   standing for injunctive relief under Davidson); *Lilly v. Jamba Juice Co.*, 2015 U.S. Dist. LEXIS 34498,

14   at *4 (N.D. Cal. Mar. 18, 2015) (consumer has standing where "unless the manufacturer or seller has

15   been enjoined from making the same misrepresentation," the "consumer won't know whether the label

16   is accurate" and "won't know whether it makes sense to spend her money on the product").

17       Plaintiff has adequately alleged standing for equitable relief.

18   **III.    CONCLUSION**

19       Volvo asks this Court to adopt a rule that would immunize manufacturers from liability

20   whenever they conceal safety defects before consumers lease or purchase vehicles through dealer

21   networks. Adoption of this rule would be incompatible with California consumer protection law, at

22   odds with how modern commerce functions, and dangerous to public safety.

23       The law is clear and directly on point, and none of it supports Volvo's arguments. Accordingly,

24   Plaintiff respectfully submits that this motion should be denied in its entirety.

25   DATED: November 5, 2025              **FAZIO | MICHELETTI LLP**

26                                        by      /s/ *Jeffrey L. Fazio*

27                                        Jeffrey L. Fazio (146043)
                                          Dina E. Micheletti (184141)
28                                        **FAZIO | MICHELETTI LLP**

-25-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1111 Broadway, Suite 400
Oakland, CA 94607
T: 925-543-2555
F: 925-369-0344

Keliang (Clay) Zhu (305509)
Andre Y. Bates (178170)
Yi Yao (292563)
**DEHENG LAW OFFICES, P.C.**
Silicon Valley Office
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
T: 925-399-5856
F: 925-397-1976

Attorneys for Plaintiff
Robert M. Becker, on behalf of himself
and all others similarly situated


FAZIO | MICHELETTI LLP
Attorneys

-26-

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS SECOND AMENDED COMPLAINT**