Jeffrey L. Fazio (146043) (jlf@fazmiclaw.com)
Dina E. Micheletti (184141) (dem@fazmiclaw.com)
**FAZIO | MICHELETTI LLP**
1111 Broadway, Suite 400
Oakland, CA  94607
T: 925-543-2555
F: 925-369-0344

Keliang (Clay) Zhu (305509) (czhu@dehengsv.com)
Andre Y. Bates (178170) (aybates@dehengsv.com)
Yi Yao (292563) (yyao@dehengsv.com)
**DEHENG LAW OFFICES, P.C.**
Silicon Valley Office
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
T: 925-399-5856
F: 925-397-1976

*Attorneys for Plaintiff*
*Robert M. Becker, on behalf of himself*
*and all others similarly situated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT M. BECKER, on behalf of himself and all others similarly situated,<br><br>　　　Plaintiff,<br><br>　　　　　　*v.*<br><br>VOLVO CARS OF NORTH AMERICA, LLC, a Delaware limited liability company; VOLVO CAR USA, LLC, a Delaware limited liability company; and VOLVO CARS AB (publ.), a Swedish public limited company,<br><br>　　　Defendants. | No. 3:25-cv-05331-MMC<br><br>**[PROPOSED] ORDER DENYING DEFENDANTS VOLVO CARS NORTH AMERICA, LLC AND VOLVO CAR USA, LLC'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>DATE: December 5, 2025<br>TIME: 9:00 a.m.<br>COURTROOM: 7 (19th Floor)<br><br>**Hon. Maxine M. Chesney** |

This matter is before the Court on Defendants Volvo Car North America, LLC and Volvo Car USA LLC's Motion to Dismiss Second Amended Complaint ('SAC").  Following oral argument and having considered the memoranda filed in support of and in opposition to that motion, Defendants' motion is DENIED for the reasons set forth herein.

### A.    PLAINTIFF'S FRAUD-BASED CLAIMS ARE PROPERLY PLEADED

Volvo challenges Plaintiff's fraud claims on four grounds: no duty to disclose, safety marketing was puffery, no "direct dealings," and insufficient scienter. Each challenge fails.

### 1.    Volvo Misapplies California Law: *Dhital*, Not *Rattagan*, Controls This Fraudulent Inducement Case

Volvo's lead argument rests on a fundamental misreading of California Supreme Court precedent. It contends that *Rattagan v. Uber Technologies, Inc*., 17 Cal. 5th 1 (2024), eliminated the long-established duty manufacturers owe to disclose latent defects before consumers enter transactions. Volvo's reliance on *Rattagan* is misplaced. Nothing in *Rattagan* addressed—much less overruled—the separate and well-settled body of law governing a manufacturer's duty to disclose latent defects before a consumer ever enters a transaction. The controlling authority is *Dhital v. Nissan North America, Inc.*, 84 Cal. App. 5th 828 (2022). Dhital squarely held that a manufacturer with "exclusive or superior knowledge of a material defect that is not known to the plaintiff" has a duty to disclose it. Id. at 842. After issuing *Rattagan* in August 2024, the Supreme Court had *Dhital*'s petition for review before it. On December 18, 2024, the Court dismissed review—effectively republishing *Dhital* without modification or instructions. *See* 327 Cal. Rptr. 3d 898, 559 P.3d 1083 (2024). This dismissal sent an unmistakable signal: *Dhital*'s rule for pre-transaction fraudulent inducement by concealment remains good law alongside *Rattagan's* rule for fraud during contractual performance.

Federal courts in California have recognized this distinction. In *Moore v. American Honda Motor Co., Inc*. (where Volvo's counsel, Mr. Mallow represented Honda), Judge Freeman confronted the identical argument Volvo advances here and rejected it, holding that "*Dhital* rather than *Rattagan* applies to the fact pattern in this case." 2025 U.S. Dist. LEXIS 59461, at *25 (N.D. Cal. Mar. 28, 2025). *Moore* noted that the California Supreme Court's dismissal of *Dhital*'s appeal

FAZIO | MICHELETTI LLP
Attorneys

1    after deciding *Rattagan* "indicated that the reasoning in *Dhital* should guide claims . . . of

2    fraudulent inducement by omission." *Id*. at *26. The Central District reached the same conclusion

3    in *Ramos v. Ford Motor Co*., holding that "*Dhital* controls fraudulent concealment inducing the

4    formation of a contractual relationship," whereas "*Rattagan* controls fraud within an existing one."

5    2025 U.S. Dist. LEXIS 73678, at *13-14 (C.D. Cal. Apr. 16, 2025) (emphasis in original).

6        The distinction is both legally sound and practically essential. *Rattagan* addresses fraud in

7    the performance of an existing contract—situations where contractual remedies and duties ***already***

8    govern the parties' relationship. *Dhital* addresses fraud that ***induces*** the contract's formation—

9    situations where the fraudulent concealment precedes and causes the transaction itself. To conflate

10   these scenarios, as Volvo urges, would eviscerate consumer protection for pre-contractual fraud

11   and reward manufacturers who conceal dangerous defects until after the sale closes.  The Second

12   Amended Complaint alleges that Plaintiff would not have leased his vehicle had he known of the

13   Powertrain Control Defect that Volvo concealed. ECF 19 ¶¶ 85, 104-07. This is quintessential

14   *Dhital* fraudulent inducement, and *Rattagan* is inapposite**.**

15        **2.    The SAC Pleads Three Independent Bases for a Duty to Disclose**

16        A duty to disclose arises under the four circumstances described in *LiMandri v. Judkins*:

17   (1) when defendant has exclusive knowledge of material facts not known to plaintiff; (2) when

18   defendant actively conceals a material fact; (3) when defendant makes partial representations that

19   are misleading without additional facts; or (4) when parties are in a fiduciary relationship. 52 Cal.

20   App. 4th 326, 336 (1997). *See also Falk v. Gen. Motors Corp*., 496 F. Supp. 2d 1088, 1095 (N.D.

21   Cal. 2007) (discussing same). The claims at issue here are predicated on the first three, each of

22   which is satisfied for the reasons described below.

23        **a**.    ***Plaintiff has Properly Alleged Exclusive Knowledge of a Material***

24             ***Safety Defect***

25        A manufacturer that possesses exclusive or superior knowledge of a latent defect unknown

26   to consumers has a duty to disclose it. *Dhital*, 84 Cal. App. 5th at 842; *Wilson v. Hewlett-Packard*

27   *Co*., 668 F.3d 1136, 1147 (9th Cir. 2012). The SAC alleges Volvo knew of the Powertrain Control

28   Defect from sources uniquely available to it: pre-release testing data, internal validation studies,

FAZIO | MICHELETTI LLP
Attorneys

1    aggregate warranty claim records, early consumer complaints to Volvo and its dealers, Volvo's

2    own investigations using flight data recorders, knowledge of critical defects in the shared Battery

3    Energy Control Module ("BECM") from the sister Polestar 2 vehicle, and safety recalls for related

4    unintended acceleration issues. ECF 19 ¶¶ 43, 47-48, 55-58, 59. The SAC also alleges that, after

5    one investigation, Volvo's own Critical Incident Coordinator admitted in writing "there was a

6    manufacturing defect at the time of the incident." *Id*. ¶ 71 & Ex. 4 (ECF 19-4). The SAC further

7    alleges that Consumers like himself could not discover this latent, intermittent electronic defect

8    through reasonable inspection. *See, e.g., id*. ¶ 47 (discussing Volvo's use of sophisticated

9    electronic data recorders when it chose to respond to complaints of uncommanded vehicle

10   propulsion).  These facts are sufficient to trigger a duty to disclose under the first *LiMandri* factor

11   (exclusive knowledge).

12       Volvo contends that the existence of some NHTSA complaints defeats "exclusive

13   knowledge." ECF 38 at 9:9-10. This argument fails. California law does not require literally

14   exclusive knowledge; superior knowledge suffices. *See Falk*., 496 F. Supp. 2d at 1097-98 ("The

15   fact that some information may be publicly available does not defeat a claim of superior

16   knowledge" where the manufacturer possesses "superior knowledge from sources like pre-release

17   testing data"). A manufacturer is deemed "to have known a lot more about the defect, including

18   information unavailable to the public." *Margolis v. Apple Inc.*, 777 F. Supp. 3d 1060, 1069-70

19   (N.D. Cal. 2025) (cleaned up). This superior knowledge of a dangerous safety defect triggers a

20   duty to disclose it. *See, e.g., Khan v. Shiley*, 217 Cal. App. 3d 848, 858 (1990) ("our decision

21   neither establishes a new cause of action nor drastically extends existing law. It merely confirms

22   that ***a manufacturer of a product may be liable for fraud when it conceals material product***

23   ***information from potential users. This is true whether the product is a mechanical heart valve***

24   ***or frozen yogurt***") (emphasis added; footnote omitted); *see also Czuchaj v. Conair Corp.*, No. 13-

25   CV-1901-BEN (RBB), 2014 U.S. Dist. LEXIS 54410, at *10-12 (S.D. Cal. Apr. 16, 2014)

26   ("Exclusivity is not applied with rigidity, and is analyzed in part by determining whether the

27   defendant has 'superior' knowledge of the defect" (citing *Johnson v. Harley-Davidson Motor Co.*

28

FAZIO | MICHELETTI LLP
Attorneys

1   *Grp., LLC,* 285 F.R.D. 573, 583 (E.D. Cal. 2012), and discussing *Falk*, 496 F. Supp. 2d at 1096-

2   97).

3

4           b.      ***Plaintiff has Properly Alleged that Volvo Actively Concealed the***

5                   ***Defect***

6           A duty to disclose also arises when a party "actively conceals a material fact from the

7   other." *LiMandri*, 52 Cal. App. 4th at 336. The SAC alleges Volvo did not just remain silent; it

8   took affirmative steps to conceal the defect's existence. As alleged, these acts include issuing

9   restrictive Technical Service Bulletins to dealers on how to address the defect without triggering

10  warranty claims, ECF 19 ¶ 48(f), implementing the "FSM220" program designed to mask

11  warranty claims related to the defect, *id*. ¶ 48(g), and offering $1,000 "goodwill" payments to

12  dissatisfied customers to "sanitize the warranty record" and prevent NHTSA reporting, *id*. ¶ 48(h).

13  These allegations of affirmative conduct, designed to prevent consumers and regulators from

14  discovering the truth, are more than sufficient to establish a duty to disclose **under the second**

15  ***LiMandri* factor (active concealment)**. *See Lovejoy v. AT&T Corp*., 92 Cal. App. 4th 85, 94

16  (2001) (duty arises when defendant "performs an act designed to prevent the plaintiff from

17  discovering the truth"); *Stevens v. Superior Court*, 180 Cal. App. 3d 605, 609-10 (1986) (active

18  concealment includes conduct "undertaken for the purpose of preventing, or which has the effect

19  of preventing, discovery of the concealed facts").

20          c.      ***Plaintiff   has   Properly   Alleged   that   Volvo's   Partial***

21                  ***Representations About Safety Triggered a Duty to Disclose***

22          A duty to disclose also arises when a party makes "partial representations" that are

23  misleading because they "suppress[] a fact which makes them misleading." *LiMandri*, 52 Cal.

24  App. 4th at 336. The SAC alleges that Volvo has built its global brand on the singular promise of

25  "Safety first, always." ECF 19 ¶¶ 17c & n. 2, 18, 22-23, 26, 45, 48f.iii., 49-51. As alleged in the

26  SAC, "Volvo's marketing materials promote the XC40 Recharge with taglines such as 'Safety

27  first. Always' and 'Every mile should be safe,' creating consumer expectations of predictable,

28  reliable vehicle control." *Id*. ¶ 49. The SAC also alleges that "Volvo positions the XC40 Recharge

not merely as an EV, but as a symbol of its broader commitment to safety and sustainability, integrating this message deeply into its brand narrative." *Id.* ¶ 50. Accepting these allegations as true for the purpose of this motion, Plaintiff has sufficiently alleged a duty to disclose under the third *LiMandri* factor (partial representations that are misleading without additional facts). *See Continental Airlines, Inc. v. Goodyear Tire & Rubber Co*., 819 F.2d 1519, 1525 (9th Cir. 1987) (applying California law) (defendant who represents that it is the "industry leader in safety" has duty to disclose facts inconsistent with that representation); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig*., 754 F. Supp. 2d 1145, 1179 (C.D. Cal. 2010) (marketing vehicles as safe while knowing of unintended acceleration defect creates duty to disclose).

### 3.    As Alleged, Volvo's Safety Representations Are Actionable Misrepresentations, Not "Puffery"

Volvo argues that representations about vehicle safety as alleged in the SAC are "non-actionable puffery." (See ECF 38 at 11:10-21.) Volvo is mistaken. Safety is not a subjective opinion; it is a measurable design attribute that consumers rely upon and manufacturers quantify through testing, certification, and recalls. While generalized statements of opinion are not actionable, "a statement 'crosses the line' from puffery to an actionable misrepresentation" when it is "juxtaposed with a manufacturer's contemporaneous knowledge of a concealed defect." *In re Takata Airbag Prods. Liab. Litig*., 193 F. Supp. 3d 1324, 1340 (S.D. Fla. 2016) (applying California law).

The California Supreme Court's decision in *Hauter v. Zogarts* is instructive. 14 Cal. 3d 104 (1975). There, the manufacturer marketed a golf training device as safe despite knowing it could cause serious injury. *Id*. at 112-113 ("the assertion 'Completely Safe Ball Will Not Hit Player' constitutes a factual representation. Defendants' statement parallels that of an automobile dealer who asserts that the windshield of a car is "shatterproof'"). The Court held this was not "mere puffing" but rather "a specific representation of fact" because safety "is not a matter of opinion." *Id*. The representation was actionable because it addressed "a matter of legitimate

1    concern to the consumer" that the consumer "could not be expected to discover" through

2    inspection. *Id.*

3         *Hauter*'s reasoning applies here. Again, safety is not subjective. The SAC alleges Volvo

4    represents that safety is its "first" priority and "core value," while simultaneously concealing a

5    defect causing uncommanded acceleration.  Taken as true for the purposes of this motion, these

6    representations are factual statements about the vehicle's design and engineering—not opinions

7    about abstract brand values. *See Johnson v. Glock, Inc.*, 2021 U.S. Dist. LEXIS 253042, at *25-

8    26 (N.D. Cal. Sept. 22, 2021) ("Last are the statements about safety: describing the guns as 'Safe

9    Action©,' 'Safe. Simple. Fast. = Confidence,' and that it 'delivers on our promise of safety,

10   reliability, and simplicity.' I cannot find that this group of representations is mere puffery; a

11   factfinder will have to make that assessment").[1]

12        Recent precedent confirms this analysis. In *Kohanof v. Porsche Cars N.A., Inc.*, the Central

13   District addressed virtually identical safety representations in a vehicle defect case. 2025 U.S.

14   Dist. LEXIS 94513, at *19-20 (C.D. Cal. Mar. 31, 2025).  The court held that while some

15   statements constitute puffery—such as calling a vehicle the "best SUV"—representations that

16   vehicles are "safe" are "objectively true or false" and therefore not puffery as a matter of law. *Id.*

17   The court explained that whether a statement constitutes puffery "is a question of fact, not law,"

18   and cited with approval the *Takata* airbag litigation, which held that "[a]dvertising a car as safe

19   and reliable when it actually has a safety-related defect that may render it unable to stop is not

20   'within the tolerable range of commercial puffery,' especially because [the defendant] allegedly

21

22

---

[1] *See also In re Future Motion, Inc., Onewheel Prods. Liab. Litig.*, No. 23-md-03087-BLF, 2024 U.S. Dist. LEXIS 99867, at *45-48 (N.D. Cal. July 12, 2024) (defendant's statements that product "keep[s] you perfect" and is safe for riders of "all ages" were not puffery when allegations suggested product was dangerous); *Hernandez v. Radio Sys. Corp.*, No. EDCV 22-1861 JGB (KKx), 2023 U.S. Dist. LEXIS 40038, at *11-16 (C.D. Cal. Mar. 9, 2023) (representations that electric shock collars were "safe" and "harmless" were not puffery because they addressed "product attributes of importance to customers" and "reasonable consumer could be misled"); *In re Toyota Motor Corp.*, No. 8:10ML 02151 JVS (FMOx), 2012 U.S. Dist. LEXIS 189744, at *280 (C.D. Cal. May 4, 2012) ("Advertising a car as safe and reliable when it actually has a safety-related defect that may render it unable to stop is not within the tolerable range of commercial puffery, especially because Toyota allegedly had exclusive knowledge of the SUA defect") (cleaned up).

1  had exclusive knowledge of the [] defect." *Id.* (quoting *In re Takata Airbag Prods. Liab. Litig.*,

2  2020 U.S. Dist. LEXIS 95692, 2020 WL 3286821, at *7 (S.D. Fla. May 29, 2020)).

3        **4.**      **The SAC Satisfies the "Direct Dealings" Requirement**

4       Distilled to its essence, Volvo argues that manufacturers owe no duty to consumers unless

5  they sell vehicles directly to the public, rather than through dealer networks. If accepted, this

6  theory would immunize every automotive manufacturer from liability for concealing safety

7  defects—a result that would eviscerate consumer protection law and contradict how modern

8  commerce functions.

9       Volvo's argument fails for two independent reasons: (1) the "direct dealings" requirement

10  does not mean what Volvo claims it means, and (2) the SAC adequately alleges the requisite

11  relationship.

12        **a.**      *"Direct Dealings" Does Not Require Contractual Privity*

13       In *Rattagan*, the California Supreme Court stated that a fraud claim requires "a transaction

14  [that] must necessarily arise from direct dealings between the plaintiff and the defendant; it cannot

15  arise between the defendant and the public at large." 17 Cal. 5th at 41 (quoting *Bigler-Engler v.*

16  *Breg, Inc*., 7 Cal. App. 5th 276, 312 (2017)) (emphasis added). Volvo seizes on this language to

17  argue that consumers who purchase vehicles through dealerships have no fraud claim against

18  manufacturers. The argument misreads the quoted language and ignores both precedent and

19  practical reality.

20       Start with the text. The *Rattagan* Court required "direct dealings between the plaintiff and

21  the defendant"—not a "direct transaction," as Volvo repeatedly mislabels it. (See ECF 38 at 7:24-

22  25.) The contrast was between dealings "between the plaintiff and the defendant" versus dealings

23  "between the defendant and the public at large." *Rattagan*, 17 Cal. 5th at 41. This language

24  distinguishes fraud claims based on specific relationships from claims based on generalized public

25  statements, not claims involving dealer intermediaries from claims involving direct sales.

26       Judge Tigar explained this distinction persuasively in *Ladanowsky v. FCA US LLC*.

27  Rejecting the identical argument Volvo makes here, Judge Tigar held: "[A]s a car manufacturer,

28  FCA cannot shirk its duty to disclose material facts to subsequent purchasers of its vehicles just

because consumers purchase those vehicles from FCA's dealerships rather than from FCA directly." 2024 U.S. Dist. LEXIS 234447, at *9 (N.D. Cal. Dec. 30, 2024) (emphasis added). The court recognized that interpreting "direct dealings" to require contractual privity would create an irrational windfall for manufacturers, allowing them to "shirk" disclosure duties merely by using the dealer distribution model that has dominated the automotive industry for over a century.

Judge Vera's recent decision in *Meneses v. FCA US LLC* provides even more detailed analysis. The court explained that *Bigler-Engler*'s "direct dealings" language must be read in context:

> FCA construes this language to bar fraudulent concealment claims against manufacturers where products are sold indirectly through third-party intermediaries, such as dealerships. FCA overreads these cases. Bigler-Engler for example, discusses whether the parties directly transact as just one part of the analysis of the aspects of a relationship giving rise to a duty to disclose. Also relevant to this same analysis is whether the defendant knew of plaintiff's use of its product, whether the defendant advertised their product to consumers, and whether the defendant derived benefit from plaintiff's use of the product . . . . Bigler-Engler's requirement of "direct dealings between the plaintiff and the defendant" is best understood in the context of the rest of the sentence—as opposed to "between the defendant and the public at large"—not as requiring immediate privity.

2025 U.S. Dist. LEXIS 211418, at *13-14 (N.D. Cal. Oct. 3, 2025) (citations omitted; emphasis added).

In other words, the relevant inquiry is whether the manufacturer had a relationship with the specific consumer (or class of consumers) sufficient to trigger a disclosure duty, ***not*** whether the manufacturer signed the purchase contract. The SAC easily satisfies this standard. Plaintiff alleges Volvo knew of Plaintiff's use of its product (he leased a Volvo vehicle from an authorized Volvo dealership), ECF 19 ¶ 10; Volvo advertised its products directly to Plaintiff and other consumers through nationwide marketing campaigns touting "Safety first, always," *id.* ¶¶ 17-20, 49-50; Volvo derived direct benefit from Plaintiff's lease payments, *id.* ¶ 147; and Volvo controlled every aspect of the transaction through its comprehensive dealer network, *id.* ¶¶ 17-28. These facts establish a relationship between Volvo and Plaintiff that is anything but "between the defendant and the public at large."

The distinction between "direct dealings" and dealings with "the public at large" is meaningful and finds support in decades of California precedent. Courts have long recognized that

1  manufacturers who market directly to consumers, derive revenue from their purchases, and control

2  the distribution channel have a relationship with those consumers sufficient to trigger disclosure

3  duties—regardless of whether an intermediary signs the final contract. *See Geernaert v. Mitchell*,

4  31 Cal. App. 4th 601, 608 (1995) ("The essence of the tort [of fraudulent nondisclosure] is

5  preventing another from acquiring relevant information, not a breach of a confidential

6  relationship."); *Varwig v. Anderson-Tully Co.*, 147 Cal. App. 3d 324, 334 (1983) ("there may arise

7  a situation where nondisclosure constitutes actionable fraud even where the parties to the

8  transaction are not in a confidential or fiduciary relationship").

9

10      Volvo attempts to support its position by citing *Hervey v. BMW of N. Am., LLC*, No.

11  B321367, 2025 Cal. App. Unpub. LEXIS 939 (Cal. App. Feb. 18, 2025), and *Gonzalez v. FCA US*

12  *LLC*, No. 23-cv-05835-TSH, 2024 U.S. Dist. LEXIS 42395 (N.D. Cal. Mar. 11, 2024). These

13  cases do not help Volvo. *Hervey* is an unpublished decision involving a used car buyer—a

14  materially different scenario from the original lessee of a new vehicle alleged here.[2]

15      Moreover, *Hervey* preceded the California Supreme Court's dismissal of its review of

16  *Dhital*, and thus did not have the benefit of that critical signal. *Gonzalez* likewise predated the

17  Supreme Court's December 2024 dismissal of *Dhital* review and, more important, predated the

18

---

19  [2] As the *Meneses* court went on to observe, however, "California courts have held that '[u]nder

20  California law, a vendor has a duty to disclose material facts not only to immediate purchasers,
    but also to subsequent purchasers when the vendor has reason to expect that the item will be

21  resold.'" 2025 U.S. Dist. LEXIS 211418, at *14 (quoting *OCM Principal Opportunities Fund,
    L.P. v. CIBC World Mkts. Corp.*, 157 Cal. App. 4th 835, 839 (2007), and citing *Barnhouse v. City*

22  *of Pinole*, 133 Cal. App. 3d 171, 192 (1982)). The court also explained that in *Barnhouse*, "at least
    one of the plaintiff-appellants purchased their home from the original purchaser and did not deal

23  directly with the developer," hence "[t]he relationship between plaintiff and defendant in
    *Barnhouse* is thus exactly as direct as the one between Plaintiffs and FCA here." *Id*. at *14 n. 3.

24  *See also* BAJI 12.50 (9th ed. 2003) ("A person has reason to expect that a nondisclosure of material
    fact will be passed on to other persons and that such persons will act upon it, if the nondisclosure

25  is made in connection with the sale of goods, the furnishing of services, or a business transaction
    that will directly affect other persons"); *Shapiro v. Sutherland*, 64 Cal. App. 4th 1534, 1551 (1998)

26  ("Although there was no privity of contract between Sutherland and Shapiro, a duty to disclose
    may arise between parties who are in a nonfiduciary or nonconfidential relationship under the

27  circumstances, as where a seller knows of facts which are basic to the transaction, if he knows that
    the buyer is ignorant of those facts and he knows that the buyer could not reasonably discover

28  those facts.

FAZIO | MICHELETTI LLP
Attorneys

1    detailed analysis in *Moore*, *Ladanowsky, and Meneses*—all of which were decided after the *Dhital*

2    dismissal and thus correctly analyzed the issues in light of the full picture. These more recent

3    decisions from this District are far more persuasive. And, at the very least, whether a relationship

4    constitutes "direct dealings" is a factual issue inappropriate for resolution on a motion to dismiss.

5                    **b.    *Each Defendant is Liable for the Same Fraudulent Conduct***

6           Plaintiff adequately alleges that, although Volvo AB manufactured the Class Vehicles,

7    Defendants VCNA and VCUSA are independently liable because they were not passive

8    intermediaries—they actively perpetrated the same fraudulent scheme through their coordinated

9    roles in marketing, distribution, and warranty administration.[3]

10          As alleged in the SAC, these Defendants' roles "were coordinated under Volvo AB's

11   overarching corporate policies, ensuring that the same safety representations and omissions

12   regarding the Defect were conveyed at every level of consumer contact." *Id.* ¶¶ 102, 112. VCNA

13   and VCUSA were not merely conduits for Volvo AB's fraud—they were active participants who

14   executed the marketing campaigns that made the affirmative safety misrepresentations,

15   administered the warranty denials that perpetuated the concealment, and disseminated the service

16   directives that instructed dealers to dismiss consumer complaints as "normal function."

---

[3] The SAC alleges that VCNA serves as "Volvo AB's regional operational hub for marketing, brand communications, and warranty program administration in the United States and Canada." ECF 19 ¶ 11. VCNA "develops and executes Volvo's regional advertising campaigns" that shape "consumer perceptions of Volvo vehicle safety and reliability." *Id.* ¶ 23. VCNA administered the warranty programs and, "[a]cting under corporate directives from Volvo AB," implemented policies that "perpetuated Volvo AB's concealment of the Defect by promoting Class Vehicles using Volvo's global 'Safety first, always' messaging while following instructions to treat surging complaints as 'normal function' and limit warranty remedies." *Id.*

VCUSA serves as "the exclusive importer and distributor of Volvo passenger vehicles in the United States" and is "responsible for U.S. sales, marketing, warranty administration, and dealer communications." *Id.* ¶ 12. "[A]cting as Volvo AB's agent," VCUSA "imports, markets, and sells Volvo passenger vehicles in the United States, administers warranty coverage, and communicates with U.S. dealers and customers." *Id.* ¶ 25. VCUSA "disseminated marketing materials touting the Class Vehicles' safety and performance and implemented service policies that downplayed or dismissed customer complaints about the Defect as 'normal function.'" *Id.* ¶ 26.) As the U.S. warrantor, VCUSA "issued the New Vehicle Limited Warranty and controlled the administration of warranty claims," and "[f]ollowing direction from Volvo AB, . . . denied or limited repairs for surging complaints." *Id.* ¶ 27.

FAZIO | MICHELETTI LLP
*Attorneys*

1   Under California law, it is "the settled rule that every person connected with a fraud is

2   liable for the full amount of damages." *Crawford v. Nastos*, 182 Cal. App. 2d 659, 665 (1960).

3   VCNA and VCUSA acted in concert as to the fraudulent concealment by affirmatively promoting

4   the vehicles' safety credentials while simultaneously concealing the known defect and denying

5   warranty repairs. They are therefore independently liable for the entire fraudulent scheme,

6   regardless of which corporate entity manufactured the vehicles. *See Continental Airlines, Inc. v.*

7   *McDonnell Douglas Corp.*, 216 Cal. App. 3d 388, 407 (1989) (distributor liable for fraud where

8   it "played an active and substantial role in promoting" the product and concealing known defects).

9

10          **5.      The SAC Alleges Scienter with Particularity**

11          The SAC alleges that, after one vehicle owner experienced uncommanded acceleration,

12   Volvo investigated using a sophisticated "flight data recorder" and concluded unequivocally that

13   "there was a manufacturing defect at the time of the incident." ECF 19 ¶¶ 47, 71 & Ex. 4 (ECF

14   19-4). If proven, this is a direct admission of knowledge.

15          This admission is wholly consistent with detailed allegations of contradictory conduct that

16   "strongly impl[y]" fraudulent intent. *In re S1 Corp. Sec. Litig.*, 173 F. Supp. 2d 1334, 1351 (N.D.

17   Ga. 2001). The SAC alleges that while Volvo publicly dismissed the defect as "normal," ECF 19

18   ¶ 33, Volvo simultaneously:

19   • Deployed sophisticated flight data recorders—typically "associated with deep technical

20      investigation into anomalous system behaviors in critical applications such as aviation"—

21      to investigate identical symptoms in other customer vehicles, *id*. ¶¶ 47, 55-58;

22   • Issued restrictive Technical Service Bulletins to dealers on how to address the defect, *id*. ¶

23      48(f);

24   • Implemented the "FSM220" program designed to mask warranty claims related to the

25      defect, *id*. ¶ 48(g); and

26   • Offered $1,000 "goodwill" payments to dissatisfied customers to "sanitize the warranty

27      record" and prevent NHTSA reporting, *id*. ¶ 48(h).

28

FAZIO | MICHELETTI LLP
Attorneys

1    If proven, this pattern—public denial coupled with private acknowledgment and

2  systematic concealment—is the hallmark of fraudulent intent. *See Stevens*, 180 Cal. App. 3d at

3  609-10.

4    The SAC also alleges that Volvo had knowledge of defects in the Battery Energy Control

5  Module ("BECM")—a critical component shared with the Polestar 2 vehicle—including "critical

6  powertrain failures" and "loss of propulsion" due to software defects. ECF 19 ¶ 48(b). Volvo also

7  conducted multiple safety recalls for related unintended acceleration issues, including NHTSA

8  Recall 22V-288 for a faulty accelerator pedal harness. *Id*. ¶¶ 46, 48(c). These allegations

9  demonstrate that Volvo was on notice of "the system's vulnerability to corrupted input signals

10  causing unintended acceleration." *Id*. ¶ 46.

11    To the extent Volvo argues the SAC fails to identify by name the specific Volvo employees

12  who possessed knowledge of the defect, Volvo is asking for more than Rule 9(b) requires. *See,*

13  *e.g., Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1018 (N.D. Cal. 2020) ("while, typically,

14  averments of fraud must be accompanied by 'the who what when where, and how of the

15  misconduct charged,' pure omissions claims can succeed without the same level of specificity

16  required by a normal fraud claim") (cleaned up). "Because this is a fraudulent concealment case

17  involving the internal doings of a sophisticated corporation, those facts are within the Defendants'

18  knowledge and are properly to be determined through discovery, not on a motion to dismiss."

19  *Gray v. BMW of N. Am., LLC*, No. 13-cv-3417-WJM-MF, 2014 U.S. Dist. LEXIS 133337, at *8

20  (D.N.J. Sep. 23, 2014)) (citing *Alfaro v. Community Housing Imp. System & Planning Ass'n, Inc*.,

21  171 Cal. App. 4th 1356, 1384-85 (2009)); *see also In re Craftmatic Sec. Litig*., 890 F.2d 628, 645

22  (3d Cir. 1989) (corporate fraud claims should be judged with sensitivity to "unique problems"

23  caused by "defendants' concealing conduct and 'inside' information") (citing *Wool v. Tandem*

24  *Computers, Inc*., 818 F.2d 1433, 1439 (9th Cir. 1987)).

25

26

27

28

FAZIO | MICHELETTI LLP
Attorneys

1

### 6.    Plaintiff's Statutory Claims Do Not Require Privity and Are

2

### Independently Viable

3    Volvo's attempt to dismiss the CLRA, UCL, and FAL claims on privity grounds fails.

4    These consumer protection statutes have broader standards than common law fraud and do not

5    require privity with the defendant.

6

### a.    *The CLRA Does Not Require Privity*

7    The Consumers Legal Remedies Act defines "transaction" broadly as "an agreement

8    between a consumer and another person, whether or not the agreement is a contract enforceable

9    by action, and includes the making of, and the performance pursuant to, that agreement." Cal. Civ.

10   Code § 1761(e) (emphasis added). Moreover, the statute must be "liberally construed" to protect

11   consumers. Cal. Civ. Code § 1760; *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 954 (2017); *see also*

12   *Chamberlan v. Ford Motor Co.*, No. C 03-2628 CW, 2003 U.S. Dist. LEXIS 27912, at *17 (N.D.

13   Cal. Aug. 6, 2003) ("Liberally construed, the CLRA's proscription against unfair and deceptive

14   business practices encompasses Defendant's alleged concealment of product defects").

15   "[W]hile tort standards at times may be relevant to a court's evaluation of CLRA actions,

16   that does not mean that CLRA actions must fulfill the same elements as common law fraud

17   claims." *Chamberlan v. Ford Motor Co*., 369 F. Supp. 2d 1138, 1144 (N.D. Cal. 2005).[4] Courts

18   have consistently held that "a manufacturer that is not the direct seller may be held liable for failure

19   to disclose material defects under the CLRA . . . although not for common law fraud." *Falco v.*

20   *Nissan N. Am. Inc.*, 96 F. Supp. 3d 1053, 1062–63 (C.D. Cal. 2015). There are "numerous cases

21   supporting [the] contention that a direct sale is not required to allege a CLRA claim." *Dei Rossi v.*

22   *Whirlpool Corp*., No. 2:12-cv-00125, 2013 U.S. Dist. LEXIS 153682, at *28 (E.D. Cal. Oct. 24,

23   2013). The CLRA's "protection extends to the manufacturer as well, regardless of whether the

24   consumer dealt directly with the manufacturer." *Id*.

25   _____

26   [4] Many other courts have cited *Chamberlan* for this fundamental understanding that most modern
commercial transactions occur through a retailer intermediary. *See, e.g., Bledsoe v. FCA US LLC*,
27   663 F. Supp. 3d 753, 795 (E.D. Mich. 2023)*; Makaeff v. Trump Univ., Ltd. Liab. Co*., 145 F. Supp.
3d 962, 980 (S.D. Cal. 2015); *Reniger v. Hyundai Motor Am*., 122 F. Supp. 3d 888, 899 (N.D. Cal.
28   2015).

1    In *Chamberlan*, the District Court held that used-car purchasers—who had no transaction

2    of any kind with the manufacturer—could pursue CLRA claims based on the manufacturer's

3    exclusive knowledge of a defect. 369 F. Supp. 2d at 1144. The court specifically rejected Ford's

4    argument that lack of privity barred CLRA standing. *Id. See also Seifi v. Mercedes-Benz USA*,

5    LLC, No. C12-5493 TEH, 2013 U.S. Dist. LEXIS 73415, at *23 (N.D. Cal. May 23, 2013) ("The

6    consumer protection goal behind the CLRA would be undercut if consumers were barred from

7    bringing claims for failure to disclose material facts simply because of lack of privity"); *Keilholtz*

8    *v. Superior Fireplace Co*., No. CV 07-6072 CAS (JTLx), 2008 U.S. Dist. LEXIS 113583, at *18-

9    19 (C.D. Cal. June 23, 2008) (transaction requirement satisfied where plaintiff purchased product

10   and defendant's misrepresentations "concern the characteristics and performance of the product at

11   issue").

12   The SAC alleges Plaintiff entered into a transaction for a Volvo vehicle based on Volvo's

13   representations about safety and concealment of the defect. ECF 19 ¶¶ 2, 10, 104-07, 110-13. This

14   satisfies the CLRA's broad "transaction" requirement. The statute's consumer protection purpose

15   would be "undercut" if Volvo could escape liability simply because it used dealers as

16   intermediaries. *Seifi*, 2013 U.S. Dist. LEXIS 73415, at *23.

17   The legislative history confirms this interpretation. As the then-Chief Counsel for the

18   California Assembly Judiciary Committee explained shortly after it became law, the CLRA

19   provides

20   remedies for those consumers damaged by specifically proscribed deceptive
     practices on the part of a merchant. It applies to transactions for the sale or lease of
21   goods or services "primarily for personal, family or household purposes," or for
     "services for other than a commercial or business use, including services furnished
22   in connection with the sale or repair of goods. A contract is not a necessary
     condition precedent to an action." ***The only transaction necessary is some***
23   ***"agreement between a consumer"*** *and the defendant* ***"whether or not the***
     ***agreement is enforceable by action, and includes the making of, and the***
24   ***performance pursuant to that agreement." The agreement need not be express.***
     ***An advertisement which invokes action by a consumer certainly "includes the***
25   ***making of" an agreement and is therefore a "transaction" within the meaning of***
     ***the statute***. A construction any less broad would render several subparagraphs of
26   Civil Code section 1770 worthless as a practical matter.

27

28

FAZIO | MICHELETTI LLP
Attorneys

James S. Reed, *Legislating for the Consumer: An Insider's Analysis of the Consumers Legal Remedies Act*, 2 MCGEORGE L.REV. 1, 10 (1971) (citing, *inter alia,* Cal. Civ. Code § 1761(e)) (footnotes omitted; emphasis added). The CLRA was designed to reach precisely the type of manufacturer misconduct alleged here.

Volvo's "direct relationship" it also squarely contradicted by the Legislature's most recent amendments to the CLRA itself. In July 2024, Senate Bill 478 (the "Honest Pricing Law") took effect. *See* SB 478 (2023-2024 Reg. Sess.), Stats. 2023, ch. 400. The new law amends the very statute at issue, Cal. Civ. Code § 1770, to make it unlawful to engage in "drip pricing" by, among other things, "*[a]dvertising, displaying, or offering* a price for a good or service that does not include all mandatory fees or charges." Cal. Civ. Code § 1770(a)(29)(A) (emphasis added).

This amendment is dispositive. It provides a clear and recent legislative signal that the **act of advertising**—an act the legislative history confirms was the bill's precise target, *see, e.g.*, Assem. Com. on Judiciary, Analysis of Sen. Bill No. 478 (2023-2024 Reg. Sess., as amended May 18, 2023, p. 1 (noting bill combats "deceptive price advertising")—is an integral, actionable part of the "making of" a "transaction" under § 1761(e). By this amendment, the Legislature has explicitly defined a specific *form of advertising*—an act often performed by the manufacturer, not the final retailer—as a violation of § 1770.

This action affirms the *Chamberlan* court's broad interpretation of the statute. It confirms the CLRA is designed to regulate the *entire* consumer journey, starting with the manufacturer-controlled representations that are "intended to result in" a sale. Cal. Civ. Code § 1770(a).

**b.    *The UCL Does Not Require a Transactional Relationship***

The UCL, like the CLRA, is a consumer protection statute that must be "liberally construed" to protect consumers. *Kasky v. Nike, Inc*., 27 Cal. 4th 939, 950 (2002). As the California Supreme Court has explained,

> [a]t common law, deceived consumers had no claim for unfair competition. This made little sense, since ultimately it is the consumer who is harmed by a business that passes off goods or services as genuine, or as those of another. . . . No matter; consumers were left without a claim or remedy. This was the era of *caveat emptor* [that is, let the buyer beware].

FAZIO | MICHELETTI LLP
Attorneys

> The UCL and the FAL were enacted for the specific purpose of creating new rights and remedies that were not available at common law. The statutes deliberately broaden the types of business practices that can properly be found to constitute unfair competition, and eliminate a number of elements that were required in common law actions for fraud.

*Nationwide Biweekly Admin., Inc. v. Superior Court*, 9 Cal. 5th 279, 322 (2020) (cleaned up).

The statute prohibits "unlawful," "unfair," and "fraudulent" business practices. Cal. Bus. & Prof. Code § 17200. Each prong is independently viable and does not require proof of the elements of common law fraud. *Lozano v. AT&T Wireless Servs., Inc*., 504 F.3d 718, 731 (9th Cir. 2007).

The "unlawful" prong borrows violations from other laws. *Korea Supply Co. v. Lockheed Martin Corp*., 29 Cal. 4th 1134, 1143 (2003). Here, Plaintiff alleges Volvo's concealment violates the CLRA, the FAL, and federal law—specifically the Transportation Recall Enhancement, Accountability, and Documentation ("TREAD") Act, which requires manufacturers to report safety defects. *See* 49 U.S.C. § 30118(c) (requiring manufacturer to notify consumers when it "learns the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety"); 49 C.F.R. § 573.2(a) (discussing same). Volvo's failure to report the Powertrain Control Defect to NHTSA, combined with its affirmative efforts to "sanitize the warranty record" to prevent reporting, ECF 19 ¶ 48(h), violates the TREAD Act and thus provides a predicate for the UCL's unlawful prong. *See Korea Supply*, 29 Cal. 4th at 1143 (UCL can borrow violations of federal statutes).

The "fraudulent" prong does not have a "direct dealings" requirement; it requires only that members of the public are likely to be deceived. *See Nationwide Biweekly*, 9 Cal. 5th at 309 ("to state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived") (cleaned up); *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009) (same). Unlike common law fraud, it does not require proof of actual reliance, justifiable reliance, or privity. *Lozano*, 504 F.3d at 731. The SAC's allegations that Volvo marketed its vehicles as safe while concealing a dangerous defect easily satisfy this standard.

c.    ***The FAL Does Not Require Privity***

FAZIO | MICHELETTI LLP
Attorneys

1    The same is true of the False Advertising Law, which prohibits "unfair, deceptive, untrue

2  or misleading advertising." Cal. Bus. & Prof. Code § 17500. Like the UCL, the FAL is a public

3  protection statute that does not require privity. *See In re Toyota Motor Corp*., No. 8:10ML 02151

4  JVS (FMOx), 2012 U.S. Dist. LEXIS 189744, at *277-81 (C.D. Cal. May 4, 2012) (plaintiffs need

5  not point to specific advertisement to maintain FAL claim based on material omissions regarding

6  safety defect; causation satisfied where plaintiffs alleged manufacturer's nondisclosure caused

7  economic loss).

8    The SAC's allegations Volvo's safety representations, made in nationwide marketing

9  campaigns, satisfy the FAL's requirements. The question is whether those representations, in

10  context, were likely to deceive consumers, not whether Volvo or its dealers signed the lease

11  agreement. *Nationwide Biweekly*, 9 Cal. 5th at 309. Moreover, a plaintiff "is not required to

12  necessarily plead and prove individualized reliance on specific misrepresentations or false

13  statements where, as here, those misrepresentations and false statements were part of an extensive

14  and long-term advertising campaign." *In re Tobacco II Cases*, 46 Cal. 4th at 312. Here, Volvo has

15  used nearly 100 years of advertising to make "safety" synonymous with "Volvo." *See, e.g.,* ECF

16  19 ¶¶ 49-50 ("Volvo's reputation for safety is arguably its most significant brand asset, and it has

17  formed the bedrock of Volvo's promotion of its XC40 Recharge EVs. Volvo advertising and other

18  corporate communications implicitly and explicitly draw on Volvo's decades-long focus on

19  safety").

20    **B.    THE INDEPENDENT TORT DOCTRINE DOES NOT BAR THE FRAUDULENT**

21         **CONCEALMENT CLAIM**

22    Volvo separately argues that the economic loss rule bars the common law fraud claim. *See*

23  ECF 38 at 12:20-13:10. Volvo's economic-loss argument fails because it collapses the distinction

24  between breach of warranty and fraudulent inducement, which arises before any contract exists.

25    The economic loss rule provides that a plaintiff may not recover in tort for economic losses

26  that "arise from . . . a contract breach." *Robinson Helicopter*, 34 Cal. 4th at 988. The rule does not

27  bar tort claims that are independent of the contract. Fraudulent inducement is the quintessential

28  independent tort. *Id*. at 989-90.

*Dhital* squarely held that a claim that a manufacturer "fraudulently induced the plaintiffs to buy . . . by concealing a known defect . . . is not a claim that 'sounds in' or 'is grounded in' breach of contract" and thus is not barred by the economic loss rule. 84 Cal. App. 5th at 848. Federal courts applying California law post-*Rattagan* have expressly adopted this holding. *See Moore*, 2025 U.S. Dist. LEXIS 59461, at *29 (explaining that fraudulent inducement claim survives economic loss rule because "Plaintiffs' point is that they were fraudulently induced into entering a contract that they might otherwise have rejected. Had they known . . . they might have . . . chosen a different car altogether."); *Ramos*, 2025 U.S. Dist. LEXIS 73678, at *13-14 (same).

Plaintiff's claim here is identical: The SAC alleges that Volvo's pre-contractual concealment of a dangerous safety hazard induced him to enter the lease in the first place. *See, e.g.,* ECF 19 ¶¶ 91, 104-07, 113, 126, 133. This is not a claim that Volvo breached its warranty; it is a claim that Volvo's fraud induced the contract's formation. The independent tort doctrine does not apply.

Moreover, *Robinson Helicopter* itself forecloses Volvo's argument. There, the California Supreme Court held that the economic loss rule did not bar recovery where "the breach is accompanied by a traditional common law tort, such as fraud," where "the means used to breach the contract are tortious, involving deceit," or where "one party intentionally breaches the contract intending or knowing that such a breach will cause severe . . . harm." 34 Cal. 4th at 990. The Court emphasized that "[f]ocusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated." *Id.*

Fraudulent concealment of a safety defect satisfies all three exceptions. It is "a traditional common law tort" (fraud); it involves "tortious means" (deceit); and it reflects "intentional conduct" designed to induce reliance. *Id.* As the Court explained, "a party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to that contract." *Id.* at 993. Nor could Mr. Becker have "rationally calculate[d]" that Volvo would conceal a defect causing uncommanded acceleration while proclaiming "Safety first, always."

Neither the economic loss rule nor the independent tort doctrine insulate Volvo from tort liability for its fraudulent inducement.

## C.    THE SONG-BEVERLY ACT CLAIM IS PROPERLY PLEADED

Volvo argues that Plaintiff's implied warranty claim under the Song-Beverly Warranty Act fails because he did not "timely revoke acceptance" under Commercial Code Section 2608. ECF 38 at 14:11-15:7. Volvo is mistaken. "*In contrast to the California Uniform Commercial Code, the Song-Beverly Act 'contains no "reasonable time" requirement by which the consumer must invoke the [Song-Beverly] Act or lose rights granted by that statutory scheme*.'" *Mexia v. Rinker Boat Co., Inc*., 174 Cal. App. 4th 1297, 1307 (2009) (quoting *Krotin v. Porsche Cars N. Am., Inc*., 38 Cal. App. 4th 294, 301-302 (1995)) (emphasis added). Rather, Song-Beverly provides its own remedial scheme that does not incorporate the Commercial Code's timing requirements for revocation of acceptance. As the Central District recently held in rejecting this identical defense argument:d

> Although this argument has some superficial appeal, it ignores the fact that the operative condition is set forth in Section 1794 of the Civil Code, namely "where the buyer has . . . justifiably revoked acceptance." There is nothing in Section 1794 or the Song-Beverly Act more generally to suggest that the meaning of "justifiably revoked" is to be determined with reference to the Commercial Code and specifically Section 2608 of the Commercial Code. *The legislature could have, but did not explicitly define "justifiably revoked" to mean "timely revoked" under the requirements of Section 2608 of the Commercial Code. This Court therefore declines to read the statute in this manner*.
>
> In short, the Song-Beverly Act is clear on the requirements for damages and *timely* revocation under acceptance is not among them. *See* Civ. Code § 1793.2(d) and Civ. Code § 1794(b).

*Gofnung v. BMW of N. Am., LLC*, No. 2:21-cv-06328-MEMF-(JCx), 2023 U.S. Dist. LEXIS 78498, at *17-18 (C.D. Cal. May 4, 2023) (footnote omitted; bold italics added, normal italics in original).[5]

The court's reasoning applies with equal force here. Section 1794(b) sets forth the remedies available to a buyer when the manufacturer breaches the implied warranty of merchantability. Nothing in the statute conditions those remedies on compliance with Commercial Code Section 2608's timing requirements. Volvo's attempt to read Section 2608's "reasonable time" and

---

[5] *See also Fitzpatrick v. Ford Motor Co*., No. 2:22-cv-01924-FWS-JPR, 2024 U.S. Dist. LEXIS 93870, at *15 (C.D. Cal. Jan. 5, 2024) (same);

FAZIO | MICHELETTI LLP
Attorneys

1  "substantial change in condition" requirements into the Song-Beverly Act contradicts the statute's

2  plain language and consumer protection purpose.

3      Moreover, even if Commercial Code timing requirements applied, Plaintiff satisfies it. The

4  SAC alleges that he experienced the defect the day after leasing the vehicle, ECF 19 ¶ 29, reported

5  it to the dealer, *id*. ¶¶ 30-32, was told by Volvo that the behavior was "normal," *id*. ¶ 33, and filed

6  this action within nine months of taking possession. Plaintiff's timeline was reasonable and caused

7  no conceivable prejudice to Volvo. *See Gavaldon v. DaimlerChrysler Corp.*, 32 Cal. 4th 1246,

8  1264 (2004) (revocation must occur "within a reasonable time after the buyer discovers or should

9  have discovered the ground for it").

10      **D.    PLAINTIFF HAS PROPERLY PLEADED CLAIMS FOR EQUITABLE RELIEF**

11      Finally, Volvo argues that Plaintiff's claims for equitable relief under the CLRA, UCL,

12  and FAL must be dismissed. ECF 38 at 15:25-17:11.  The Court disagrees.

13      ***First***, Volvo argues that Plaintiff's legal remedies are adequate, citing *Sonner v. Premier*

14  *Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020). But *Sonner* requires only that a plaintiff plead

15  inadequacy. Plaintiff has done so. ECF 19 ¶¶ 120, 128, 136. More fundamentally, legal damages

16  are inherently inadequate to remedy the ongoing public safety risk and market-wide deception at

17  issue here. *See, e.g., J.J. v. Ashlynn Mktg. Grp., Inc.*, No. 24-cv-00311-GPC-MSB, 2025 LX

18  246296, at *46-47 (S.D. Cal. July 1, 2025) ("Plaintiff C.B. thus seeks 'injunctive relief to prevent

19  future harm—not just to Plaintiffs, but to the broader public. . . . These allegations are sufficient

20  at this stage to adequately plead that Plaintiff C.B. lacks an adequate remedy at law to subdue the

21  risk of future harm to the public") (citing cases). Nor will money damages serve to compel Volvo

22  to disclose the Powertrain Control Defect to other current and prospective owners and lessees, or

23  correct the false information that continues to mislead the public about Volvo's safety. Only

24  injunctive relief can accomplish these objectives.

25      ***Second***, Volvo argues Plaintiff lacks standing for an injunction because he now knows of

26  the defect and cannot be "fooled again." This argument was explicitly rejected by the Ninth Circuit

27  in *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018). Davidson held that a

28  consumer has standing to seek an injunction where she "would 'consider purchasing the product

1   again if she could be sure' it was not defective" but "is 'unable to rely on the product's advertising
2   . . . in the future.'" *Id*. at 969-70.

3       This is precisely what the SAC alleges. Plaintiff alleges he is a "safety-conscious"
4   consumer who "would be interested in leasing or purchasing a Class Vehicle from Volvo in the
5   future" but "will be unable to rely on Volvo's representations" absent an injunction requiring
6   corrective disclosures and prohibiting further deceptive conduct. ECF 19 ¶¶ 119, 127, 135. This
7   is the exact "inability to rely" harm that *Davidson* recognizes as sufficient for Article III standing.
8   *See also Hernandez v. Radio Sys. Corp.*, No. EDCV 22-1861 JGB (KKx), 2023 U.S. Dist. LEXIS
9   40038, at *16-18 (C.D. Cal. Mar. 9, 2023) (plaintiff who "continues to have use" for defendant's
10  products and "would want to purchase [them] in the future" but "does not and cannot know if
11  [defendant's] advertising is accurate and truthful" has standing for injunctive relief under
12  Davidson); *Lilly v. Jamba Juice Co.*, 2015 U.S. Dist. LEXIS 34498, at *4 (N.D. Cal. Mar. 18,
13  2015) (consumer has standing where "unless the manufacturer or seller has been enjoined from
14  making the same misrepresentation," the "consumer won't know whether the label is accurate"
15  and "won't know whether it makes sense to spend her money on the product").

16      Plaintiff has adequately alleged standing for equitable relief.

17      For each of the foregoing reasons, Defendants' motion to dismiss Plaintiff's Second
18  Amended Complaint is hereby DENIED.

19      SO ORDERED.

20  Dated: November 5, 2025          _____

21                                          Hon. Maxine M. Chesney
                                            United States District Judge

22
23
24
25
26
27
28

