Jeffrey L. Fazio (146043) (jlf@fazmiclaw.com)
Dina E. Micheletti (184141) (dem@fazmiclaw.com)
**FAZIO | MICHELETTI LLP**
1111 Broadway, Suite 400
Oakland, CA  94607
T: 925-543-2555
F: 925-369-0344

Keliang (Clay) Zhu (305509) (czhu@dehengsv.com)
Andre Y. Bates (178170) (aybates@dehengsv.com)
Yi Yao (292563) (yyao@dehengsv.com)
**DEHENG LAW OFFICES, P.C.**
Silicon Valley Office
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
T: 925-399-5856
F: 925-397-1976

*Attorneys for Plaintiff*
*Robert M. Becker, on behalf of himself*
*and all others similarly situated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT M. BECKER, on behalf of himself and all others similarly situated, | No. 3:25-cv-05331-MMC |
| Plaintiff, | |
| *v.* | **PLAINTIFF'S OPPOSITION TO DEFENDANT VOLVO CARS AB's MOTION TO DISMISS SECOND AMENDED COMPLAINT** |
| VOLVO CARS OF NORTH AMERICA, LLC, a Delaware limited liability company; VOLVO CAR USA, LLC, a Delaware limited liability company; and VOLVO CARS AB (publ.), a Swedish public limited company, | DATE: February 27, 2026 TIME: 9:00 a.m. COURTROOM: 7 (19th Floor) |
| Defendants. | **Hon. Maxine M. Chesney** |

## **TABLE OF CONTENTS**

PAGE

I.   INTRODUCTION .................................................................................................. 1

II.  SUMMARY OF PERTINENT FACTS ................................................................ 2

    A.   The Parent is the Applicant for CARB Certification—Not Its Subsidiaries ............... 2

    B.   The Parent's Brand Book Governs California Dealer Operations ............................. 4

    C.   The Parent Controls Design and Engineering of the Defective Powertrain ............... 5

    D.   Volvo Safety Messaging Originates at the Parent Level .......................................... 5

III. LEGAL STANDARD ........................................................................................... 6

IV.  ARGUMENT ....................................................................................................... 6

    A.   The Parent Purposely Directed Its Activities at California .................................... 6

        1.   Forty Years of CARB Certification Constitute Purposeful Direction ............. 7

        2.   CARB Certification Imposes Ongoing California-Specific Obligations ........ 8

        3.   The Ragnmark Declaration's Silence on CARB Certification is Telling ........ 9

        4.   The Parent Exercises Complete Control Over U.S. Marketing, Sales, and Dealership Operations ................................................................................. 10

        5.   Plaintiff's Brand Book Argument is Based on a Distinction Without a Difference .......................................................................................... 11

        6.   Volvo's Safety Messaging Demonstrates Purposeful Direction at California .............................................................................................. 13

        7.   Stream-of-Commerce-Plus: the Parent Did Far More Than Place Products in the Stream of Commerce ............................................................. 14

    B.   Plaintiff's Claims Arise Out of and Relate to the Parent's California Contacts ........ 15

        1.   Plaintiff's Claims Arise Out of the Parent's California Contacts ................ 15

        2.   Plaintiff's Claims Relate to the Parent's California Contacts ..................... 16

    C.   Exercising Jurisdiction Over the Parent is Reasonable ........................................ 17

    D.   In the Alternative, Plaintiff is Entitled to Jurisdictional Discovery ....................... 19

V.   CONCLUSION ................................................................................................... 19



**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS SECOND AMENDED COMPLAINT**

1

## TABLE OF AUTHORITIES

2                                                                                        **PAGE**

### *Cases*

3

*Asahi Metal Industry Co. v. Superior Court,*
4        480 U.S. 102 (1987) ................................................................. 15, 18

5   *Burger King Corp. v. Rudzewicz,* \
         471 U.S. 462 (1985)) ................................................................. 6, 9
6
*Calder v. Jones,*
7        465 U.S. 783 (1984) ................................................................. 8, 14

8   *Data Disc, Inc. v. Systems Technology Associates, Inc.,*
         557 F.2d 1280 (9th Cir. 1977) ..................................................... 19
9
*Ford Motor Co. v. Montana Eighth Judicial District Court,*
10       592 U.S. 351 (2021) ................................................ 15, 16, 17, 18

11  *Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.,*
         905 F.3d 597 (9th Cir. 2018) ....................................................... 10
12
*Getz v. Boeing Co.,*
13       654 F.3d 852 (9th Cir. 2011) ....................................................... 19

14  *Gray & Co. v. Firstenberg Mach. Co.,*
         913 F.2d 758 (9th Cir. 1990) ......................................................... 9
15
*Holland America Line Inc. v. Wartsila N. Am., Inc.,*
16       485 F.3d 450 (9th Cir. 2007) ......................................................... 7

17  *Mavrix Photo, Inc. v. Brand Techs., Inc.,*
         647 F.3d 1218 (9th Cir. 2011) ....................................................... 6
18
*Schwarzenegger v. Fred Martin Motor Co.,*
19       374 F.3d 797 (9th Cir. 2004) ......................................................... 6

20  *Scott v. Breeland,*
         792 F.2d 925 (9th Cir. 1986) ......................................................... 9
21
*Sinatra v. National Enquirer, Inc.,*
22       854 F.2d 1191 (9th Cir. 1988) ..................................................... 17

23  *Williams v. Yamaha Motor Co. Ltd.,*
         851 F.3d 1015 (9th Cir. 2017) ..................................................... 6, 7
24
*Yamashita v. LG Chem, Ltd.,*
25       62 F.4th 496 (9th Cir. 2023) ......................................................... 16

26

27

28



3:25-cv-05331-MMC

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS SECOND AMENDED COMPLAINT**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT

Defendant Volvo Cars AB (the "Parent") asks this Court to believe that it is a passive Swedish corporation with no meaningful connection to California. The record tells a very different story. For over **four decades**, the Parent (operating under its alternate corporate name "Volvo Car Corporation") has directly and continuously engaged with California's regulatory apparatus, obtaining California Air Resources Board ("CARB") Executive Orders certifying its vehicles for sale in this State since at least 1984. It is not a subsidiary that obtained these certifications. It is the Swedish parent corporation itself—identified on the Executive Orders as *"Volvo Car Corporation,"* with an address in *Gothenburg, Sweden* (where Volvo accepted service of process)—that applied for and received authorization to place its vehicles into the California stream of commerce.

The declaration of the Parent's Legal Director, Magnus Ragnmark, on which the present motion depends, is notable not for what it says, but for what it conspicuously omits. Mr. Ragnmark does not deny that the Parent (a/k/a Volvo Car Corporation) obtained CARB Executive Orders for certifying the XC40 Recharge—the very vehicle at issue—for sale in California for each of the model years leased or owned by the proposed Class. He does not deny that Volvo Car Corporation (*i.e.,* the Parent) is identified as the **manufacturer** on the vehicle identification labels of Class Vehicles sold to California consumers. He does not deny that Volvo Car Corporation has been obtaining CARB certifications since 1984. And he does not deny that CARB certification requires the applicant to be the entity that "**controls the vehicle specifications**" to ensure compliance by all production vehicles. Instead, Mr. Ragnmark focuses his declaration on what the co-Defendant subsidiaries (VCNA and VCUSA) do—which no one disputes—while carefully avoiding any discussion of the Parent's own direct contacts with California.

As to the Brand Book, Volvo's motion attempts a sleight of hand. Mr. Ragnmark states he is "not aware of any document titled 'Volvo Experience & Identity Guideline' authored or related to Volvo Cars AB" and suggests that the document referenced in the Second Amended Complaint ("SAC") is actually a publication of *AB Volvo* (the commercial truck company) that Plaintiff did not even motion in the SAC. But this artful denial cannot withstand scrutiny. Volvo Cars AB and

-1-

1    AB Volvo are jointly represented in trademark matters through **Volvo Trademark Holding AB**,

2    which "owns, maintains and manages all the trademarks consisting of or containing Volvo" and

3    "grants licenses to those two industrial entities to use the Volvo trademark." The Brand Book itself

4    identifies **Volvo Cars** as one of the entities governed by its mandatory branding rules. Far from

5    being irrelevant to Volvo Cars AB, the Brand Book is part of a coordinated trademark governance

6    structure in which Volvo Cars AB is a direct participant and co-licensee.

7    This is not a case where Plaintiff seeks to impute a subsidiary's contacts to a foreign parent.

8    Plaintiff relies on the Parent's **own direct contacts** with California—contacts that include more

9    than 40 years of CARB certification applications, ongoing quarterly reporting obligations to

10   California regulators, specification control over California-bound vehicles, and direct

11   manufacturer identification on every Class Vehicle sold in this State. These contacts satisfy every

12   element of the Ninth Circuit's specific jurisdiction test.

13   **II.    SUMMARY OF PERTINENT FACTS**

14   **A.    THE PARENT IS THE APPLICANT FOR CARB CERTIFICATION—NOT ITS**
15   **SUBSIDIARIES**

16   CARB's certification program is unambiguous about who may obtain an Executive Order.

17   As CARB's own program description states: "Certification is granted only to the **manufacturer** of

18   the vehicles who *controls the vehicle specifications* to ensure compliance by all production

19   vehicles." California Air Resources Baord, On-Road Light-Duty Vehicle Certification Program

20   ("*CARB Certification*"), available online at https://ww2.arb.ca.gov/our-work/programs/road-light-

21   duty-vehicle-certification-program/about (emphasis added). The program further provides that

22   "[c]ertification can be granted to an importer only if the importer demonstrates that it has **control**

23   **of the vehicle specifications***." Id.* (emphasis added).

24   The Parent—operating under the name "Volvo Car Corporation"—obtained CARB

25   Executive Order A-018-0224-1, which certifies the 2020 and subsequent model-year XC40

26   Recharge (designated "VOLVO XC40 P8 AWD RECHARGE") as a Zero Emission Vehicle for

27   sale in California, and obtained certification for each of the other model years. *See* Request for

28   Judicial Notice ("RJN"), Exs. 1-4. Each of the Executive Orders were issued to "VOLVO CAR

-2-

FAZIO | MICHELETTI LLP
Attorneys

1    CORPORATION"—not to VCNA, not to VCUSA, but to the Swedish parent corporation itself.

2    *See id.* This is not a matter of inference. Moreover, the vehicle identification labels on Class

3    Vehicles sold to California consumers confirm: "MFD BY VOLVO CAR CORPORATION." *See*

4    Declaration of Robert M. Becker, Ex. A.

5         Critically, this is not a recent or isolated contact. The Parent has been applying for and

6    obtaining CARB Executive Orders since at least 1984. Executive Order A-18-36, issued in 1985,

7    certified Volvo's 740/760 Turbo models for California sale—with the applicant again identified

8    as "VOLVO CAR CORPORATION." *See* RJN, Ex. 5. This 40-year pattern of direct engagement

9    with California's regulatory apparatus demolishes any suggestion that Volvo Cars AB's California

10   contacts are incidental, passive, or mediated exclusively through subsidiaries.

11        Nor is the CARB certification relationship the result of a one-time filing. The Executive

12   Orders impose ongoing obligations on the certificate holder, including that "[p]roduction vehicles

13   shall be in all material respects the same as those for which certification is granted" and that

14   "[q]uarterly production reports shall be submitted to the Executive Officer no later than 45 days

15   after the end of each quarter." *E.g.*, RJN, Ex. 1 at 1. These continuing obligations require Volvo

16   Car Corporation to maintain an ongoing relationship with California regulators—reporting

17   quarterly on production vehicles, obtaining approval for specification changes, and remaining

18   subject to CARB's compliance testing and enforcement authority, which includes penalties of up

19   to $37,500 per violation per vehicle. *See id.*

20        Indeed, the Parent has obtained CARB Executive Orders not only for the Class Vehicles,

21   but also for related vehicles and systems sharing the same platform. *See* RJN, Exs. 1-4; ECF 19 ¶

22   37 (discussing fact that XC40 and Polestar 2 share same platform). This demonstrates that Volvo

23   Car Corporation directly controls platform-level design and certification decisions for vehicles

24   sold in California.

25        **B.    THE PARENT'S BRAND BOOK GOVERNS CALIFORNIA DEALER OPERATIONS**

26        The Ragnmark Declaration's treatment of the Brand Book is equally misleading. Mr.

27   Ragnmark states he is "not aware of any document titled 'Volvo Experience & Identity Guideline'

28   "authored or related to Volvo Cars AB." ECF 49-1 ¶ 20. He then suggests the document cited in

-3-

FAZIO | MICHELETTI LLP
*Attorneys*

**PLAINTIFF'S OPPOSITION TO VOLVO AB'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**

1   the SAC "appears to be a document prepared by AB Volvo related to commercial trucks." *Id.* But

2   this framing obscures the actual corporate relationship.

3       The Brand Book itself reveals the integrated trademark governance structure. As it states:

4   "Volvo Trademark Holding AB owns, maintains and manages all the trademarks consisting of or

5   containing Volvo. This legal entity is jointly owned by AB Volvo and Volvo Car Corporation, and

6   grants licenses to those two industrial entities to use the Volvo trademark." The document further

7   specifies that the "Volvo Spread Word Mark logotype is the primary identification carrier for ***all***

8   ***Volvo entities,***" and expressly lists "Volvo Cars" among the governed entities. *See* RJN, Ex. 8 at

9   3. The "Volvo Iron Mark logotype" is likewise described as governing "all Volvo entities," again

10  including "Volvo Cars." *See id.*

11      This is not a case where one company's policies have been mistakenly attributed to another.

12  The Brand Book is a joint governance instrument of the shared Volvo trademark, and its mandatory

13  branding rules apply ***by their own terms*** to the Parent. When the Brand Book states that

14  "[p]romotion of all Volvo product and service offerings must always be Volvo-branded and follow

15  the guidelines outlined in this document," it is issuing a directive that binds the Parent and its

16  subsidiaries—including those operating California dealerships.

17      Indeed, a "Volvo Brand Book – Guideline – Dealer edition" (January 2022) is accessible

18  through Volvo's proprietary dealer platform that explicitly describes it as the "Brand Book" at the

19  top of the page. *See*  https://relayto.com/explore/volvo-brand-book-3qkgv71mt76bf.  This dealer-

20  specific edition contains sections on "Marketing Material" and "Events and Dealerships"—

21  precisely the types of California-directed dealer controls alleged in the SAC. *See* ECF 19 ¶ 17b.

22  The existence and accessibility of this document contradicts Mr. Ragnmark's professed

23  unfamiliarity.

24      C.    THE PARENT CONTROLS DESIGN AND ENGINEERING OF THE DEFECTIVE

25            POWERTRAIN

26      It is undisputed that the Parent "designs, tests, manufactures, and assembles Volvo-branded

27  passenger vehicles in the ordinary course of its business." ECF 49-1 ¶ 11. The SAC further

28  alleges—and Volvo does not deny—that Volvo's engineering divisions and wholly-owned

-4-

3:25-cv-05331-MMC

FAZIO | MICHELETTI LLP
Attorneys

1  subsidiaries (including Zenseact AB for vehicle control software and HaleyTek AB for
2  infotainment software) "develop, test, and approve the powertrain control software and calibration
3  parameters used in the Class Vehicles." ECF 19 ¶ 13. The Powertrain Control Defect at the heart
4  of this case originates in design and manufacturing decisions made by the Parent in Gothenburg.

5        The CARB certification requirements make this connection even more direct. Because
6  Volvo obtained the Executive Order as the manufacturer with "control of the vehicle
7  specifications," any production changes affecting the certified powertrain—including field fixes
8  for the very defect at issue—require the Parent's approval under the terms of its CARB
9  certification. The entity that controls the vehicle specifications is the same entity that created the
10  defect, obtained California authorization to sell the defective vehicle, and retains ongoing control
11  over any remedial measures.

12      **D.**    **VOLVO SAFETY MESSAGING ORIGINATES AT THE PARENT LEVEL**

13        The SAC alleges, and the motion does not effectively rebut, that the Parent "pre-approves
14  or requires approval of safety messaging disseminated in the United States, including the corporate
15  safety tagline 'Safety first, always.'" SAC ¶ 17(c). That tagline appears in the Parent's global
16  newsroom materials bearing the notice "© Volvo Car Corporation," confirming headquarters
17  authorship and copyright ownership. The Parent's only response in the present motion is that the
18  SAC cites a press release about the Volvo EX30 (a vehicle not at issue) as the source—but this
19  misses the point entirely. The SAC cites the press release to demonstrate that the Parent *authors*
20  *and owns* the safety messaging, not to allege a claim about the EX30. The "Safety first, always"
21  tagline was used to market the Class Vehicles, and it was created and copyrighted by Volvo Car
22  Corporation.

23
24
25
26
27
28

FAZIO | MICHELETTI LLP
Attorneys

III.    LEGAL STANDARD

When a defendant challenges personal jurisdiction on written materials without an evidentiary hearing, the plaintiff need only make a *prima facie* showing of jurisdictional facts. *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011). "[U[ncontroverted allegations in the complaint must be taken as true," and factual disputes are resolved in the plaintiff's favor. *Id.*

The Ninth Circuit applies a three-part test for specific jurisdiction: "(1) the defendant either purposefully directs its activities or purposefully avails itself of the benefits afforded by the forum's laws; (2) the claim arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction comports with fair play and substantial justice." *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1023 (9th Cir. 2017) (cleaned up).

"If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476–78 (1985)).) As demonstrated below, Plaintiff has met his burden; Volvo has not.

IV.    ARGUMENT

A.    THE PARENT PURPOSELY DIRECTED ITS ACTIVITIES AT CALIFORNIA

The present motion relies on a narrative of corporate separation: that VCNA and VCUSA handle all U.S. operations, and that the Parent has no direct contact with California. But that narrative collapses under the weight of the Parent's own regulatory filings, which demonstrate four decades of direct, purposeful engagement with California.

1.    *Forty Years of CARB Certification Constitute Purposeful Direction*

The Parent states unequivocally that "**Volvo Cars AB Has No Contacts With California.**" ECF 49 ("Motion") at 3:23 (emphasis in original). The Ragnmark Declaration's carefully circumscribed denials are more nuanced, but they do not create genuine factual disputes on the critical jurisdictional facts. *See generally* ECF 49-1. To the contrary, the Parent admits that it obtained the CARB certifications, *see, e.g.,* Motion at 9:21 ("all but the first of the above

-6-

FAZIO | MICHELETTI LLP
*Attorneys*

1    allegations is inaccurate"), but goes on to contend that CARB certification "is entirely unrelated

2    to Becker's claims in this action[,]" *id.* at 12:10-11. As demonstrated below, the Parent is mistaken.

3            This is the single most important jurisdictional fact in this case and, as just demonstrated,

4    it is one the Ragnmark Declaration does not and cannot deny. Put simply, Volvo Car

5    Corporation—the Parent's alternate corporate name—has been the direct applicant for CARB

6    Executive Orders certifying Volvo passenger vehicles for sale in California since at least 1984.

7    This is not an attribution of subsidiary contacts to the Parent. This is the Parent *itself* voluntarily

8    submitting applications to a California regulatory agency, accepting California-specific

9    obligations, and obtaining California-specific authorization to place its vehicles into the California

10   market.

11           The significance of this fact cannot be overstated. CARB certification is not a mere

12   formality or a passive compliance exercise. As CARB's program description explains,

13   "[c]ertification is granted only to the ***manufacturer*** of the vehicles who *controls the vehicle*

14   *specifications* to ensure compliance by all production vehicles." *CARB Certification.* The entity

15   that obtains a CARB Executive Order is representing to the State of California that it is the

16   manufacturer, that it controls vehicle specifications, and that it will ensure ongoing compliance.

17   By obtaining Executive Orders for the XC40 Recharge, the Parent made precisely these

18   representations to California—and it has been making them for over 40 years.

19           This sustained pattern of direct regulatory engagement distinguishes this case from the

20   authorities Volvo Cars AB cites. In *Williams*, the Ninth Circuit found no specific jurisdiction

21   because the foreign parent did "not conduct any activities within the state of California, nor [did]

22   it target California via marketing or advertising." 851 F.3d at 1024. Here, by contrast, the Parent

23   has been conducting activities directed at California—specifically, applying for and obtaining

24   CARB Executive Orders—continuously for four decades.

25           In *Holland America Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007),

26   the court held that "placement of a product into the stream of commerce, without more, is not an

27   act purposefully directed toward a forum state." But the Parent did far more than place a product

28   into the stream of commerce. It affirmatively applied to California's environmental regulatory

-7-

1   authority for permission to sell specific vehicle models in this State, accepted ongoing regulatory

2   obligations, and subjected itself to California enforcement jurisdiction.

3       Each CARB Executive Order represents a deliberate, voluntary decision by the Parent to

4   engage with California's regulatory apparatus for the purpose of accessing the California market.

5   This is the very definition of purposeful direction: an intentional act, expressly aimed at the forum

6   state, with knowledge that the consequences of the act—the sale of certified vehicles to California

7   consumers—would be felt in California. *See Calder v. Jones*, 465 U.S. 783, 789-90 (1984).

8                   **2.    *CARB Certification Imposes Ongoing California-Specific Obligations***

9       The Parent's CARB contacts are not limited to the initial certification application. The

10  Executive Order imposes continuing obligations that create ongoing, systematic contact with

11  California:

12      **Quarterly Reporting.** The Executive Order requires that "[q]uarterly production reports

13  shall be submitted to the Executive Officer no later than 45 days after the end of each quarter."

14  This means Volvo Car Corporation submits production data to California regulators at least four

15  times per year—an ongoing obligation that has persisted for decades across multiple vehicle lines.

16      **Specification Control.** The certification requires that "[p]roduction vehicles shall be in all

17  material respects the same as those for which certification is granted." This means Volvo Car

18  Corporation must approve any changes to the specifications of California-bound vehicles to

19  maintain CARB compliance. This is not passive oversight—it is active, ongoing specification

20  control directed specifically at California.

21      **Enforcement Exposure.** As the certification holder, the Parent is directly subject to CARB

22  enforcement, with penalties of up to $37,500 per violation per vehicle. This direct regulatory

23  exposure to California enforcement authority is a contact that the Parent voluntarily accepted by

24  seeking certification.

25      These ongoing obligations transform what might otherwise be characterized as a single

26  regulatory filing into a *continuous and systematic relationship* between the Parent and the State of

27  California. Unlike cases involving isolated commercial transactions, the CARB certification

28  relationship is a continuous and wide-reaching contact that has persisted for over 40 years. *Cf.*

FAZIO | MICHELETTI LLP
*Attorneys*

1   *Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir. 1990) (purposeful availment

2   requires "significant activities within a State" or "continuing obligations" with forum residents)

3   (quoting *Burger King*, 471 U.S. at 475-76).

4        The Parent's purposeful direction toward the United States—and California specifically—

5   extends beyond CARB certification to federal safety regulation. In February 2021, the Parent

6   (using the name Volvo Car Corporation) made the "Field Action decision" to recall 2,278 XC40

7   Recharge vehicles (the same model Plaintiff leased) for defects in the Battery Energy Control

8   Module causing loss of propulsion during driving. *See* RJN, Ex. 9 (NHTSA Part 573 Safety Recall

9   Report 21V-109, Chronology section).

10       This federal filing, made pursuant to 49 CFR §573, identifies **the Parent**—not its U.S.

11  subsidiary—as the entity making safety decisions affecting vehicles sold in the United States. The

12  defect at issue in the recall (BECM microprocessor causing loss of propulsion) is the same electric

13  powertrain system that Plaintiffs allege is defective in their XC40 Recharge. This demonstrates

14  that the Parent directly engages with U.S. federal regulators regarding product safety decisions

15  affecting California consumers, creating additional purposeful contacts with this forum.

16              **3.    *The Ragnmark Declaration's Silence on CARB Certification Is Telling***

17       The Ragnmark Declaration is carefully drafted to discuss what the Parent does ***not*** do in

18  California: it does not own property, does not maintain an office, does not import vehicles, does

19  not sell directly to consumers. But Mr. Ragnmark conspicuously fails to address the elephant in

20  the room: the Parent's decades-long history of obtaining CARB Executive Orders. He does not

21  deny that the Parent is the applicant on the Executive Orders. He does not deny that the Parent

22  (Volvo Car Corporation) is identified as the manufacturer on the vehicle identification labels of

23  Class Vehicles. He does not deny quarterly reporting obligations to CARB. This silence, in a

24  declaration specifically prepared to contest jurisdiction, speaks volumes.

25       Where a defendant produces a declaration that contradicts the allegations, the plaintiff must

26  "come forward with facts, by affidavit or otherwise, supporting personal jurisdiction." *Scott v.*

27  *Breeland*, 792 F.2d 925, 927 (9th Cir. 1986). But where, as here, the declaration does not actually

28  address the plaintiff's strongest jurisdictional allegations, those allegations remain uncontroverted

-9-

FAZIO | MICHELETTI LLP
Attorneys

1  and must be taken as true. *Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d 597,

2  602 (9th Cir. 2018).

3      **4.    *The Parent Exercises Complete Control Over U.S. Marketing, Sales, and***

4          ***Dealership Operations***

5      In a press release that it issued on December 15, 2014, the Parent announced a

6  comprehensive "global marketing strategy" called "The Volvo Way to Market," which centralized

7  all marketing, sales, and dealership operations under Swedish parent control. *See* RJN, Ex. 6

8  (Volvo Cars Global Marketing Strategy, Dec. 15, 2014). The strategy, announced by Alain Visser,

9  Senior Vice President Marketing, Sales and Customer Service at Volvo Car Corporation,

10  eliminated any pretense of subsidiary autonomy in U.S. operations. *Id.* at 1.

11      This is the point at which the Parent determined which U.S. motor shows to attend, how

12  advertising would be controlled, and set global brand messaging. *Id*. But the Parent's control went

13  ***much*** further:

14          Several car brands invest in so-called brand centers, located in major cities.
          Volvo Cars believes that each Volvo dealer is a brand center on its own. That is

15          why the company has started to implement the following initiatives: ***All new***
          ***dealerships will have a globally uniform lay-out and look and feel. Exterior and***

16          ***interior will look and feel Scandinavian and truly Volvo.***

17          Existing dealerships will be upgraded in a similar way with small details
          that make a difference. ***These will display the Scandinavian roots of the Volvo***

18          ***brand and the key attributes and customer benefits of Volvo products***.

19          Volvo Cars will implement small differentiators that underline the company
          s Scandinavian and Swedish heritage. Examples include offering customers a drink

20          in Sweden-produced glasses, sound and smell elements that portray a Scandinavian
          spirit and waiting/lounge areas that offer highlights from Swedish cuisine.

21
          ***All dealer staff will go through a training program to be familiarized with***

22          ***these new customer service processes and standards***. European dealership staff
          will be dressed by Swedish fashion designer Oscar Jacobsson.

23
          **Service**

24
          The final leg of the Volvo Way to Market is Volvo Personal Service ***which***

25          ***entails the introduction of a Personal Service Technician for each and every***
          ***Volvo customer. At the delivery of his or her new car, the customer will be***

26          ***introduced to the Personal Service Technician who will take care of the customer***
          ***and the car throughout the ownership***.

27
          ***This programme obviously requires an extensive training and***

28          ***development, which is already underway***. A number of countries have already

-10-



1  adopted the Personal Service Technician concept as a pilot programme and
2  customer satisfaction in these markets has increased significantly. ***By 2018 all
   Volvo dealerships around the globe will be offering this service as standard.***

3  *Id.* at 3-4 (emphasis added).

4      This centralized control continues today. In 2023, the Parent appointed a new "global head

5  of marketing" who, despite being 'based at our US headquarters," reports directly to Deputy CEO

6  Björn Annwall and serves on the corporate "Group Management Team"—not U.S. subsidiary

7  management. *See* RJN, Ex. 7 (Volvo Cars Appoints New Global Head of Marketing, June 30,

8  2023).

9      When a Swedish parent corporation dictates which U.S. motor shows to attend, controls

10 dealership design in California, manages online sales to California consumers, and requires

11 California dealer staff to follow parent-mandated training and service protocols, that parent has

12 purposefully directed its activities toward the forum state. This is not a case of subsidiary

13 autonomy; it is complete parent control over California operations.

14      **5.    *The Brand Book Argument Is Based on a Distinction Without a***

15          ***Difference***

16      The Parent makes much of the distinction between Volvo Cars AB and AB Volvo (the

17 commercial truck manufacturer), asserting that the Brand Book cited in the SAC is actually an AB

18 Volvo document having nothing to do with Volvo Cars AB. *See* Motion at 10:4-20. But the Brand

19 Book itself defeats this argument. As the document states: "Volvo Trademark Holding AB owns,

20 maintains and manages all the trademarks consisting of or containing Volvo. This legal entity is

21 ***jointly owned by AB Volvo and Volvo Car Corporation***, and grants licenses to those two industrial

22 entities to use the Volvo trademark." Fazio Decl., Ex. 8 at 2 (emphasis added).

23      The Brand Book further specifies that the Volvo Spread Word Mark is "the primary

24 identification carrier for ***all Volvo entities***," and expressly includes "Volvo Cars" in its list of

25 governed entities. *See id.* at 4. The Volvo Iron Mark logotype is similarly described as governing

26 all Volvo entities, again listing "Volvo Cars." And the Brand Book provides that when "VolvCo

27 Group or other Volvo entities" participate in events alongside "VolvCo Cars (or another Volvo

28

FAZIO | MICHELETTI LLP
*Attorneys*

1    entity),” the shared Word Mark must be used—with “[n]o exceptions” permitted “unless approved

2    by the Brand management department at Volvo Group HQ (BEX).” *Id.* at 3.

3         This is not a case of mistaken identity. The Brand Book is a governance instrument for the

4    shared Volvo trademark, and Volvo Cars AB is bound by its terms as a co-licensee. Whether the

5    Brand Book was technically “authored” by AB Volvo or by the joint trademark entity is irrelevant

6    to the jurisdictional analysis. What matters is that the mandatory branding rules—including rules

7    governing marketing materials and dealer operations—apply to Volvo Cars AB and its dealer

8    network, including dealers in California.

9         Yet, in his declaration, Mr. Ragnmark asserts that “Volvo Cars AB does not direct specific

10   marketing at consumers in the United States, including to California residents.” ECF 49-1 ¶ 19.

11   *See also* Motion at 4:15-19 (citing same). But this is flatly contradicted by Volvo Car Corporation's

12   own public statements. The 2014 “Volvo Way to Market” explicitly describes a “global marketing

13   strategy” controlled from Gothenburg, Sweden, with 'globally uniform' standards applied to U.S.

14   operations. The strategy dictates which U.S. motor shows to attend (Detroit), controls U.S. online

15   sales, mandates U.S. dealership design and training, and requires U.S. customer service

16   protocols—all decided at Swedish parent headquarters. RJN, Ex. 6.

17        Nearly a decade later, this centralized structure persists. In 2023, Volvo appointed a 'global

18   head of marketing' who reports to Deputy CEO Björn Annwall (based in Sweden) and serves on

19   the corporate 'Group Management Team'—not U.S. subsidiary leadership. RJN, Ex 7. There is no

20   subsidiary autonomy when every significant U.S. operational decision requires parent approval or

21   follows parent-mandated global standards.

22        6.    ***Volvo’s Safety Messaging Demonstrates Purposeful Direction at***

23        ***California***

24        The motion attempts to dismiss the SAC’s allegations about safety messaging by noting

25   that the cited press release involved the EX30 rather than the XC40 Recharge. This misses the

26   point. The press release was cited to establish that the “Safety first, always” tagline is authored

27   and copyrighted by Volvo Car Corporation—as evidenced by the “© Volvo Car Corporation”

28   notice. *See* ECF 19 ¶ 17c. The tagline is not vehicle-specific; it is a ***corporate*** safety message that

-12-

FAZIO | MICHELETTI LLP
Attorneys

1 │ Volvo Cars AB created and that its subsidiaries deployed in marketing all Volvo vehicles,

2 │ including the Class Vehicles.

3 │     The motion's own allegations confirm this. The SAC alleges that "VCNA designed and

4 │ executed North American advertising campaigns, while VCUSA disseminated those campaigns

5 │ through U.S. dealer channels" (SAC ¶ 24), and that both did so "using Volvo AB's global safety

6 │ messaging and brand directives." ECF ¶ 24. Volvo argues it cannot be subject to jurisdiction for

7 │ activities performed by its subsidiaries, but the SAC alleges that the safety messaging *originated*

8 │ at the parent level. This is not imputation of subsidiary contacts; it is recognition of the parent's

9 │ own role as the creator and approver of the safety messaging at issue.

10 │     The Parent's centralized control over brand and marketing strategy—including for

11 │ California-targeted advertising—is confirmed by public statements from its Senior Vice President

12 │ of Strategy, Brand and Retail, Bjorn Annwall. In a 2018 CNBC interview, Annwall explained that

13 │ Volvo's marketing "cannot be about making stories. It has to be genuine and real,' and that

14 │ marketing decisions must reflect corporate-level strategic choices, not subsidiary autonomy." *See*

15 │ RJN, Ex. 10.

16 │     Annwall specifically discussed the launch strategy for Class Vehicles, the XC40, as part of

17 │ Volvo's **global** brand repositioning "aimed at a younger audience" with a subscription model

18 │ targeted at California's tech-forward market. *Id*. This confirms that advertising and marketing

19 │ decisions affecting California consumers originate from the Swedish parent corporation's brand

20 │ leadership, not from autonomous U.S. subsidiary operations. Combined with the Brand Book's

21 │ requirement that all marketing materials receive approval from "Volvo Group HQ (BEX)," this

22 │ demonstrates parent corporation control over California-directed advertising content

23 │     This distinction is jurisdictionally significant because Plaintiff's false advertising and

24 │ concealment claims are based on Volvo's safety representations. *See* ECF 19 ¶¶ 102-106, 131. If

25 │ Volvo Cars AB created the "Safety first, always" messaging that VCNA and VCUSA deployed in

26 │ California—and if Volvo Cars AB knew about the Powertrain Control Defect while that messaging

27 │ was being disseminated—then Volvo Cars AB committed an intentional act (creating false safety

28 │ messaging) expressly aimed at the California market (through its subsidiaries' distribution

-13-

1    channels) causing harm in California (to consumers who relied on the messaging). This satisfies

2    the *Calder* effects test.[1]

3        **7.    *Stream-of-Commerce-Plus: Volvo Cars AB Did Far More Than Place***

4            ***Products in the Stream of Commerce***

5        The motion argues that Volvo's revenue from California sales is insufficient to establish

6    jurisdiction under the "stream of commerce" theory. On this point, the motion is correct as a matter

7    of law—but irrelevant, because Plaintiff does not rely on a pure stream-of-commerce theory.

8    Plaintiff's jurisdictional theory rests on Volvo Cars AB's ***direct, affirmative actions*** targeting

9    California, including:

10       Directly applying for and obtaining CARB Executive Orders for the specific vehicles at

11   issue, as the manufacturer with specification control;

12   •    Maintaining a forty-year history of direct CARB certification applications;

13   •    Submitting quarterly production reports to California regulators;

14   •    Subjecting itself to CARB's enforcement jurisdiction with penalties of up to

15       $37,500 per vehicle;

16   •    Creating and copyrighting the safety messaging deployed to market Class

17       Vehicles to California consumers;

18   •    Participating in mandatory branding rules that govern California dealer marketing

19       and operations; and

20   •    Designing and manufacturing the defective powertrain with knowledge that

21       CARB-certified vehicles would be sold to California consumers.

22

23

24   _____

25   [1] Plaintiffs' false advertising claims arise directly from Volvo Car Corporation's control over brand messaging and marketing content. Bjorn Annwall, Volvo's Senior Vice President of Strategy, Brand and Retail, explained in 2018 that marketing 'cannot be about making stories' and must
26   reflect actual corporate practices—not subsidiary decisions. This confirms that advertising content regarding vehicle safety and performance originates from parent-level brand strategy, not U.S.
27   subsidiary autonomy. When combined with the Brand Book's explicit requirement that marketing materials receive approval from Volvo Group HQ, it is clear that the advertising Plaintiffs
28   challenge was approved—if not created—by the Swedish parent corporation.

**-14-**

**PLAINTIFF'S OPPOSITION TO VOLVO AB'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**

FAZIO | MICHELETTI LLP
Attorneys

1    Even under the more restrictive plurality opinion in *Asahi Metal Industry Co. v. Superior*

2  *Court*, 480 U.S. 102 (1987), these contacts satisfy the "something more" requirement. Volvo Cars

3  AB did not merely place a product into the stream of commerce with awareness that it might reach

4  California. It *applied to California* for authorization to sell specific vehicles here, accepted

5  ongoing California regulatory obligations, and created the marketing messaging used to sell those

6  vehicles to California consumers.

7         **B.     PLAINTIFF'S CLAIMS ARISE OUT OF AND RELATE TO THE PARENT'S CALIFORNIA**

8              **CONTACTS**

9         The nexus between Volvo Cars AB's California contacts and Plaintiff's claims is not

10  merely close—it is direct. The Supreme Court's decision in *Ford Motor Co. v. Montana Eighth*

11  *Judicial District Court*, 592 U.S. 351, 359 (2021), established that "arise out of" and "relate to"

12  are alternative, not synonymous, requirements. Plaintiff's claims satisfy both.

13         **1.     *Plaintiff's Claims Arise Out of the Parent's California Contacts***

14         Volvo Car Corporation obtained CARB Executive Order A-018-0224-1 certifying the

15  XC40 Recharge—the specific vehicle Plaintiff leased—for sale in California as a Zero Emission

16  Vehicle. The CARB certification covers the electric powertrain and emissions control systems of

17  the Class Vehicles. Plaintiff's claims allege defects in *the same powertrain* that Volvo Car

18  Corporation certified to CARB. This is not a tangential connection—it is a direct causal chain:

19  Volvo Cars AB designed the powertrain, obtained California certification for that powertrain, and

20  the powertrain is defective.

21         Under *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 504-05 (9th Cir. 2023), a claim "arises

22  out of" a defendant's forum contacts when there is a "direct nexus" between the contacts and the

23  cause of action. Here, the direct nexus is unmistakable: the jurisdictional contact (CARB

24  certification of the XC40 Recharge powertrain) and the cause of action (defects in the XC40

25  Recharge powertrain) involve the same product, the same technology, and the same corporate

26  decision-maker.

27         Moreover, Plaintiff's fraudulent concealment and false advertising claims are based on

28  Volvo's safety representations—representations that originated at the parent level ("Safety first,

                                            **-15-**

FAZIO | MICHELETTI LLP
Attorneys

1  always") and were disseminated in California through the subsidiaries. If Volvo Cars AB created

2  the safety messaging, knew about the Powertrain Control Defect, and allowed its subsidiaries to

3  continue marketing Class Vehicles using that messaging, the claims arise directly from Volvo Cars

4  AB's own conduct directed at California.

5      The "arising from" requirement is unquestionably satisfied. Volvo obtained California

6  certification for the XC40 Recharge electric powertrain (CARB EO A-018-0224-1), made federal

7  safety decisions regarding that same powertrain (NHTSA Recall 21V-109), and Plaintiffs' claims

8  challenge defects in that identical system. This is not a case where plaintiff seeks to hold a foreign

9  parent liable for unrelated conduct—the jurisdictional contacts (CARB certification, NHTSA

10  recall decisions) and the claims (powertrain defects) are inseparable.

11          **2.    *Plaintiff's Claims Relate to the Parent's California Contacts***

12      Even if the "arise from" standard required something more, the Supreme Court's decision

13  in *Ford* made clear that "arise from" and "relate to" are alternative tests. 592 U.S. at 353. A claim

14  "relates to" the defendant's forum contacts when the contacts and the litigation have a sufficient

15  "connection" or "affiliation." *Id.* at 353-54.

16      In *Ford*, the Supreme Court held that Ford was subject to jurisdiction in Montana and

17  Minnesota over product liability claims even though the specific vehicles at issue were not sold in

18  those states. The Court emphasized Ford's extensive forum contacts—selling vehicles, advertising,

19  and building relationships with consumers in the forum states—and concluded that the claims

20  "related to" those contacts because "Ford had systematically served a market in Montana and

21  Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those

22  States." *Id.* at 353.

23      Here, Volvo has systematically served the California market for the very vehicles that

24  Plaintiff alleges are defective. Volvo Car Corporation

25      •    obtained California regulatory certification for the XC40 Recharge;

26      •    makes recall decisions affecting California consumers;

27      •    controls the Volvo trademark used in California advertising; and

28      •    receives revenue from California sales through its subsidiaries.

-16-



1    Plaintiff's claims "relate to" this systematic California presence. Volvo cannot obtain

2    California certification, make California-affecting recall decisions, and profit from California sales

3    while simultaneously claiming it has no jurisdictional connection to California litigation about

4    those very vehicles.

5    When an automobile manufacturer obtains regulatory certification for a specific vehicle's

6    powertrain in a specific state, sells thousands of those vehicles in that state, and the powertrain

7    turns out to be defective, the resulting claims "relate to" the certification in the most intuitive sense:

8    the certification enabled the vehicles to be sold, the vehicles were sold, and the defect manifested.

9    Exercising jurisdiction over a manufacturer that seeks a state's regulatory approval to sell a

10    product, and then sells a defective version of that product in that state, is precisely the type of case

11    that *Ford*'s "relate to" standard was designed to capture.

12    **C.    EXERCISING JURISDICTION OVER THE PARENT IS REASONABLE**

13    Volvo Cars AB argues that exercising jurisdiction would be unreasonable because it is a

14    foreign corporation with no U.S. contacts. This argument ignores the record. The seven-factor test

15    from *Sinatra v. National Enquirer, Inc.*, 854 F.2d 1191, 1198-99 (9th Cir. 1988), supports

16    jurisdiction here.

17    **Extent of purposeful interjection.** As set forth above, Volvo has been purposefully

18    interjecting itself into California for over 40 years through direct CARB certification applications,

19    ongoing quarterly reporting, and specification control over California-bound vehicles.

20    **Burden on the defendant.** Volvo is a global automaker with operations in dozens of

21    countries. It already maintains a U.S. litigation presence through its law firm Shook, Hardy &

22    Bacon. As the Court in *Ford* noted, a large, multinational corporation that deliberately markets its

23    products in a forum state faces no constitutionally significant burden litigating there. *See* 592 U.S.

24    at 363-64. While the Supreme Court has cautioned about extending jurisdiction over foreign

25    defendants, *see Asahi*, 480 U.S. at 114-15, that concern is significantly diminished when the

26    foreign defendant has affirmatively sought regulatory approval from the forum state, *id.* at 112.

27    **California's interest.** California has a paramount interest in adjudicating safety-defect

28    claims involving vehicles certified for sale in California and operated on California roads. This

-17-

FAZIO | MICHELETTI LLP
Attorneys

1  interest is heightened by the CARB certification relationship: California granted Volvo Car

2  Corporation authorization to sell the XC40 Recharge here, and California has a direct interest in

3  ensuring that vehicles certified under its regulatory programs are safe.

4  **Efficient resolution and convenience.** Volvo argues that exercising jurisdiction is

5  unnecessary because Plaintiff could obtain relief from VCNA or VCUSA. *See* Motion at 13:15-

6  18. But Volvo Cars AB (a/k/a Volvo Car Corporation) designed the defective powertrain, obtained

7  CARB certification for it, and created the safety messaging at issue. VCNA and VCUSA are

8  distribution and marketing entities; they did not design the powertrain and do not control vehicle

9  specifications. Dismissing Volvo Cars AB would deprive Plaintiff and the proposed Class of the

10  ability to obtain full relief from the entity ultimately responsible for the defect.

11  **Alternative forum.** Volvo suggests that there may be "no alternative U.S. forum" that

12  could exercise jurisdiction over it. *See id.* at 13:23-26. This concession underscores the

13  unreasonableness of dismissal. If no U.S. court can exercise jurisdiction over the manufacturer that

14  obtained California certification, designed the defective powertrain, and created the safety

15  advertising, then California consumers are left to pursue a Swedish corporation in Swedish courts

16  for defects in vehicles that Volvo itself certified for California sale.d

17  D.    IN THE ALTERNATIVE, PLAINTIFF IS ENTITLED TO JURISDICTIONAL

18         DISCOVERY

19  If the Court has any doubt about the sufficiency of Plaintiff's jurisdictional showing,

20  Plaintiff respectfully requests leave to conduct targeted jurisdictional discovery. Unlike the "both

21  attenuated and based on bare allegations" claims rejected in *Getz v. Boeing Co.*, 654 F.3d 852, 860

22  (9th Cir. 2011), Plaintiff's jurisdictional theory is grounded in specific, documented facts—

23  including CARB Executive Orders, vehicle identification labels, and Brand Book provisions—and

24  seeks discovery to develop the full scope of Volvo Cars AB's California contacts.

25  Targeted discovery would include: (1) all CARB applications, correspondence, and reports

26  submitted by Volvo Car Corporation to CARB since 1984; (2) the complete Brand Book, including

27  the "Marketing Material" and "Events and Dealerships" sections, and evidence of distribution to

28  California dealers; (3) documents showing who at Volvo Cars AB approves safety messaging for

-18-

FAZIO | MICHELETTI LLP

1 U.S. dissemination; (4) specification change approvals and field fix authorizations for the XC40

2 Recharge; and (5) communications between Volvo Cars AB and its U.S. subsidiaries regarding

3 the Powertrain Control Defect.

4      This discovery is narrowly tailored and directly relevant to the jurisdictional analysis.

5 "Discovery may appropriately be granted where pertinent facts bearing on the question of

6 jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Data*

7 *Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1285 n.1 (9th Cir. 1977).

8 **IV.   CONCLUSION**

9      For the foregoing reasons, Plaintiff respectfully requests that the Court deny Volvo Cars

10 AB's Motion to Dismiss for Lack of Personal Jurisdiction. Volvo Cars AB has purposefully

11 directed its activities at California for over four decades through direct CARB certification

12 applications, ongoing regulatory reporting, specification control over California-bound vehicles,

13 creation of safety messaging deployed in California, and participation in mandatory branding rules

14 governing California dealer operations. Plaintiff's claims arise directly from and relate to these

15 California contacts. Exercising jurisdiction is consistent with fair play and substantial justice. In

16 the alternative, Plaintiff requests leave to conduct targeted jurisdictional discovery.

17 DATED: February 3, 2026     **FAZIO | MICHELETTI LLP**

18     by   /s/ *Jeffrey L. Fazio*

19     Jeffrey L. Fazio (146043)
    Dina E. Micheletti (184141)
20     **FAZIO | MICHELETTI LLP**
    1111 Broadway, Suite 400
21     Oakland, CA 94607
    T: 925-543-2555
22     F: 925-369-0344

23     Keliang (Clay) Zhu (305509)
    Yi Yao (292563)
24     Brian Cohen (316427)
    **DEHENG LAW OFFICES, P.C.**
25     Silicon Valley Office
    7901 Stoneridge Drive, Suite 208
26     Pleasanton, CA 94588
    T: 925-399-5856
27     F: 925-397-1976

28     *Attorneys for Plaintiff*

**-19-**

**PLAINTIFF'S OPPOSITION TO VOLVO AB'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Robert M. Becker, on behalf of himself*
*and all others similarly situated*

FAZIO | MICHELETTI LLP
*Attorneys*

PLAINTIFF'S OPPOSITION TO VOLVO AB'S MOTION TO DISMISS SECOND AMENDED COMPLAINT