UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, District Judge

| | |
|---|---|
| BECKER,<br>Plaintiff,<br>vs.<br>VOLVO CARS OF NO. AM., LLC et al.,<br>Defendants. | No. C 25-05331-MMC |

San Francisco, California
Friday, February 27, 2026

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 9:03 - 10:41 = 104 MINUTES

APPEARANCES:

For Plaintiff:
Fazio Micheletti, LLP
1111 Broadway, Suite 400
Oakland, California 94607
BY: JEFFREY L. FAZIO, ESQ.

For Defendants:
Shook, Hardy & Bacon
2121 Avenue Of The Stars
Suite 1400
Los Angeles, California 90067
BY: COLM A. MORAN, ESQ.
BY: MICHAEL L. MALLOW, ESQ.

Transcribed by:
Echo Reporting, Inc.
Contracted Court Reporter/ Transcriber
echoreporting@yahoo.com

Friday, February 27, 2026 9:03 a.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK: All rise. This Court is now in session. The Honorable Maxine M. Chesney, presiding.

THE COURT: I didn't think this was no yet. It's making a lot of noise bouncing around. Okay.

THE CLERK: Calling Civil Case 25-05331, Robert M. Becker versus Volvo Cars of North America, LLC. Will counsel please step to the podiums and state your appearances for the record?

MR. FAZIO: Good morning, your Honor. Jeffrey Fazio for Plaintiff.

THE COURT: All right. Good morning. And just one moment. I'm going to just make a note here. Thank you.

Okay. For the Defendant?

MR. MORAN: Good morning, your Honor. Colm Moran for Defendants.

THE COURT: Okay. Anyone else? Yes.

MR. MALLOW: Good morning, your Honor. Good to see you again. Michael Mallow, Shook, Hardy and Bacon, on behalf of the Defendants.

THE COURT: Thank you. Okay. I've got a bunch of questions here. I don't know where to start frankly. I guess we could talk briefing, but it really ties in in part

to the other motion about the personal jurisdiction. Let me see what I've got here just in terms -- I've got -- I have to put everything in a sack.

Okay. So, I'd just like to ask Mr. Fazio. Why do you need Volvo AB?

MR. FAZIO: Primarily for the information that pertains to the defect. Recently, Volvo AB acquired a company called Zenseact that is explicitly for analyzing issues like this. It built the vehicle. It has the specifications, and ultimately, we're going to request equitable relief.

THE COURT: Let me ask you a question. As far as liability goes and ability to recover --

MR. FAZIO: Yes.

THE COURT: All right. You have the two U.S. entities that don't appear to be judgment-proof, and could -- in other words, it doesn't sound like in order to find someone liable, you-- you need the Swedish entity that -- Volvo AB.

So, you're -- there seems to be more of one of discovery, and I'm just questioning, do they have to a party for you to get what you need? It's a little earlier to turn to the other side and say, give it to me. But maybe there could be some cooperation here that could be arrived at. I just want to see going through tons of litigation, a party

if you don't need them. And I have a number of thoughts about the personal jurisdiction. I'm happy to talk to you about that. I just wanted to see, is it worth, you know, kind of spinning our wheels here --

MR. FAZIO: Yeah.

THE COURT: -- to get them in as a named defendant?

MR. FAZIO: No, I understand, your Honor. And we've been in this situation before with Toyota in fact.

The upshot is that this is not something we didn't think about a lot. This is a situation where the parent company has had a lot of relationship with his market, California, coming in for the last at least 40-plus years --

THE COURT: Okay.

MR. FAZIO: -- selling their cars. They build the car.

THE COURT: Yes.

MR. FAZIO: This is not tangential.

THE COURT: And what -- and then as a result of that particular body of facts, are you just mad at them? I mean --

MR. FAZIO: No, I don't think so. We could have sued the dealers, right, but we know that.

THE COURT: But they're small potatoes. I mean, you got two major entities. I -- you know, I mean, I don't

know. I don't know the person who owns (indiscernible). Okay. Maybe -- living in Hillsboro and rolling in dough. All right. But the point is that -- okay.

Let me go back then and put it aside for a minute, because I think your -- probably your easiest road to personal jurisdiction, if you want to keep AB in, is direction, not availment. So availment, you got this carb thing about the emission standards in California. For tort liability at least -- I wanted to ask you a question about this, too, because, you know -- well, nevermind.

For tort liability, the -- usually if you've got an intentional tort, that's the easiest way to show personal jurisdiction. So you have the, you know, prime example, slander. All right. You lied about the person, you know where they live. They're going to suffer their harm there, and, okay. Fraud is similar in that regard.

What I wanted to ask -- and I should have this, but I don't. Is personal jurisdiction claim specific? In other words, let's say you've got personal jurisdiction on one claim, but the other claim isn't a tort, it's some kind of contract claim and maybe everything happened in another state.

MR. FAZIO: I don't believe so, but, again, circling back to the reason that we sued the parent and not just subsidiaries, is the direct involvement in everything

from, you know, creating a global advertising situation, as its own senior VP spoke out of, to designing the dealerships. They have strict -- down the coffee they serve.

THE COURT: You want to keep them in, we'll keep them in.

MR. FAZIO: Yeah.

THE COURT: The point is, you've got two people that aren't saying that they don't belong here, all right. On any theory they're happy to be here, or if not happy, at least happy to be here as much as anywhere else.

And so, I don't want to hear any more about why you want AB. I'm not convinced you need them, all right. If you want them, fine, we will go through all the work that goes along with it.

If you are really concerned about recovery, sometimes where someone says, gee, you know, I sued this entity. They've all got the same name with a different ending. I don't want to get in a situation where someone says, I got the wrong one.

MR. FAZIO: Well, for equitable relief we believe we had them.

THE COURT: Don't interrupt for a minute.

MR. FAZIO: I'm sorry, your Honor.

THE COURT: Thank you.

MR. FAZIO: Didn't mean to.

THE COURT: Thank you. We've got a lot of things to talk about. In particular, what's wrong with his car, if anything, all right, which they haven't brought up that jumps out at me totally. Okay.

I don't know if counsel here are familiar with driving on hills. This is a hill problem. It's not a flat-road problem. It's not somebody at a stop light two blocks away in the Tenderloin. It's somebody on a steep grade. Yes, driveway incline/decline.

MR. FAZIO: Well, our client. That's not so, the whole logic.

THE COURT: People they -- you say have a problem. He's got a hill problem, they don't. We'll get to that. All right.

So you want to talk about personal jurisdiction. We'll keep talking about it for a minute. On those occasions people sometimes say, you know, look. Maybe we can come to some agreement where if there is liability found, and you are concerned that the particular entities involved, that we think they're perfectly fine, and our client doesn't belong here, we'll have some kind of stipulation. It will be covered. They will handle it, if necessary, various things, but you're not concerned about money here.

You apparently are just concerned about pointing to

someone in the courtroom, if you had to go do a jury trial, except the same lawyer will be sitting there for all of them. You won't have (indiscernible).

Anyway, let's get back -- I'm going to skip this, because the real question is, have you pled a tort claim against anybody to start with?

MR. FAZIO: Yes.

THE COURT: And we'll go to the other stuff. I don't think you, and I'll tell you why. I understand the problem to be as described here. The guy has a driveway. Do you know what city he lives in?

MR. FAZIO: Yeah. He lives in -- I think Kenwood.

THE COURT: "Kenwood."

MR. FAZIO: -- in Marin County.

THE COURT: Kentfield? No. Kenwood. Okay.

MR. FAZIO: I -- it's Ken-something.

THE COURT: And he's in Marin?

MR. FAZIO: "Marin."

THE COURT: All right. And it sounds like -- have you ever --

MR. FAZIO: Field maybe. I don't know.

THE COURT: Pardon me?

MR. FAZIO: Kentfield. I --

THE COURT: I could be Kentfield. That's some kind of fancy neighborhood. Okay.

All right. So -- but have you -- you've never seen his house?

MR. FAZIO: No.

THE COURT: Have you ever seen a picture of it?

MR. FAZIO: No.

THE COURT: No. Okay. Well, I was --

MR. FAZIO: I saw the video.

THE COURT: Okay. So that has a picture of the driveway?

MR. FAZIO: It shows the car moving. He videoed it.

THE COURT: Good enough. All right. As I understood what he's talking about is a situation as how all cars, before hill hold, which some cars have, operated. You're on a hill, okay. And let's say you are going uphill, which he calls -- or you call in the, you know, the pleading, the incline, right? Okay. You're going uphill and you've probably never seen Bill Cosby's act on driving a Volvo on a hill in San Francisco.

MR. FAZIO: No.

THE COURT: It's very funny. He's got his foot way above his head, and he's telling the other cars, go around, go around. He's in -- in a stick shift -- anyway, it's very funny. Leaving that aside. Okay.

So, you're on a hill and the ordinary thing is you got

your foot on the brake, and now you want to go forward. And you don't just take your foot off the brake with some lead time to get your foot on the accelerator to go forward, because in that gap time the car's going to drift back.

Ditto if you are, let's say, pointing downhill. That's the decline idea. And let's say you want to back up for some reason, because maybe you're in a parking space and the guy in front of you is, you know, pretty close, and you got room behind you.

So like you're pointing downhill now, like you want to back up the old way, and, frankly, the way a lot of cars still work, is you got your foot on the brake and you need to get, you know, the accelerator depressed so you can back up, not -- if you don't get an immediate connection -- you know, you got to be, you now, really fast. I don't even know if anybody can be fast enough.

You've got to, you know, get your foot on the accelerator so -- otherwise you will drift forward because cars coast in the direction that their wheels are, you know. So, they're going to go backwards if they're going uphill. They're going to go forward if you're going downhill.

Until very recently, everybody had to drive the way it sounds like Burlingame guy told your client he had to drive the car. In other words, keep your foot on the brake until you've got the accelerator depressed enough that you are --

you know, feel confident that the car will go in your direction. I don't call this a surge. I call that a coast.

And if he's coasting backwards or coasting forward, that isn't what the people who are making the other complaints were complaining about. They weren't driving on an incline or decline, they were just kind of driving, and then they said that these aberrations occurred at least one or two were recognized by Volvo, and called the cars in for recall.

There is nothing to indicate that they didn't fix the problem. You are alleging there's more to the problem than what they purported to fix, but I don't know there's any indication of that. So, I have got a little bit of a difficulty.

If they represented anywhere that you don't need to do what he was told by the dealership, then you've got something a little different. In other words, your car has got this new technology. You don't have to deal with holding on on the hill. Your car won't drift back or go forward when you don't want to. But so far there wasn't anything to that.

I did look at a couple of the assertions they make. The website says, well, we can't say you should never use the brake. Sometimes you may need to use the brake. I don't know, but that's how I was reading it. Now if I mis-

reading what his problem is, it's not pled in a way to suggest that I am, then I'd give you a chance to re-plead it. But it sounds to me like he's just got -- you're on a hill. You put your foot on the brake so you don't go back into the car behind you, and I don't know. Anyway, Volvo didn't bring this.

MR. FAZIO: May I respond, your Honor?

THE COURT: You may, yes.

MR. FAZIO: Yeah. I think that it's a little different than that. It's not -- I own an electric vehicle as well, and I certainly understand this phenomenon you're describing as on the hill, up or down.

THE COURT: Yes.

MR. FAZIO: This is different. He was in the driveway, yes, but when he puts it in park it goes backwards.

THE COURT: Well, let's --

MR. FAZIO: When he put it in drive --

THE COURT: That's not what he described.

MR. FAZIO: Not park but drive, it went backwards.

THE COURT: No, he didn't describe that.

MR. FAZIO: Yes, it's in the complaint.

THE COURT: No, it isn't. The way he -- it's not the way he described it. If that is what's happening, in other words the car -- you put the car in -- well, if he's

on -- if he's -- yes, it goes backwards. If he doesn't make the connection fast enough --

MR. FAZIO: No.

THE COURT: -- appear --

MR. FAZIO: If you put it into reverse, it goes forward. If you put in drive, it goes back.

THE COURT: And I cannot believe --

MR. FAZIO: Okay.

THE COURT: I mean, it's so bizarre. If you want to plead that that is exactly what he did, and somebody at a car dealership said, when you put your car on a flat street in reverse, it goes forward. And on a flat street when you put it in gear to go forward, it goes backwards. In other words, the gears are reversed in some way, I mean, you could not drive a car like that, period. End of discussion.

MR. FAZIO: It's not constant, but it does that unexpectedly and it does surge, your Honor, in the opposite direction.

THE COURT: It only happens in his driveway, where apparently in a -- I don't know how steep it is, but --

MR. FAZIO: I have several others who've stepped --

THE COURT: Excuse me.

MR. FAZIO: -- who want to be part of the case --

THE COURT: Great.

MR. FAZIO: -- that we need to add.

THE COURT: You may need to add them, but the main thing is, you've got to make it clearer. I will get -- let me get the complaint and I'll -- I'll read --

MR. FAZIO: Sure.

THE COURT: -- you what he said. And, clearly, the complaints made by the people were not, I put it in gear a, and it did something different. They're saying, I'm like, I'm stopped and the car surged or I -- I don't know. I wasn't totally clear about the people who weren't getting forward motion, whether it stalled or what exactly happened.

But I'll tell you, I don't think you've got enough here to show knowledge even if you show a defect. But let me go back to where in the complaint you said this, because I highlighted it.

MR. FAZIO: It's in paragraph 29 of our complaint, your Honor.

THE COURT: Right. Here we are. So I'm in 31 to two. All right. Let's see. That's where he reported that, and they told him it was normal. All right. And here's 29:

"When he attempted to move the vehicle rearward out of his downward sloping driveway the following day, the vehicle surged forward approximately 20 inches."

Now, at this point, downward sloping, the way I read it is, he's going downhill.

MR. FAZIO: No, he was is like this.

THE COURT: That is the way you wrote it, all right, so --

MR. FAZIO: I have the video attached.

THE COURT: Do I have the video?

MR. FAZIO: It's cited and linked, yes.

THE COURT: I don't know that I saw a video.

MR. FAZIO: YouTube video linked to the complaint.

MR. MALLOW: We actually have the video, your Honor. Did you like to see it?

THE COURT: Well, I'm happy to see if we can play it here. I'll look at it, but hang on. All right.

When he attempted -- I'm going to read this again. Rearward out of his downward sloping driveway. So you're saying it goes downhill to get in the --

MR. FAZIO: Yeah, there's a slight slope on his driveway, like most people have. Yeah.

THE COURT: Well, no, most people don't, okay.

MR. FAZIO: It's not uncommon I should say.

THE COURT: So, where's his garage? Are you going downhill or downward to get in the garage?

MR. FAZIO: It's uphill to go into the garage.

THE COURT: Yes. So he is backing out or --

MR. FAZIO: Yes.

THE COURT: -- is he going --

MR. FAZIO: That's what happened here. That's what we're describing.

THE COURT: Please do me a favor. Don't talk over me. And the reason I say that --

MR. FAZIO: I was answering your question.

THE COURT: -- in particular, is that we do not have a court reporter today who would yell at you. We just have a recording --

MR. FAZIO: I get it.

THE COURT: -- (indiscernible).

MR. FAZIO: My apologies.

THE COURT: Okay. Now, give me a minute.

Okay. He says it goes -- all right. This -- in this first sentence that you're describing from 22 to 24, let's say, because it's -- he's got two different scenarios.

MR. FAZIO: And down to 28, it talks about the opposite --

THE COURT: Just give me a minute here. From 22 to 24, that's all I'm talking about at the moment.

MR. FAZIO: Okay.

THE COURT: Which direction is his car pointing in?

MR. FAZIO: You mean southeast? I --

THE COURT: No. Is going -- is the front of the car going downhill or is it going uphill?

MR. FAZIO: It's pointed upwards towards his garage.

THE COURT: All right.

MR. FAZIO: Well, actually, another car in front of it.

THE COURT: All right. He is -- all right. The garage is uphill of the street. Maybe not markedly in your words, but it's uphill. He is facing as if he were going to drive into the garage, but he's not. He's trying to back out to go to the street.

MR. FAZIO: Exactly.

THE COURT: All right. All right. Now he says in those -- if that's what happened, he's saying that -- how did it surge uphill? I -- this is very --

MR. FAZIO: I don't think that's what --

THE COURT: He's describing his car that he's trying to back out. The car, instead of rolling backwards is surging.

MR. FAZIO: It almost hit the car in front of him.

THE COURT: Surges uphill?

MR. FAZIO: Right.

MR. MALLOW: Your Honor --

THE COURT: Weird.

MR. FAZIO: Yeah.

MR. MALLOW: I apologize. If it -- I think seeing the video, which is referenced in the complaint, could be very helpful. We -- we do have it.

THE COURT: Well --

MR. MALLOW: We connected into the system. But you can see all of this --

THE COURT: Right. I'm just trying to say, what would I understand as a normal person reading this complaint, okay. Then we can see about looking at the video.

MR. MALLOW: It's not clear to us either, so.

THE COURT: Well -- well, you say the video may clear it up?

MR. MALLOW: Correct.

THE COURT: All right.

And then he discovered that the vehicle would also suddenly surge rearward if parked on an incline. Now I take that -- you see, I read that as going uphill, you know --

MR. FAZIO: It can be both ways.

THE COURT: -- when you state -- or you want to just talk and I'll sit here? Okay. I understood it as going uphill. Now, is that what you meant or not?

MR. FAZIO: Yeah.

THE COURT: You meant an incline to be going

downhill?

MR. FAZIO: No. I meant an incline meaning up or down, depending on where you happen to park. You could be on a street that's heading down, you could be on a street that's heading up, but if it's on an incline, that's my client's experience. It's not the same experience that other class members have reported, but they too want to be part of this case. And if given leave to amend, I'll certainly add them.

THE COURT: Okay. I don't quite get it, because at other places there were references to a decline.

MR. FAZIO: Yeah, there are, but I didn't say that they were always on a decline and always on an incline. That's not the case.

THE COURT: I'm just going to sit here, because unless I can talk fast enough to keep my sentences connected together, if I state a sentence, before I can get the next sentence out, you're in there.

MR. FAZIO: I'll wait for you to ask me a question, your Honor.

THE COURT: Right. Let's just get -- it's not a total conversation, it's a hearing. All right. So let's get back to this.

There are times you used decline, times you used incline. I understood incline to be going uphill. Let's

say you're a hiker. You say, boy, it's a steep incline. You think you're going uphill. Nobody thinks about going back down, okay. And then if you're looking downhill and, say, well, it's a sharp drop, it's a sharp decline. Nobody's talking about going backwards uphill.

So, that's how I understood, given that two different words were used. That incline meant the car was parked with the nose uphill, and decline meant it was nose downhill. Now you say it's the opposite.

I'm going to ask the court clerk, is there any way we can play their video, if they've got some kind of link here?

THE CLERK: (Indiscernible).

THE COURT: Okay. She's game.

All right. Who's got whatever it is, and we'll just go off the record while you try and put it into effect.

MR. MALLOW: And, your Honor, if we -- if we can't get it to play on the screens, everything, as long as counsel's okay with it, we can hand you the (indiscernible) as well --

MR. FAZIO: I'm fine. Yeah.

MR. MALLOW: -- so you could see it. So --

THE COURT: That's fine.

MR. MALLOW: So, regardless, we'll get you to see it.

THE COURT: What's the -- the easiest way.

MR. MALLOW: Sure.

THE COURT: Okay.

MR. MALLOW: So I think you just need to connect to the -- it would be defense counsel table?

MR. FAZIO: The monitor back there I think is functioning. Or, yeah, just blank that one.

MR. MALLOW: See something for a second.

THE CLERK: Okay. Let me try one other --

MR. MALLOW: Maybe we just provide the Judge with the -- like a -- you want to just confirm that it's video that you --

MR. FAZIO: I've -- yeah.

MR. MALLOW: Okay. Trust you.

Your Honor, may I approach?

THE COURT: Pardon me?

THE CLERK: I'll give it a shot.

MR. MALLOW: If they --

THE COURT: Okay.

THE CLERK: Hold on.

MR. MALLOW: Just hit the arrow that's on the screen, it should play for you.

THE COURT: Okay. All right. Now this won't show what he's doing in the car?

MR. MALLOW: No, he actually narrates the -- what he's doing. So, it's very helpful.

THE COURT: Okay. Wait a minute. Where's the --
MR. FAZIO: It's on the screen, your Honor.
MR. MORAN: Just press the center.
THE COURT: Just in the center. Yeah.
MR. MALLOW: And just for the record, your Honor, if I may. Your Honor's going to be watching the video that is referenced in paragraph 31 of Plaintiff's complaint.
THE COURT: Is there any way to turn the sound up or not?
MR. MALLOW: Yes. There's -- the volume button.
THE COURT: Right. And it's pretty low on the sound at the moment. And then --
MR. MALLOW: (Indiscernible).
THE COURT: Right. And then if you could just get it back to the start.
MR. MALLOW: I have -- am I looking at the --
THE COURT: Okay. Thank you.
MR. MALLOW: That's the -- not the second amended?
MR. FAZIO: Yeah, it's set.
MR. MALLOW: Second amended.
THE COURT: Okay. Fine.
MR. FAZIO: I see the reference to --
THE COURT: Okay. Counsel, I'm now going to try playing it. Do you want to get it on your various devices as well? Okay.

(Video playing.)

THE COURT: Okay. I'm not -- I want to play it again. I wasn't quite clear. He said he put it into reverse and then he took his foot off the brake. All right. I don't know if you're not stepping on the accelerator that the car isn't going to go forward. I'm not sure.

MR. FAZIO: In reverse?

THE COURT: Yeah, just in reverse, but I'm not sure about that. Whether you should need any kind of power to keep it or whether it should just sit there. I don't know.

MR. MALLOW: Your Honor, I think counsel may have misspoken about which direction the driver -- what's the attitude of the driveway. As I saw the video and as I heard the narration, if the house is here -- it's not showing up on the record, but if you have the house, it appears the driveway is descending into the house, not --

THE COURT: Yes.

MR. MALLOW: -- ascending into the house. So what he said was, I put the vehicle in reverse and it went -- and the vehicle traveled in the direction of the downhill.

THE COURT: He said he had a foot on the brake, and then he took his -- that's why I wanted to play it again, just to see if there was a place where it could drift forward before you were in gear, all right. Or, in other

words, if the car -- if your car is just in the equivalent of neutral and you take your foot off the brake, it is going to coast in whatever direction the hill is, all right. But in this particular instance, I believe he said, I -- the car was in reverse, all right, on a -- the car is pointed with the nose downhill. He is backing up to the street, all right. And I didn't get what the grade is here. I don't know, what is it, 30 degrees?

MR. MALLOW: He didn't say.

MR. FAZIO: I don't believe I misspoke, your Honor. I mean, it shows uphill.

THE COURT: What?

MR. FAZIO: I mean, people can differ. Until somebody goes up and measures it, I don't think that I'm willing to concede I misspoke.

THE COURT: You mean the degree of the hill? I couldn't -- he said he was going to measure it as best as he could. Did he say what it was?

MR. FAZIO: Whether it was incline or decline?

THE COURT: No. Did he say it's a 45-degree hill --

MR. FAZIO: No.

THE COURT: -- it's 90 -- yeah, it's 90 degrees. Okay. So, I'm just trying to estimate. It looked fairly steep, incline or decline, whatever you want to call it, but

here it is, and he's pointing this way downhill. He wants to back uphill to get to the street. And in doing so, he says, okay, I'm taking my foot off the brake. And I just wanted to see if he said quite how it worked. Because when you take your foot off the brake and you are not yet in gear, the car is going to go downhill, all right.

He says he put it into gear, which was reverse, and nonetheless, the car went forward. And I'm just not sure how that -- I can't remember how cars are supposed drive in that regard, of whether you still have to have acceleration in order to avoid the drift in the direction that the car would ordinarily go, all right.

So -- but I thought I would play it again just to hear what he said. And let me see. To get back to -- that doesn't --

MR. MALLOW: Would you like us to re-set it, your Honor?

THE COURT: Well, I thought -- there's nothing to sort of slide back. Well, here, let me hit that and hit this. I don't know.

MR. FAZIO: If you tap it once the red dot should appear and you can slide back.

THE COURT: No. The red dot seems where -- to be where it should be, but I'm not getting the forward arrow, and I'm not sure -- well, now it's circling around. Give me

a second here. Yeah. I didn't mean to hit this. Yeah, now nothing.

Let me just show you. I'm getting a circle going around. Let me give this back, yeah, to you, and maybe you can set it up again. Yeah.

MR. MALLOW: It might be refreshing.

(Pause.)

MR. MORAN: He's just trying to connect to the courtroom wi-fi.

I don't know if your --

MR. MORAN: My phone has a better essentially --

MR. MALLOW: No, my -- let's see.

Sorry about that, your Honor.

THE COURT: That's okay. I'm just glad that somebody else is having the same --

MR. MALLOW: We were doing so well for a moment.

MR. FAZIO: Is the idea -- I'm not sure, your Honor. Are we trying to determine whether the defect exists in the context of a 12(b)(6) motion?

THE COURT: I'm trying to determine whether what he's describing is a defect.

MR. FAZIO: I think that might require (indiscernible).

THE COURT: Well, I -- the way I had originally understood it, I was at least going to say that you would

have to plead that this is not how the car is supposed to operate. In other words, that it's operating essentially like cars that have operated for decades, since they were made. But you are describing something that -- at least that you're trying to explain what it is, may be different, but I'm waiting for counsel to see if he can bring it back up again.

MR. FAZIO: May I explain, your Honor?

THE COURT: Let's wait until I watch the video again, okay?

MR. FAZIO: Sure.

THE COURT: You had said, essentially, that a picture is worth a thousand words, so I'm going to skip your thousand words and watch the video.

MR. FAZIO: Okay.

THE COURT: Those weren't your words, but that's essentially what you were trying to say, watch the video.

(Video playing.)

THE COURT: I'm -- okay. Okay. I'm -- stop it, because the distance it went at the moment isn't critical.

MR. MALLOW: There's an important thing he says right -- if you keep going.

(Video playing.)

THE COURT: Okay. He didn't let us know, but, okay. I'm going to give you the iPad back -- well, yes,

it's an iPad.

All right. Just as -- I'll just tell you how I understand that. I'm not making any final ruling here, and I may have misunderstood to a certain extent what you were trying to describe. And, yes, I, you know, watched the video. The video really is -- I don't -- did you incorporate it by reference in the complaint?

MR. FAZIO: Yes, your Honor.

THE COURT: Okay. So, what we have here is someone who is anticipating that having the car in gear on a slope will preclude the car from moving at all in the direction the car wants to move in. All right. You know, in other words, if you just have something on a slope and you're not trying to stop it, it will go downhill.

So the car wants to go downhill, and he is relying on being in reverse to prevent the car from going downhill. And it goes down a little bit and then it -- you know, 20 inch, and then stops. All right. And maybe that's what cars aren't supposed to do. I'm really trying to think about how these things work.

I've had a car with hill-holding. You know, it was advertised that the car would hold on a hill, and that you did not have to have your foot on the brake to keep it from, you know, going the way it wants to go. And you did not need to be applying pressure to the accelerator to keep it

from doing it either. Because if the car wants to roll back and you've got your foot on the accelerator, you're going to go up. You know, you will go forward.

If you're going forward and you want to back up, as he was doing, then you ordinarily need your foot on the accelerator so you can keep that pressure and counter the -- you know, what the car wants to do.

I can't really remember at this point what you need to do ordinarily. If he wants to plead that this is not how cars are supposed to work, and/or he was informed when he bought the car that it had hill holding, or it had something else or this isn't it. Or if you just describe the car isn't designed to do that, it's designed to hold even without applying anything on the accelerator, because he's leaving it.

You know, he just puts it into gear. He doesn't have his foot on the accelerator at that point, he's just sitting there, and he expects the car is going to sit there. And it didn't. It went forward, not a couple of inches, 20, and there's a car parked -- apparently these people don't use their garage. Maybe they turned it into a second bedroom or they have storage in it, but they -- hopefully, they got two-car garage and they're parking out in the driveway. So, anyway. I know understand a little better what he's, you know, saying.

Take it for a moment that the Defendant didn't say you don't have a defect, all right. They simply said, you haven't shown we knew about it. And the motion was only made on behalf of the two American companies, not the Defendant is trying to get out of the case on personal jurisdiction.

Let me get the motion, and then we'll see where we are. Okay. It says -- well, yeah, like -- this one's like personal jurisdiction. Wait a minute. Let me go back. I had to do this in two separate packets here to keep them straight.

Yes. The motion to dismiss under 12(b)(6) is brought under Volvo Car North America and Volvo Car USA.

MR. FAZIO: Correct.

THE COURT: Not AB. I don't know why they didn't bring it on behalf of AB. They only brought the motion under -- I meant under 12(b)(6), I'm sorry. They brought it only under (b)(2) for AB, maybe thinking they would waive jurisdiction argument if they -- I don't know, but -- so, I think one can do it both ways, but maybe this was in an exercise of caution.

I don't think enough has been shown that this particular problem has been called to the attention of the Defendants. I don't think there's enough just by citing a few exemplars. You really need to have at least an

allegation that there are many, many, and not just say there are a lot, but actually have some fact to show it. And maybe make clear that there's a connection between whatever he's saying is the problem and these complaints. Maybe they have lots of problems, but anyway.

Maybe these problems that people are complaining are different than his problem. And I don't know that you have to add people. You need -- maybe just add an allegation to make clear that the fact that you are in gear and you do not apply any pressure to the accelerator, the car is nonetheless supposed to sit there, all right. That's what he expected, it would sit there. And I don't know if that's -- you know, I don't know if that's right or not, but he could plead that it's not what it's supposed to do I think.

MR. FAZIO: May I explain, your Honor?

THE COURT: Sure.

MR. FAZIO: The intention behind the complaint was to use Mr. Becker's experience, the phenomenon that he experienced, putting it in reverse, expecting it to go in reverse, and going forward instead.

THE COURT: You don't expect the car to move ahead.

MR. FAZIO: When you put it in reverse, you usually expect reverse.

THE COURT: Only if you step on the accelerator.

MR. FAZIO: Well, not necessarily.

THE COURT: But when you're not asking it to move, you've got a different problem.

MR. FAZIO: When you put most cars in reverse, they go in reverse.

THE COURT: They sit there.

MR. FAZIO: Okay. I don't -- I'm not here to argue that point.

THE COURT: We can go in a car, sit on a flat street --

MR. FAZIO: Right.

THE COURT: -- point your car in reverse, it does not back up.

MR. FAZIO: Okay.

THE COURT: It sits.

MR. FAZIO: I don't believe anybody here is qualified to make that (indiscernible).

THE COURT: (Audio glitch.)

MR. FAZIO: Okay.

THE COURT: And I'm telling you --

MR. FAZIO: (Audio glitch.)

THE COURT: -- that putting a car in a gear doesn't move it.

MR. FAZIO: Okay.

THE COURT: All right. You're in --

MR. FAZIO: I understand. May I explain?

THE COURT: No.

MR. FAZIO: All right. Thank you.

THE COURT: You either don't drive or you don't know how cars work. When you put a car in gear it doesn't move unless you ask it to move.

MR. FAZIO: Okay.

THE COURT: And how you ask it to move is to step on the accelerator.

MR. FAZIO: All right.

THE COURT: I want to find out if anybody has a different experience. I'm just going to ask counsel over there.

Do you expect your car to back up when you don't put any power, ask it to move?

MR. MALLOW: In an electric vehicle, absolutely not.

THE COURT: In any vehicle on a flat street? Cars don't move until you want them to move.

MR. MALLOW: My experience -- and I've been driving EV's for like four or five years now. My experience is, if you -- if you're on a flat surface and you put it into gear and take your foot off the brake, there can be some movement based on the internal combustion engine being in gear. However, in an internal combustion engine vehicle,

if you're on a hill and you put it in drive, the car is going to go backwards until you hit the accelerator.

If you're going downhill and you want to go in reverse, the car is going to go forward unless you hit the accelerator to go backwards. So, it can't -- if you -- if we want to talk about the EV world, then your Honor is a hundred-percent correct.

But Plaintiff wants to -- and if you want to talk about the world where you're dealing with traditional combustion engines, unless you apply hill assist, you're going to roll in the direction of the hill unless you press the accelerator.

THE COURT: All right. Now, just going back.

MR. MALLOW: So you were exactly right.

THE COURT: Yeah. Just going back. You're on an absolute flat surface in a regular car, all right, and you put your car into drive, okay. You're saying there is some creep forward. How much?

MR. MALLOW: It -- again, it depends -- assuming we're totally flat, there will still be a -- there will be some little creep forward.

THE COURT: It's not really driving away --

MR. MALLOW: No.

THE COURT: -- in drive?

MR. MALLOW: No, it's not driving.

THE COURT: Fine. All right. That is my understanding of -- okay. If it has some minor movement maybe, but it's not supposed to go anywhere when you don't want it to go anywhere. It's supposed to essentially sit there. If it creeps forward some millimeters or backwards some millimeters, I don't know.

Anyway, the main thing here is the driver is not on a flat surface. And my understanding when you're on a hill, is the car's going to drift in the direction that the wheels want to go until you do something to keep it from doing it. And putting it in gear, I -- as I say, I really don't know if that's what -- it's supposed to stop. Okay.

So, if it is not supposed to -- if it is supposed to stop, but then he has to make that clearer, okay, as to what he's complaining about. It isn't you need more people to parrot whatever he's saying. What's -- what caught my attention is that the Volvo dealer didn't say, okay, we're going to try and fix it, and whatever.

They didn't look like they were just kissing him off. They -- they went and they got another car to see what it did, and it was -- these are on a ramp or something, so they could run the same tests. And they noted the same situation, and then they contacted somebody in Volvo who said that's what it's supposed to do.

Now, maybe that's wrong. Maybe it isn't what it's

supposed to do. I think the dealer thought it was, all right. And that -- I don't think that was initially a cover-up, as much as someone saying, that's what the car does. And then if you want -- normally, all right. And then you want to say that's now how it was advertised to me, that isn't how other cars drive, and this has a safety feature, fine, okay.

But it just struck me that there was something odd about his problem, and apparently he doesn't have it except on a hill. I don't think he has said that, you know, he was just driving and there's a car in front of him, and he puts it in reverse and he runs into the car in front of him, or vice-versa.

And the people who had the problems that were reported were not people driving on hills. So, I don't know. I -- I think it would be cleared up or -- in some way, and I'm -- certainly give you an opportunity, but this is the first time I had a chance to, you know, be asked to say anything about it.

So, you can say where you think you've pled enough, but I read your papers and you've been taking it as the same problem. It didn't look like you had enough to show that -- let's say these NHTSA reports, there's nothing to say that Volvo gets them, they monitor them. That dealer complaints are passed up to Volvo beyond the dealer. I don't know.

But Volvo is responsible automatically for what the dealer knows. I don't know that that's correct.

If they know there's a problem and they sell the car, even though there's not a contract between Volvo AB and your client, that may be enough, you know, for liability or maybe not. But there's a warranty. Nobody's attached that. I don't know who it's with exactly. There are no -- you can fill in blanks if you'd like, Mr. Fazio, and we'll see where we are.

MR. FAZIO: Thanks, your Honor.

THE COURT: I meant now.

MR. FAZIO: I thought you were giving us your implicit ruling.

THE COURT: No. It is what -- unless you can show me that there's something really -- I didn't buy everything the Defendants said. If you want, I can go to that first, just in the interest of time.

MR. FAZIO: I was trying to explain that Mr. Becker's specific situation was not representative of the whole. We had cited to a number of people, many of whom have come forward to my office asking to become part of this case. Some of them here, most of them throughout the country. But the bottom line is that, yeah, we don't know what's causing this either. And it's not just being on a specific hill at a certain incline.

We have people saying things, a woman in Santa Barbara, for example, that it was like being on a runaway horse. That it was jumping over the bumps or what have you, the divider. She was terrified. I've written about that. Another woman hit her husband's car because it surged forward. There are myriad situations all involving this powertrain, all surging suddenly.

One person almost hit someone in a crosswalk. Another one in, I think Iowa, we've discussed that at length in our complaint, totals the car. She was in a car when it just got away from her, smashed into everything. This is not normal.

Trying to figure it out here in the context of a motion to dismiss, I don't think that's the appropriate venue or -- I am in the case to be doing it, but I'm happy to discuss all of that. I just don't believe that when you put a car in drive or reverse that you should expect it to sit idle. You indicate which direction you want it to go by doing that, putting it in -- the transmission into gear means that's the way you want the car to go.

To the extent that there's knowledge, we've talked about the recalls that they were involved in with the same vehicle platform, the Polestar 2. You're shaking your head, your Honor. I've added everything I could in my complaint. I'm happy to stand by it. I don't need to say another word.

THE COURT: Okay. Again, the exemplars that you pled were very different than what your client experienced.

MR. FAZIO: That's true.

THE COURT: And so, they may have some other problem.

MR. FAZIO: Maybe.

THE COURT: He sounded like he had a normal situation. Now, maybe it isn't normal, but then as I say, the Defendant didn't bring this up at all. They just had all these sort of oddball arguments, a lot of them that didn't work, all right. And I can tell them, it's just for the future. They'll probably move again, so, you know, I'll tell them what I didn't think was very persuasive.

But their lead argument is there's not enough to show that the problem, which they just accepted as a problem, had been reported. And they didn't draw any distinction between the reports and what was going on here, except that some of them were things where cars were not going forward, they were going backward, but then this car your client says goes both directions when you don't want it to.

If there's a recall, and I think you would have to say that they didn't fix whatever the problem is that those cars had, and you were -- which isn't in there. Which, usually, you know, there's some part and they put it in, and then they don't build the car to require a recall every time,

then they fix it for the newer cars. There was about a five-year gap there.

But if you are pleading that there's a defective powertrain that causes all these problems in some fashion, and maybe that certainly would go to safety, but I did not understand what you were pleading here. And I'm still not sure exactly if there's a problem with, you know, the way the car behaves on a hill, okay, to say that.

Now, going to 12(b)(2) for a minute, and I'll go back to 12(b)(6), having the two of these to have to deal with. The 12(b)(2), if it's tied to the directed wrongful behavior, if there's a pleading that makes Volvo AB equally responsible for whatever the wrongdoing is, then the only question is, are they directing that wrongdoing at California? All right.

They did get special permission through this emission control statute, so that might be enough. That would be a focus for next time to look at it, and see if that might be enough.

They also -- you know, they have all kinds of installations here, being a showroom, they've got a dealer, whatever, in this district. There are probably multiple. So that if that in some way plays into it for -- you're looking at California, not just Tanzania, all right, then plead that, too. And then -- but for now, I'm not letting

them out right now, because you may well be able to plead something here of interest.

And then as I said, there was no argument to the extent that, let's say, you could do the easy one, intentional tort. And then the harder is kind of availing, and is the carb certification, is that enough for availing? Maybe, you know, but would you need that for like your warranty claim or your -- any claim you're not making a fraud claim, you know, on, like the Song-Beverly, so --

MR. FAZIO: Yeah.

THE COURT: Okay.

MR. FAZIO: That's the only non-fraud claim in the complaint.

THE COURT: No, the breach of warranty.

MR. FAZIO: That's what I said. That's the Song-Beverly is the only non-fraud claim in the complaint. Everything else is either common law, CLRA, FAL, UCL, all fraud.

THE COURT: No, breach of warranty.

MR. FAZIO: There's a breach of warranty of claim, plus all of the others, and they're all fraud.

THE COURT: But are you saying the breach of warranty claim is a fraud claim?

MR. FAZIO: No. I said, everything except the Song-Beverly claim is fraud based.

THE COURT: And I said, what about breach of warranty?

MR. FAZIO: I said, breach of warranty is not fraud, but all the rest of them the claims are.

THE COURT: Don't you have a Song-Beverly claim and a breach of warranty claim?

MR. FAZIO: No. That is the warranty claim.

THE COURT: That's your warranty claim. All right. I may have misunderstood that. Fine. Weird. Maybe you're right. Let's see. You have fraudulent concealment and you have CLRA, and you have UCL, FAL. Warranty you have -- I see what you mean. Okay. I guess I don't quite think of it that way. Okay.

And then unjust enrichment. Are you actually pursuing that?

MR. FAZIO: Yes, your Honor.

THE COURT: All right. That will get ultimately thrown out unless you can show the --

MR. FAZIO: Well, the Ninth Circuit disagrees.

THE COURT: Unless you -- no, Sonner, which I'm relying on, says if you have a legal claim you can't bring an equitable --

MR. FAZIO: We've addressed that, yeah.

THE COURT: And so you have -- if you want your money back, you can get your money back under your legal

claims.

MR. FAZIO: Not when it's safety related.

THE COURT: I don't think so.

MR. FAZIO: Money isn't going to do the trick. It's equitable relief.

THE COURT: Okay. I'll probably throw it out. Let's put is that way.

MR. FAZIO: Okay.

THE COURT: You don't need it anyway. And so the real --

MR. FAZIO: I think we do.

THE COURT: Excuse me. Is that I'm going to cut this hearing off very quickly if we keep on. And the next time I look at your complaint, I may do it with a less open mind.

All right. So let's get back to where we were. We got the Defendants' defenses, and I am trying to give you as much opportunity as I can to address whatever concerns I have, which you disagree with, which are personal -- yeah, I mean, you're perfectly -- you know --

MR. FAZIO: It's not personal, your Honor.

THE COURT: No. I just mean you -- you disagree with them, and, you know, you're entitled to that. But if you're stuck with my ruling is, then I'm just trying to give you an idea of what might help to, you know --

MR. FAZIO: I don't -- I've got a feeling where you're going, but I haven't heard a ruling.

THE COURT: Well, you're going to get one pretty soon.

MR. FAZIO: I'm sure I will.

THE COURT: All right. The first ruling is the motion to dismiss under 12(b)(6) is granted. It is granted on the basis that the Plaintiff has not clearly pled a defect. And to the extent they've pled one that they haven't shown, that the Defendant was aware of it.

Now, with respect to the -- what we'll call Song-Beverly breach of warranty claim, as to that claim, again, we have the following then. That the car was brought to a dealer. That the dealer knows that there is a defect, if there is one that was directly reported to them. And there has not been a showing legally that any of the Defendants in the case are responsible unless that information is conveyed to them in some way, directly or indirectly. And so there has to be a connection made. So that's the reasoning for that -- that dealer complaint.

Now, to the extent the Defendant is arguing under the Ratigan (phonetic) case that the case is subject to dismissal because the Plaintiff didn't report to them or try to give the car back in timely fashion. Any of those defenses were not persuasive on the arguments at least made

to the Court.

In other words, a defense that probably couldn't be cured in some way, you know, just as a legal matter pretty much, I did not accept that, but -- I'm looking again the long notes that I've got here, so hang on. I don't want to leave some of these out. I'm certainly giving leave to amend.

So, we'll just do it this way. For the UCL, FAL, CLRA and common law fraud claim, the remarks I just made apply to those claims that there needs to be a showing of knowing misrepresentation, and it's not clear that we -- we have that.

Okay. Now I'm -- as far as the (audio glitch), there's no direct transaction between the Defendants, so the moving Defendants here, or the non-moving 12(b)(6) Defendant to AB. Just a second. Well, there's no -- at the moment there's no connection between them and the dealer as a legal matter. So that I'd like to see either made one way or the other clearly.

As far as exclusive knowledge, if you can say that a manufacturer under -- give me a second and I'll get the case that I wanted to mention. This may not be -- under Dhital, which is for the record, D-H-I-T-A-L. If that case, for example, says there's the privity that's necessary maybe for any of the claims here, is an expressed warranty. I don't

have really clearly spelled out.

Also, if a manufacturer who knows about a defect, or its distributors who are deemed to know about a defect, and particularly if it goes to safety, don't disclose that to buyers in general can each be held liable probably, but I'm not absolutely certain. So that ought to be made just clearer in the briefing next time when we get to it. All right.

The -- let me just catch the various issues here.

MR. FAZIO: Just so I'm clear. Are you saying, your Honor, there has to be direct dealings with the manufacturer?

THE COURT: Well they -- there should be a warranty, for example, if the manufacturer did give the warranty. I wasn't clear who had it. That would be one easy way to show a privity, if you need privity. All right. You have a --

MR. FAZIO: I was --

THE COURT: Actually more at AB, and maybe -- even though they make the --

MR. FAZIO: Yeah. I believe it's the parent. But this is the issue that Judge Freeman dealt with Moore v. Honda, Mr. Mallow's case in the Central District. Where she rejected the direct dealing argument. You're adopting that?

THE COURT: Well, I think if you have privity,

that's fine. No, I'm not necessarily. I'm saying that if they knew and they marketed the -- you know, they made the car. They put it in -- out to be sold, AB. Where are the distributors?

You know, as long -- I just need a connection of knowledge between the dealer who knows if it is a problem, all right, that should have been corrected. That the dealer knows, and then somehow to get the dealer's knowledge either conveyed because that's how the organization works.

Or the complaints that are made, if there are enough of them, so you just don't have some aberration, you know, the car -- some one-off car doesn't work right. But to -- but the complaints are going to be conveyed to whoever you're suing here.

Like there's some kind of owner's website where people post their complaints. Is that something you would expect any of the Defendants to be monitoring with respect to complaints to the NHTSA, that would be different, but are you -- do they monitor it? In other words, to plead those connections a little better. And, again, that looked like they may be different problems, but, okay.

So then to go -- just a second, because I'm -- I don't think you had active concealment at the moment if -- you know, because you're relying on different theories.

MR. FAZIO: No. We argue that in the papers and

pled it in the complaint --

THE COURT: Yes, but I didn't accept that that was -- you know, really showed active concealment. Unless you go with the dealer and assume that the dealer really wasn't acting in good faith and was trying to, you know, just put the -- your client off in some way by saying there's no real problem. It's normal. And then, if so, wouldn't that go in the chain of knowledge.

And maybe what you did might be enough, but the other things that you were showing on a broader level, like we're going to assign you a special technician so you'll have your own person, those kind of things, I didn't accept as being actively concealing.

MR. FAZIO: We argued that they were paying them a thousand dollars to essentially keep quiet and go away, and --

THE COURT: Well, yeah, that wasn't clear.

MR. FAZIO: -- preventing dealerships from repairing these vehicles. Those are pretty active --

THE COURT: Yeah, I didn't buy it.

MR. FAZIO: Okay.

THE COURT: Okay. I know what you said, and you -- there could be a million reasons why they did that. If it was only one, maybe, but you can't say they're just trying to -- instead of giving people good service or making

them happy after they had to go through a problem that they fixed, or, you know, some they fixed, I don't think you can call it active concealment.

MR. FAZIO: Yeah. I don't believe we said that we weren't happy, your Honor. We addressed it in the papers, but, okay.

THE COURT: Yeah. Well, you were talking about what they did with other people in other times, not your client, and I didn't accept it. Okay.

MR. FAZIO: Is that with respect to the knowledge?

THE COURT: Except it goes to active concealment.

MR. FAZIO: Right.

THE COURT: In other words, you need some hook. I don't have to tell you everything I know in the world about anything.

MR. FAZIO: I'm trying to understand whether you're talking about --

THE COURT: Excuse me. There has to be some relationship of some sort legally recognized.

MR. FAZIO: Yes, I know.

THE COURT: Okay. Otherwise everybody in the world would have tell every other person in the world what things they know that are unfavorable. Okay. So, that's all.

All right. This hearing unfortunately is devolving

into an unfortunate mess, probably because I could have been better prepared, but so could you. All right. Now, going on.

The -- okay. Independent tort doctrine, I don't think that's applicable here. That's negligence cases. We didn't have negligence cases here.

And I think Song-Beverly controls over whatever the commercial code is for purposes of making -- I guess trying to give the car back, for example. Making one's position known that they don't want the car, all right. I mean, when you have a specific statute and a general statute, and they don't coincide with specific controls. So, all right. So, I'm not saying -- the Defendant can raise these again, but they probably are not going to bar anything.

Now, if we get to a point on personal jurisdiction where -- how the company works in terms of who does what for what, as -- in other words, that you have Ms. Raganoff (phonetic) making a declaration that certain facts exist that would suggest that Volvo AB doesn't really have any connection to any of the things going on over here, and in particular, California.

If you needed those connections in order to have personal jurisdiction, I might give you discovery to test his declaration, all right. If what he said isn't going to make any difference anyway, then there's no point in --

MR. FAZIO: No. We definitely appreciate the discovery, your Honor.

THE COURT: You can do that.

So, it's only -- at the moment, if you can connect the dots on a, you know, tort directed at California, that they -- they are participating in. And we didn't test whether they participated in anything -- on a merits level, because the Defendant did not come forward and say, we're challenging on 12(b)(2), and if you rule against us then you don't have a claim against AB.

If they did that, then I would have had more of a chance to maybe look and see how AB could be connected. And as I say, I'm not as well prepared on that as I might like to be, because I really stuck mostly with what -- sorry. I got a little mixed up arguing. But next time around that might well be an issue, even if not raised directly by a 12(b)(6).

So, if -- there has been that pleading against them, and it's enough against them, AB, then you've got a tort. We can look at direction. You can look at whether they aimed this not just at the world, but at California in particular, and that would be the cleanest way to try to show jurisdiction. And if you have it as to any claim, do you get it as to all?

And if you don't get it as to the ones that aren't tort

claims, which is Song-Beverly, the warranty one, and if you're in that situation, if they don't tag along, so to speak, then we could look at availment. And then Mr. Raganoff might become more important, because he says that Sweden stays in Sweden. It doesn't do anything over here.

MR. FAZIO: Well, do -- are you saying that we should wait for discovery until another round, or do we get to --

THE COURT: No, I don't want to give it yet, because it may not be necessary at all. On whatever the actual connections are next time, there may be enough. So, with respect to -- let's see how I can do that for the 12(b)(2), because I don't want to grant that under the circumstances. I see your point. Just a sec.

No, I'm just thinking about 12(b)(6). Typically one can grant with leave to amend. But on 12(b)(2), I -- I see the problem.

Let me -- let me hear from counsel that actually is doing 12(b)(2) for a minute. See if he has any suggestion because he just got it.

MR. MORAN: Thank you, your Honor. Colm Moran. I -- just very briefly. The reason we didn't move -- include Volvo Car of Sweden in the 12(b)(6) motion is at the time we filed that, that entity hadn't been served with process. And so, we filed and briefed that motion. Sweden was

subsequently served.

We did include a footnote in our 12(b)(2) motion saying we would join in the arguments, but that -- I think it's footnote one, our perspective was -- and frankly it touches on an issue that your Honor raised in terms of purposeful direction and purposeful availment, because it -- while it may not technically be a cause of action specific, certainly the tests are different based on contract versus tort. And that it makes the most sense to, you know, first assess the 12(b)(6) argument, so we know what causes of action are remaining, and then we can do a jurisdictional 12(b)(2) motion.

In any event, my suggestion, your Honor, it sounds like your Honor is inclined to grant the 12(b)(6) motion to dismiss with leave to amend.

THE COURT: Yes.

MR. MORAN: I think from our perspective, Volvo Sweden joined in that motion. I don't think you need to rule today on the 12(b)(2) motion. That the complaint would be amended. All Defendants would be entitled to bring their 12(b)(6), and Sweden could bring its 12(b)(2) motion, if it still is meritorious in our view based on the amended complaint.

So, I think that it -- that's how I would do it. Is the VCC is joined in the 12(b)(6) motion. The 12(b)(6)

motion has been granted with leave to amend. That disposes for now of the 12(b)(2) motion. Your Honor needn't rule on it. And we can see what the amended complaint pleads and determine whether there should be a jurisdictional analysis at that time.

THE COURT: All right. You're suggesting I consider your client AB to have joined in the 12(b)(6) motion? Well, I could do this, all right. Let's see what you think.

For example, if I -- if I deem that motion to be brought also as -- well, to have AB not allowed to orally joined, let's say, in the motion. You want to move to orally join?

MR. MORAN: Your Honor, actually, in our 12(b)(2) motion, footnote number one, we -- Sweden joined. So, footnote of our 12(b)(2) motion, "Volvo Cars AB hereby joins the motion to dismiss under 12(b)(6)," filed by --

THE COURT: I guess I missed that, because you should have filed -- a joinder.

MR. MORAN: My joinder. I apologize, your Honor.

THE COURT: So, all right. Let's assume for a moment -- and I don't know.

Would you -- let me tell you how that might work out, and you can decide, Mr. Fazio, whether you want to object or not. Okay. If I grant that, and then grant the 12(b)(6)

with leave to amend, I would deny the 12(b)(2) as moot, because now there's no complaint at all. Then -- because I don't want to leave it hanging. If they bring it again, I want them to bring it on whatever you plead, and not just on what you had pleaded.

So, with that kind of a -- and just kind of a practical approach, do you think that could work?

MR. FAZIO: Well, I think that it works in the sense that -- in terms of efficiency, if you assume that it's going to get granted again, then that would work. But assuming that it's not granted on any grounds, then you're just guaranteeing that we're going to do it later, rather than all at one time. I would prefer the latter, but --

THE COURT: Right. I mean --

MR. FAZIO: -- it's up to you.

THE COURT: -- once you're stuck with that I was going to dismiss with leave to amend. All right. Here's what I'm going to do then.

I will grant the motion brought by Volvo AB to join in the motion to dismiss under 12(b)(6). So that motion is granted. All right. So, Mr. Geiger (phonetic), just for you, write, "Volvo AB's motion to join in the motion to dismiss under Rule 12(b)(6) is granted." All right.

And then I will grant all three Defendants' motion to dismiss with leave to amend. We'll talk about when you want

to do that. And I will dismiss the motion brought by Volvo AB under 12(b)(2) as moot. All right. So I'm not deciding it on the merits at all.

Now, when you come back, which I'm, you know, expecting, be back on a motion to dismiss. All right. Maybe, maybe not, but I'm assuming -- well, for the moment that if you do, when pleading the three Defendants, I think it would be a good idea not to say Volvo, Volvo, Volvo, but to -- if you want to package up the two U.S. entities, maybe nobody's treating them separately, but if they are, then you want to say what they do independently and certainly independently of AB. Because AB is, you know, essentially saying they're -- they're on the eastern front. They weren't a part of the (indiscernible).

All right. So, anyway. So, at least make that determination, or you're just going to run into a, you can't lump everybody together motion, and then everybody -- you have to start all over again.

And then, how much time do you want to do this? You said you might want to add people. Now that would be a different motion and -- because I'm only giving Mr. Becker leave to amend. So if you want to start expanding the complaint, that would probably have to be a separate motion. I don't know that you need to do it, but I'd leave that up to you. So, how much time if you're just talking about

Becker?

MR. FAZIO: Just Becker, 30 days.

THE COURT: Okay. Let's take a quick look at the calendar. I'll just give you a date so that you don't argue about what the 30 days is.

MR. FAZIO: True.

THE COURT: So today's the 27. I guess it would be March 27, which is fine, if that's what you want to use or --

MR. FAZIO: Yeah, that's fine, your Honor.

THE COURT: Does that work out okay?

MR. FAZIO: Sure.

THE COURT: All right. March 27 for Plaintiff's -- and now we'd be at the third amended complaint. I recognize that the other two were not based on any legal rulings. And then we would just proceed on a, you know, 35-day briefing schedule, unless for some reason you wanted more time.

MR. FAZIO: Okay.

THE COURT: Okay. Just one second. Okay. All right. So, thank you for the T.V. show. Okay.

Ms. Geiger says that there is a further case management conference set for April 17. Maybe we ought to push that back under the circumstances.

For example, if you file on the 27th, and they file

their response, whatever it is, and if it's a motion to dismiss, and then we're looking at, you know, a couple weeks there. And then --

MR. MALLOW: Your Honor, if --

THE COURT: -- we're into sometime in May. I think we should be going over to like June or early July.

MR. FAZIO: Yeah, that makes sense.

MR. MALLOW: If I may? And just so that it's -- for the same reason it makes sense to have the date certain on the amended complaint, I'm calculating that we'd have a response to the amended complaint by May 1st. That's what I see.

THE COURT: May 1st. That -- no. No. No, not on -- you're looking at it as if it was an initial complaint. I believe it's considerably less, but I would have to look. I was thinking it was more like a couple of weeks, but it might be three weeks. I can look, but it's not months. It's not 60 days.

MR. MALLOW: No, it was -- did I miscalculate?

MR. MORAN: Yes.

MR. MALLOW: Okay.

MR. MORAN: Sorry, your Honor. I believe under F.R.C.P. 15, it would be 14 days after the amended complaint.

THE COURT: Well, that's what I was originally

using. And then running from that, which is March 13, I was just saying, if you should file another motion or motions to dismiss, that I would then be looking at a hearing in mid-ish April, April 17.

MR. FAZIO: Right.

THE COURT: And then, you know, I might need time to rule on that, depending. And then -- so I thought that I would, you know, make maybe -- I don't know, June or something for a further case management conference. We could say like -- there are holidays in there. So, for example, I can't use the 3rd of July. I could say the 10th of July, with a statement by the 2nd. The 3rd is a holiday.

MR. FAZIO: You want to set it for the 10th?

THE COURT: I'm just using that as possible. What do you think?

MR. FAZIO: That works for me. It's -- I'm fine with it, your Honor, depending on what Volvo's counsel wants to do.

MR. MALLOW: A couple issues, your Honor, if I may. I apologize. I'm set to be in trial before Judge Fitzgerald on a class trial --

THE COURT: Okay.

MR. MALLOW: -- in -- starting March 17th, and it will run -- I'm sorry, not March. Yeah, March 17th. And it's scheduled to run until the beginning of April. So --

but if I can get -- if we can get a little more than just the two weeks to file a motion to dismiss to Plaintiff's complaint, it would be appreciated.

THE COURT: I'm sorry. What -- in light of your schedule, you're asking for that?

MR. MALLOW: A little more time for us to be able to file the motion to dismiss the complaint.

THE COURT: Right. Yeah. All right. You would like to have more than two weeks to respond to the amended complaint?

MR. MALLOW: Yes, please.

THE COURT: All right. What are you asking for?

MR. MALLOW: Even if we can get to three -- is three -- do you think we can get it by three weeks?

MR. MORAN: Yes.

MR. MALLOW: Yeah, three weeks would be great, your Honor. So that would take us to --

MR. FAZIO: No objection, your Honor.

MR. MALLOW: -- one, two --

THE COURT: All right. So, let's record some of this. The third amended complaint is due February 27.

MR. MALLOW: March 27.

THE COURT: I'm sorry. March -- March 27. And the response would be due by April 17. That's what you're looking at, counsel?

MR. MALLOW: Yes, please, your Honor.

THE COURT: Okay. April 17. All right. So then let's say that from that point we go one, two, three, four -- five is May 22. Then I want some time possibly to absorb whatever you're saying.

So then I was just wondering about continuing our case management conference to either the 10th or the 17th of July.

MR. MALLOW: The 10th. Probably should have my head examined, but I am actually doing an iron man in Germany on July 5th. So I'm planning to be in Europe on -- for a couple of weeks.

THE COURT: Well, it's only for a -- the case management conference. When would you be back?

MR. MALLOW: Maybe I'm skipping a month here. If we have -- your Honor's contemplating a hearing on the MTD in June?

THE COURT: Well, I counted it up. One, two, three, four, five. No, May.

MR. FAZIO: May, right.

THE COURT: May 22 I think was the 35 days.

MR. MALLOW: For the motion to dismiss?

THE COURT: Yes. We're only talking about -- this is long before your trip.

MR. MALLOW: Yes, for sure.

THE COURT: All right. And then we're just trying to pick a date, and Ms. Geiger reminded me that you have a case management conference that would probably land somewhere in the middle of the briefing on what's probably going to be a motion to dismiss and --

MR. MALLOW: Could we do the conference in June?

THE COURT: Well, I wanted to leave enough time just to --

MR. MALLOW: To rule --

THE COURT: -- not have to move it again, just in case. For example, what if I took it under submission and gave you a long order, or however I was going to do it, I just wanted to leave enough time -- I don't want to get in the same position I got in this time, where there were issues, frankly, that I would have liked to have had a better idea about. And partly it's because they weren't raised, but then they were -- partly also maybe they were, and I just want to make sure that I don't be -- other than just fully comfortable with whatever's going on.

So how about the 17th of July with a statement by the 10th? Or if you're not back by then, the 24th by a -- and a statement by the 17th.

MR. MALLOW: The 24th for sure I have no problems with, your Honor.

THE COURT: All right.

How about you, Mr. Fazio?

MR. FAZIO: I -- that's fine, your Honor.

THE COURT: No trips, long class action --

MR. FAZIO: Nope. I have two on the East Coast, but I don't they're going to get in the way of this.

THE COURT: Okay. All right. If you run into a problem it's far enough off, just get in touch with opposing counsel, either side.

MR. FAZIO: Will do. Yes.

THE COURT: Come up with another date. Give me a stipulation to move it. These are not, you know, coming down with like the 10 Commandments or something. All right.

So -- so, then the case management conference is continued to July 24, with a statement due by the 17th.

Now, in the nature of complaints that get filed in these cases, this is far and beyond what I usually see, Mr. Fazio, in terms of being better, all right. It's a lot better, but there's still the concern about connecting some of the dots.

And I'm -- I'm thinking you will probably do it, and I know you don't want to have to do it, but once the, you know, stuff with that position and just, you know, give it your best shot --

MR. FAZIO: That's my only concern, your Honor. And the only thing that would affect the timing is the

concern you expressed about Mr. Becker's specific issue. And if we need to move to get others in to clarify what the complaint really is, you know, in other words, to demonstrate through the people who actually experienced them, that might put a crimp in the schedule in the sense that there are going to be two pending at the same time, two motions.

THE COURT: No. No. I -- let me see if I can clarify that a little bit, just to indicate what my concern -- first, either from -- or active acuity or otherwise, I did not understand what his problem was, all right. If I had some idea that it was drifting because he wasn't stepping on the accelerator at the time that the court -- that the car was not in gear, essentially. All right. Or it's in gear, but it still has some amount of drift that's okay.

Whatever the story is, it wasn't clear that this car really is not operating the way it's supposed to, as opposed to operating the way it's not supposed to. And that's something that may not be able, as you point out, to be actually decided one way or the other on a motion to dismiss. This may be something that you say this is what the car is doing and it should not do that. And then the Defendant really can't come back on a motion to dismiss and start putting in evidence. All right. So that would be

something that would likely come up later.

But what -- the way I understood you to be describing the problem -- and I didn't see the video, okay, and I'm still not sure, because we're dealing with how he's saying in the video. We can't really be there in the car with him. But we did -- you know, he did give it his best shot in that car and --

MR. FAZIO: We believe that the powertrain defect as we've described it in the complaint, manifests in different ways. And I think the easiest way -- if your Honor is saying, well, this person's -- Mr. Becker, his car is not defective by the way I look at it. Then, okay, we will bring somebody in --

THE COURT: Well, no. That would just be another Becker, all right.

MR. FAZIO: No, it would not.

THE COURT: No, no. If they have a different problem, then they also (indiscernible).

MR. FAZIO: We think it's the same, but --

THE COURT: Okay. All I'm saying is that he says he had a problem on a hill. I described -- you know, I understood it to be different than you are saying. And if you just make that a little clearer --

MR. FAZIO: Right.

THE COURT: -- in the pleading, that would be

helpful.

In the sense of whether others have had his same problem, apparently they haven't. They have had reactions of a different sort on non-inclines, all right. And that sounds like a -- bigger problem, frankly, because he didn't say that, you know, he's driving to the grocery store, and the next thing he's inside Safeway in his car. He's not saying that.

MR. FAZIO: Right. And that may be the issue, right? I mean --

THE COURT: Okay.

MR. FAZIO: -- it's easier to do that when you have somebody who can say, that happened to me.

THE COURT: Well, then that may be them, and he has no case.

MR. FAZIO: No --

THE COURT: All right. So, I just want -- I'm saying, if you want to use Becker -- you know, putting more people on the case that have a different problem than Becker may not be --

MR. FAZIO: No. We would not --

THE COURT: -- the way to go. Now, I don't know how you obtained the knowledge, maybe it just from symptoms, where you are pleading that there is some particular problem in the drivetrain that causes a multiplicity of aberrant

reactions.

Now you don't have to plead that. A person bringing a case under Song-Beverly can -- can plead symptoms and not know exactly what it's coming from.

MR. FAZIO: This isn't -- we have experts who are --

THE COURT: Great.

MR. FAZIO: fairly well --

THE COURT: Okay. Good. But, you know, nothing you can say -- well, when the Ford Pintos used to blow up when people rear-ended them and they like exploded and whatever, if you had a Ford Pinto and Ford wouldn't take the car back, you didn't have to show you blew up in the car. You could simply plead that there is a known problem with the car that in all likelihood would result in the car exploding into flames if you were tacked in a low, you know, low-speed accident.

MR. FAZIO: Yeah.

THE COURT: So, there are different ways. I understand that and I'm sure you do. I'm just saying -- I'm not saying you have to do it one way or the other.

MR. FAZIO: I understand.

THE COURT: But if you've got experts that you use routinely, and they've looked at the powertrain or can describe or know by reason of certain symptomology that you

could actually say, we've got an expert that says, if it does this and this, this means. Whatever you want to do.

Because right now what you've got is people with a lot of different problems, and Volvo says, look, we solved the, you know, didn't-go problem. And you say, well, okay, we don't have a don't-go problem, we have a go problem when we don't want to go. All right.

And then maybe there are a lot of people that have that problem, just bringing in a couple more exemplars won't do it, and so you really want to tie whatever the -- the other symptoms are to a more generic problem that you can say, this is what's causing all of this. Or that other people have hilly driveways and are having his same problem, and this is not normal. That isn't how the car was marketed or whatever. Okay.

And even acknowledging, as the Defendant essentially did in their 12(b)(6) motion, they didn't bring, hey, this is how the cars all work. This guy just doesn't know to drive. Okay. Didn't say that. So, if -- and I was prepared to say, just acknowledge, okay, it's not supposed to do whatever he says it's doing. It's not he's a bad driver. And that you still have to show that the knowledge of the problem got up to whatever Volvo entities you want to sue and --

MR. FAZIO: Yeah. I just wanted a -- I mean,

we're not ready to disclose experts, but this is not a seat-of-the-pants kind of -- you know, the lawyer thinks this so he's (audio glitch) --

THE COURT: No. It -- the clearer --

MR. FAZIO: That doesn't -- that's not all we have for --

THE COURT: -- the clearer you make it -- and that's why I say, this is like a -- this pleading is way better than what usually is said. It's obvious that you went to a lot of care in putting it together, and it wasn't your first effort, you know. But I think there are a few places where there's a problem.

MR. FAZIO: I understand.

THE COURT: All right. And -- and I'm -- from what I'm glad to hear, because on your behalf, maybe not theirs, but if you've actually got something to say, then say it. Maybe for -- we can hope (indiscernible). They may not be able to say anything in response. I don't know.

And then we have the AB issue, you know, the jurisdictional issue. And it sounds like you really, really want them, so, okay, just nail them down then. All right.

MR. FAZIO: Yes.

THE COURT: And I think that's all we can do right now. So, I'm just going to a short order that reflects the bottom line here. You know what's going on.

And if I was a little short with people, I'm sorry, but I'm kind of frustrated about how I'm just looking at this case. So, thank you.

MR. FAZIO: Thank you.

THE COURT: I hope you have a nice weekend.

MR. FAZIO: You, too. Is there a transcript that will be created out of the --

THE COURT: You'd have to order it I guess.

MR. FAZIO: Yeah. No, I mean because we're on video and all. Is there someone to contact? I'll do it. Thank you.

THE COURT: Oh, for how that's --

MR. FAZIO: Yeah.

THE COURT: -- made part of the record, the video?

THE CLERK: (Indiscernible).

MR. FAZIO: Okay.

THE COURT: Well, his voice you're saying. They actually get the video into the --

MR. MALLOW: Yeah. We're on the camera.

MR. FAZIO: Yeah. And then they'll transcribe it for me.

THE COURT: Fine. Yeah. Okay, fine.

MR. FAZIO: Thank you, your Honor.

THE COURT: All right. Thank you, everybody.

MR. MALLOW: Thank you, your Honor. Have a good

weekend.

THE COURT: You, too. Thank you. Okay.

(Proceedings adjourned at 10:41 a.m.)

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.



Echo Reporting, Inc., Transcriber

Thursday, March 19, 2026